UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**
JUL 2 8 2014
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

SONG fi, Inc., a District of
Columbia Corporation
1250 Connecticut Avenue NW
Suite 200
Washington D.C. 20036

    Plaintiff

v.

GOOGLE, INC., a California
corporation
1600 Amphitheatre Parkway
Mountain View, CA 94043

and

YOUTUBE, LLC, a California
Limited Liability Company
901 Cherry Ave.
San Bruno, CA 94066

    Defendants

Case: 1:14-cv-01283
Assigned To : Collyer, Rosemary M.
Assign. Date : 7/28/2014
Description: TRO/PI

**COMPLAINT FOR BREACH OF EXPRESS CONTRACT,
LIBEL AND TORTIOUS INTERFERENCE**

## Parties

1. Plaintiff Song fi, Inc. ("Song fi") is a District of Columbia ("D.C." or "District") corporation with its principal place of business at 1250 Connecticut Avenue NW, Suite 200, Washington DC 20036. Song fi is in the business of owning and distributing works of music and videos by independent musicians and filmmakers.

2. Defendant Google, Inc. ("Google") is a California corporation with its principal place of business in Mountain View, California. Defendant Google maintains an office at 1101 New York Avenue N.W., Suite 200, Washington D.C. 20005-2495. Defendant Google also hires multiple lobbyists in Washington D.C. in an attempt to influence decisions to Google's benefit in Congress and executive and independent agencies. Google's stated primary mission is the organization of information to make it accessible and usable to the public.

3. Defendant YouTube, LLC ("YouTube") is a California limited liability company with its principal place of business in Bruno, California. YouTube is wholly owned by Google and operates as a division of Google. YouTube operates an internet website (*www.youtube.com*) where videos can be uploaded and broadcast to the public.

## Jurisdiction and Venue

4. This Court has subject-matter jurisdiction in this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.

5. This Court has *in personam* jurisdiction over Defendant Google pursuant to the D.C. Code § 13-334(a), since Google has an office and regularly transacts business in the District and also hires lobbying agents to represent it in the District. Since YouTube is *de facto*

2

an operating division of Google rather than a subsidiary of it, this Court also has *in personam* jurisdiction over Defendant YouTube pursuant to DC Code § 13-334(a) for the same reasons that it has *in personam* jurisdiction over Defendant Google. This Court also has *in personam* jurisdiction over Defendants Google and YouTube pursuant to D.C. Code § 13-423(a)(1), (2), and (4) since this action arises out of Google and YouTube's transaction of business in the District, Google and YouTube's contract to supply services in the District, and Google and YouTube's causing of tortious injury in the District.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2).

**Factual Background**

7. YouTube is 100% owned by Google. Despite the fact that it is legally a limited liability company in California, it is a limited liability company in name only. Its chief executive officer is appointed by Google and reports directly to Google's chief executive officer. Upon information and belief, all of YouTube's planning and operations are actively and continuously controlled by Google. Google and YouTube thus are a single business entity and together will be referred to hereafter as "G-Y." G-Y operates websites for both Google and YouTube (*www.google.com* and *www.youtube.com*, respectively), and these websites will be known hereafter as "the Google website" and "the YouTube website."

8. The YouTube website is a highly popular site on the internet where individuals and entities are invited to upload videos, text, photos, music and other sounds, and other materials ("Content") for free viewing by the general public. No other video-sharing website approaches YouTube's in its recognition and use by the public worldwide. For producers and publishers of music videos seeking to obtain the widest possible audience for their videos, the use of the YouTube website is an economic and competitive necessity.

3

9. G-Y allows Content to be uploaded and viewed on the YouTube website by the public subject to specified Terms of Service ("Terms") and Community Guidelines ("Guidelines") stated on or linked to the YouTube site. Both uploaders and viewers must agree to the Terms and Guidelines as a condition of using the YouTube website, and thus a contract is created with G-Y whenever an uploader or viewer uses the site. Those Terms are heavily weighted in G-Y's favor, and members of the public have no ability to negotiate them.

10. G-Y describes its YouTube website in public-interest terms as providing "a forum for people to connect, inform, and inspire others across the globe and ... as a distribution platform for original content creators and advertisers large and small." G-Y uses the Content uploaded onto its website as the magnet to draw millions of viewers daily. That traffic, in turn, enables G-Y to earn billions of dollars annually from advertisers whose messages G-Y shows prior to, or juxtaposes next to, the Content being viewed on the YouTube website. Content uploaded through the YouTube site is also distributed through Google's e-mail service and other e-mail services using YouTube's video embedding technology. Therefore, when an uploader posts Content on YouTube, he or she is also able to utilize many of Google's other assets, distribution channels, and search engine capabilities. Far from being a public-interest site, G-Y is one of the most successful commercial ventures operating in the world today. There is no other Content-loading and -viewing website operating anywhere in the world that remotely rivals the YouTube site, especially with its associated assets from Google.

11. For each item of Content that is available on the YouTube website, G-Y shows next to it the number of times it has been viewed by the public. This "view count" has a direct relationship to the amount of the revenue that G-Y can extract from advertisers for placing the advertiser's message in the video or on the page. The higher the view count, the

4

more advertising revenue G-Y receives under a "pay for click" program it has created for generating fees. The view count is thus a critical part of G-Y's revenue-producing structure. The view count is also a gauge of how popular a particular artist is, as well as how popular You Tube is around the world.

12. G-Y is highly secretive about what constitutes a "view" in the view count. For each video or other item of Content that is uploaded on the YouTube site, only G-Y and the individual or entity that uploaded the video can see the analytics tracking the views for that Content. G-Y never discusses the view count generally or how views are counted in its public statements. G-Y does not explain how long Content must be viewed before a "view" is recorded. G-Y does not explain whether adjustments are made to view counts and, if so, how and when this is done and by what criteria. G-Y does not explain by what physical or electronic means the counts are kept and how susceptible to error those means are. In short, G-Y does nothing to make its view count system transparent and trustworthy to the public and advertisers. G-Y also makes no attempt to reduce its total discretion, control, and ability to manipulate and monetize view counts on the You Tube website.

13. The public generally, and more particularly advertisers, have no choice but to accept G-Y's counts as accurate. The trust that Google demands from the public in this regard is also inherent in the pay-for-click advertising model that Google uses when selling advertising on both the YouTube and Google sites. In this regard, there is no real difference between the You Tube view count and the Google pay-for-click advertising scheme. No one except G-Y knows if either mechanism is accurate, but G-Y makes billions on both without transparency.

14. G-Y forbids uploaders to employ any kind of electronic "robots," "spiders," or other mechanisms to increase view counts at a rate exceeding that which would

result from human viewer "hits" using a web browser. At the same time that it is forbidding uploaders on the YouTube site from using the prohibited mechanisms, G-Y is receiving revenues from advertisements on the Google website for services that use precisely the same robotic means to enhance the view counts on the You Tube website. In practice there is no way to track who is responsible for any robotic view count enhancement should it take place.

15. On information and belief, G-Y engages in willful blindness by allowing one or more of the major record companies and their agents to engage in the very automated view count enhancements that are prohibited on the YouTube site. The view counts for certain videos of these record companies are, on information and belief, artificially increased into the millions and billions through such prohibited means. The result is that view counts for many videos of major labels are far beyond any counts that human viewing could reasonably produce.

16. Currently on the YouTube website, for instance, a video by "Psy," a South Korean entertainer, has almost two billion views. Another is by a Canadian entertainer, Justin Bieber, which has more than one billion views. To get human view counts to those levels, some type of automated enhancement is necessary. When this robotic enhancement happens, the record companies benefit because their artist videos appear to be more popular than they actually are. At the same time, G-Y benefits by appearing to have more visitors than it does, but most importantly to G-Y is being able to charge greater amounts for money for fraudulent view counts.

17. While G-Y allows many major record companies to manipulate the YouTube view count, G-Y removes from the YouTube website certain videos that have been posted by independent artists not signed by a major record label. From time to time, G-Y takes down the videos of smaller independent artists that may or may not have employed robotic view

6

enhancement to prevent the view counts of lesser artists from rising to the levels of major artists who are employing automated enhancement. If all artists could achieve astronomical view counts by robotic enhancement, the public - and in particular the advertisers on G-Y websites - would realize that the entire G-Y view count and pay for click advertising scheme is a fraud.

18. On February 14, 2014, Song fi posted a video on the YouTube website entitled "LuvYa LuvYa LuvYa" (hereafter,"LuvYa"). Over the next eight weeks, "LuvYa" gathered over 23,000 views worldwide. During that time, no director, officer, employee or agent of Song fi employed any of the mechanical means prohibited by G-Y in order to artificially increase the view count for the "LuvYa" video, nor did Song fi authorize or have knowledge of any other individual or entity doing so.

19. As the view count for "LuvYa" rose above 23,000, the presence of that count, the likes, and positive comments from the public, became essential to the credibility of Song fi in seeking sponsorships from companies. The Stevie Marco viewing channel on YouTube, which is owned by Plaintiff Song fi and on which "LuvYa" was posted, also became a major asset of Song fi.

20. On April 18, 2014, without any prior notice to Song fi, YouTube took down the "LuvYa" video and left in its place a message that stated the following: "This video has been removed <u>because its Content violated YouTube's Terms of Service</u>" (emphasis added). Those Terms of Service incorporate by reference G-Y's Community Guidelines, and these Guidelines list content violations as including pornographic material, animal abuse, drug abuse, under-age drinking and smoking, and bomb making. "LuvYa," however, was a video about two six-year-olds with a mutual crush who go to lunch together on Valentine's Day. There was

7

nothing in the content of the "LuvYa" video and musical score that remotely violated the Terms of Service or Community Guidelines stated on the YouTube website.

    21. After G-Y took down Luv Ya, G-Y's false and defamatory notice about the content of "LuvYa" still appeared on hundreds of social network sites and e-mail chains that shared the original Luv Ya video worldwide." Whenever this original shared link is viewed, G-Y's false and defamatory takedown notice has been seen and will continue to be seen.

    22. On April 22, 2014, Song fi sent an on-line protest to YouTube regarding its removal of the "LuvYa" video from the YouTube website and the false and defamatory takedown notice. G-Y responded by sending a confidential form e-mail asserting that "LuvYa" had been removed because Song fi or its agents had attempted to manipulate the view count in violation of the Terms of Service stated on the YouTube site. In those Terms, #4 Section H states in pertinent part as follows:

> You agree not to use or launch any automated system, including without limitation, "robots," "spiders," or "offline readers," that accesses the Service in a manner that sends more request messages to the YouTube servers in a given period of time than a human can reasonably produce in the same period by using a conventional on-line web server.

    23. This confidential e-mail explanation of why the "LuvYa" video had been taken down had nothing to do with the "Content" violation that G-Y was simultaneously asserting to the public about "LuvYa." This difference, upon information and belief, was not by accident. It was, rather, part of G-Y's continuing efforts to avoid any public inquiries about its enhanced view counts and, in particular, any suspicions that advertisers might have about the high view counts they pay for.

24.     Song fi completed and returned the G-Y appeal form. In doing so, Song fi stated that no one connected with Song fi had ever attempted, nor had any agent of Song fi ever attempted, in any way to artificially inflate the number of views of "LuvYa" on YouTube. More generally, Song fi added that it was in full compliance with YouTube's Terms of Service in connection with "LuvYa."

25.     Later on April 22, 2014, G-Y replied by saying that it had reviewed Song fi's "appeal" and had "concluded that the decision to remove [sic] your video(s) was justified." G-Y said nothing about the false and defamatory "content" notice that was still showing when the public clicked on the original shared "LuvYa link." Instead, G-Y again asserted an alleged enhancement of the view count by automated means. G-Y stated that such violations "are not ok" and that it was important for Song fi to be careful in hiring any agents who might engage in such violations on behalf of the company. G-Y said that it had re-uploaded "LuvYa" to the Stevie Marco YouTube channel under a new link. That new link, however, did not include the 23,000 views, likes and comments that had appeared earlier about "LuvYa." The new link, furthermore, did nothing to correct its false and defamatory "Content" statement on the original link to "LuvYa" that had been distributed through hundreds of social media sites and personal e-mail chains worldwide.

26.     Nowhere in its April 22, 2014 e-mail to Song fi did G-Y discuss the factual basis that led to its takedown of "LuvYa." More specifically, G-Y did not discuss any evidence that the alleged violation of #4 Section H had occurred, over what period of time the alleged violation had occurred, or what led YouTube to believe that it was Song fi or one of its agents that had engaged in such a violation of YouTube's Terms of Service.

9

27. Approximately 44 minutes later on April 22, 2014, Song fi replied that litigation would ensue since Song fi had done nothing wrong in connection with "LuvYa" and G-Y had not shown anything to the contrary.

28. On May 12, 2014, Song fi's legal counsel communicated by letter to G-Y's chief legal officer on behalf of Song fi and one of its artists, Stevie Marco ("Marco"). In that letter, Song fi's counsel protested G-Y's action in taking down the "LuvYa" video. Song fi's counsel noted that G-Y's "prohibited content" message had left a false and defamatory impression that the video had contained indecent material. Song fi's counsel also noted that the removal of "LuvYa" was interfering with Song fi's prospective economic relationships.

29. G-Y never responded to the letter from Song fi's counsel.

30. Instead, on June 26, 2014, G-Y sent another e-mail to Song fi stating that ". . .we will not be reinstating your video."

31. Later on June 26, 2014, Song fi reiterated to G-Y in a return e-mail its intention to sue for the takedown of "LuvYa" and the false and defamatory notice that subsequently appeared on the "Luv Ya" video link.

32. G-Y's s takedown of the original "LuvYa" video and link, and the associated comments, likes, and view count from the YouTube website caused serious harm to Song fi's business activities. Song fi had featured "LuvYa," its comments, likes, and view count, and the Stevie Marco Channel on the YouTube site in negotiations with existing and potential funders, business partners, and the public generally. All of these efforts were substantially and negatively impacted when G-Y took down "LuvYa" from the YouTube website and the resulting false and defamatory notice.

33. Song fi had also featured "LuvYa" in attempting to secure the sponsorship by Nike, an international footwear company, of a July 4, 2014 performance of the "Star Spangled Banner" on the roof of the company's store in Washington D.C. Nike had given its preliminary approval for the event, and a permit for the performance had been obtained from D.C. authorities. Song fi had spent a substantial amount of money in preparation for the event. During its due diligence review of Song fi and its artist Stevie Marco, however, Nike learned of G-Y's takedown notice of "LuvYa" because of its alleged content violation. Uncertain what that notice meant but not wanting to risk a possible image problem in associating with Song fi, Nike cancelled the "Star Spangled Banner" event.

34. Of even greater importance, G-Y's removal of "LuvYa" on grounds that it contained prohibited Content caused Song fi's principal funder to suspend its financial support of the company. That suspension remains in effect today.

## FIRST CLAIM FOR RELIEF
### (Breach of Express Contract)

35. Plaintiff incorporates and re-alleges paragraphs 1 through 34 as fully set forth herein.

36. Song fi and G-Y entered into an express contract when Song fi uploaded the "LuvYa" video on the YouTube website. Pursuant to that contract, G-Y agreed to Song fi's uploading of "LuvYa" onto that site so long as Song fi did not violate the site's Terms of Service. That contract contained an implied warranty of fair dealing between G-Y as the owner and operator of the YouTube website and Song fi.

37. G-Y breached this contract and its implied warranty of fair dealing when G-Y removed "LuvYa" from the YouTube site without cause. G-Y's assertion that Song fi violated G-Y's Terms of Service in connection with "LuvYa" is unsubstantiated and false.

38. YouTube's breach of its contract with Song fi has caused Song fi damages in an amount exceeding $75,000 that will be proved at trial.

## SECOND CLAIM FOR RELIEF
### (Libel)

39. Plaintiff incorporates and re-alleges paragraphs 1 through 38 as if fully set forth herein.

40. After removing Song fi's "LuvYa" video from the YouTube website, G-Y posted in its place a false and defamatory message stating that "[t]his video has been removed because its content violated YouTube's Terms of Service."

41. G-Y knew this message was false because, according to its own e-mail to Song fi, "LuvYa" had been removed for reasons that had nothing to do with its content.

42. That message was also defamatory because it gave the impression to the average viewer that Song fi's content in the video had been pornographic or otherwise beyond the bounds of decency when in fact it was a beautiful Valentine's Day children's music video.

43. After Song fi called G-Y's attention to the false and defamatory message about "LuvYa," G-Y intentionally and maliciously continued to cause that message to be posted and viewed by the public with blatant disregard for the reputations of Song fi and its artist Stevie Marco and the Rasta Rock Opera.

44. G-Y's actions have damaged Song fi's reputation among its business partners, sponsors, investors, and acquaintances and destroyed its ability to fund its development.

Furthermore, the main financial backer of Song fi, having seen G-Y's content take-down notice and noted Nike's withdrawal from the "Star Spangled Banner" event, has withdrawn its further funding of Song fi.

45. G-Y's defamation of Song fi in this way has caused Song fi damages in an amount exceeding $75,000 that will be proved at trial.

### THIRD CLAIM FOR RELIEF
#### (Tortious Interference with Business Relationships)

46. Plaintiff incorporates and re-alleges paragraphs 1 through 45 as if fully set forth herein.

47. Song fi's counsel notified G-Y on May 12, 2014 that its action in removing the "LuvYa" video and leaving instead a message that the video had been removed because of its content was interfering with Song fi's business relationships.

48. Following its receipt of the letter from Song fi's counsel, G-Y was on notice of such interference with the business relationships of Song fi and the damage that G-Y's actions were having on those relationships, but G-Y refused to remove its false and defamatory message and reinstate Song fi's "LuvYa" video or even respond in any manner to the letter of Song fi counsel.

49. G-Y's interference with the business relationships of Song fi was thus intentional and has punitively damaged Song fi in an amount exceeding $75,000 that will be proved at trial.

## PUNITIVE DAMAGES

50. Counsel for Song fi informed G-Y on May 12, 2014 that its assertion of a content violation in connection with Song fi's "LuvYa" video was false and defamatory and was tortiously interfering with Song fi's prospective business relations with third parties.

51. Having been put on notice in this regard, G-Y has continued to post for public viewing its false and defamatory assertion about the content of Song fi's video.

52. G-Y's continuation of its false and defamatory statement and its steadfast position not to remove it have constituted intentional, willful and malicious action that has caused very considerable additional harm to Song fi's business.

53. G-Y's intentional, willful malicious and continuing refusal to remove its false and defamatory message that Song fi's video contains objectionable content entitles Plaintiff to punitive damages against G-Y under Counts II and III above.

## PRAYER FOR RELIEF

**WHEREFORE,** with respect to its claims for relief, Song fi respectfully requests the entry of judgment against Defendants as follows:

1. An order enjoining G-Y to reinstate and let remain Song fi's "LuvYa" video, together with its approximately 23,000 view count, likes, and comments at the same Uniform Resource Locator (link) address that "LuvYa" had on the YouTube website before G-Y's wrongful actions took place;

2. An award of damages against G-Y for breach of contract;

3. An award of damages against G-Y for libel;

        4.        An award of damages against G-Y for tortious interference with Song fi's prospective business relationships;

        5.        An award of punitive damages to be determined by a jury based on G-Y's intentional, willful, and malicious action in removing the video "LuvYa" from its website and posting a defamatory statement about its content that Defendants knew was false, together with G-Y's allowing that statement to remain viewable by the public continuously to the present after G-Y was informed of its false and defamatory nature; and

        6.        An award of Song fi's costs and reasonable attorneys' fees; and

        7.        Such other relief as the Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiffs demand trial by jury in this case on all issues so triable.

Respectfully submitted,

*[signature]* ✓

Ronald F. Wick
COZEN O'CONNOR
D.C. Bar 439737
1627 I Street N.W., Suite 1100
Washington D.C. 20006
Telephone: (202) 912 4800
Facsimile: (202) 640-5526
E-mail: *RWick@cozen.com*

*[signature]* ✓

Edward W. Lyle
LAW OFFICE OF EDWARD W. LYLE
D.C. Bar 025700
1250 Connecticut Avenue N.W., Suite 200
Washington DC 20036-2603
Telephone: (202) 333-4280
Facsimile: (202) 333-4282
E-mail: *ewlyle@west1805.com*

*Attorneys for the Plaintiff*
   *Song fi, Inc.*

July 25, 2014