UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SONG FI, INC.., a District of
  Columbia Corporation
1250 Connecticut Avenue NW
Suite 200
Washington D.C. 20036

   and

RASTA ROCK, INC., a District of
  Columbia Corporation
d/b/a "The Rasta Rock Opera",
1250 Connecticut Avenue NW
Suite 200
Washington DC 20036

   and

JOSEPH N. BROTHERTON,
Individually
3615 Austin Street SE
Washington DC 20020

   and

                                  Case No. 1:14-cv-01283-RMC

JOSEPH N. BROTHERTON and
LISA M. PELLEGRINO
as Father and Mother of
N.G.B.,
Minor child
3615 Austin Street SE
Washington DC 20020,

    Plaintiffs

  v.

GOOGLE, INC., a California
  Corporation
1600 Amphitheatre Parkway
Mountain View, CA 94043

**and**

**YOUTUBE, LLC, a California**
   **Limited Liability Company**
**901 Cherry Ave.**
**San Bruno, CA 94066,**

   **Defendants**

## FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEEDURES ACT, BREACH OF EXPRESS CONTRACT, BREACH OF IMPLIED-IN-FACT CONTRACT, LIBEL, AND TORTIOUS INTERFERENCE

### Parties

1.    Plaintiff Song fi, Inc. ("Song fi") is a District of Columbia ("D.C." or "District") corporation with its principal place of business at 1250 Connecticut Avenue NW, Suite 200, Washington DC 20036.   Song fi is in the business of owning and distributing works of music and videos by independent musicians and filmmakers.

2.    Plaintiff Rasta Rock, Inc. ("Rasta Rock"), d/b/a Rasta Rock Opera, is a District of Columbia ("D.C. or "District") corporation with its principal place of business at 1250 Connecticut Avenue NW, Suite 200, Washington DC 20036.  Rasta Rock does business in the District and in other jurisdictions as "The Rasta Rock Opera" music and film group.  The musicians and actors of the Rasta Rock Opera performed in a video entitled "Luv Ya Luv Ya Luv Ya" ("Luv Ya")," which is discussed below in this Complaint.

3.      Plaintiff Joseph N. Brotherton ("Joseph") is an individual and District resident and a consumer of entertainment, information and other on-line services ("Services") for personal use in connection with the You Tube website.  Joseph is also is an actor and performer in the ":Luv Ya" video discussed below in this Complaint.

4.      Plaintiff N.G.B, a 6 year old minor, is a District resident and the son of Joseph N. Brotherton and Lisa M. Pellegrino.  With parental supervision, N.G.B. is also a consumer of Services for personal use in connection with the YouTube website.  N.G.B. was also a star performer in the "Luv Ya" video discussed below in this Complaint.

5.      Song fi, Rasta Rock, Joseph, and N.G.B. are hereinafter collectively referred to as "Plaintiffs."

6.      Defendant Google, Inc. ("Google") is a California corporation with its principal place of business in Mountain View, California.  Defendant Google maintains an office at 1101 New York Avenue N.W., Suite 200, Washington D.C. 20005-2495.

7.      Defendant YouTube, LLC ("YouTube") is a California limited liability company with its principal place of business in Bruno, California.  YouTube is wholly owned by Google and operates as a division of Google.  Google-YouTube ("G-Y") operates an internet website (*www.youtube.com*) where videos can be uploaded and viewed by consumers of entertainment services worldwide.

8.      Google and You Tube are hereinafter collectively referred to as "Defendants."

## Jurisdiction and Venue

3

9.      This Court has subject-matter jurisdiction in this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.

10.      This Court has *in personam* jurisdiction over Defendant Google pursuant to D.C. Code § 13-334(a), since Google has an office in the District and regularly transacts business in the District.  This Court also has *in personam* jurisdiction over Defendant Google pursuant to D.C. Code §§ 13-423(a)(1), (2), and (4) since this action arises out of Google's transaction of business in the District, Google's continuously entering into contracts to supply services in the District, and Google's causing of tortious injury in the District whose effects are felt directly by District residents, among others.  Google is further subject to *in personam* jurisdiction because it provides consumer Services to District residents within the meaning of the D.C. Consumer Protection Act. *Id.* §§ 28-3901 *et seq.*

11.      Since YouTube is *de facto* an operating division of Google rather than a subsidiary of it, this Court also has *in personam* jurisdiction over Defendant YouTube under the same legal authorities and for the same reasons that it has *in personam* jurisdiction over Defendant Google, as recited above.  In addition, this Court also has *in personam* jurisdiction over Defendant YouTube pursuant to D.C. Code §§ 13-423(a)(2) and (4) since this action arises out of YouTube's continuously entering into contracts to supply services in the District, and YouTube's causing of tortious injury in the District whose effects are felt directly by District residents, among others.

12.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2). In addition, the D.C. Consumer Protection Act mandates venue exclusively in courts of

competent jurisdiction in the District for disputes arising under that statute.  D.C. Code § 28-3905(i)(3)(B).

## Factual Background

13.     YouTube is 100% owned by Google.  Despite the fact that it is legally a limited liability company in California, it is a limited liability company in name only.  Its chief executive officer is appointed by Google and reports directly to Google's chief executive officer.  Upon information and belief, all of YouTube's planning and operations are actively controlled by Google.  Google and YouTube thus are a single business entity and together will be referred to as "G-Y."  G-Y operates websites for both Google and YouTube (*www.google.com* and *www.youtube.com*, respectively), and these websites will be known hereafter as "the Google website" and "the YouTube website."

14.     The YouTube website is a highly popular site where consumers are invited to upload and view videos, text, photos, music and other sounds ("Content") for sharing and free viewing.

15.     Content is uploaded subject to specified Terms of Service ("Terms") and Community Guidelines ("Guidelines") found on the YouTube site.  Consumers must agree to the Terms and Guidelines as a condition of using the YouTube website.  Therefore, millions of contracts have been and will continue to be created between G-Y and consumers of their Services worldwide.

16.     G-Y describes the YouTube website as providing "a forum for people to connect, inform, and inspire others across the globe . . . ."  The "people" referenced in G-Y's statement include consumers of the District of Columbia, including Plaintiffs, who regularly view and/or upload videos on YouTube.

17.     The D.C. Consumer Protection Procedures Act ("CPPA") regulates the furnishing of consumer goods and services in the District.  Consumer goods and services are defined as anything that "[a] person does or would . . . receive and normally use for personal, household, or family purposes...."  D.C. Code, § 28-3901(a)(2)(B).  A "consumer" is any "person" who, among other things, receives consumer goods or services.  *Id.* § 3901(a)(2)(A).  A "person" is defined as an" individual, firm, corporation, partnership, cooperative, association, or any other organization, legal entity, or group of individuals however organized."  *Id.* § 28-3901(a)(2)(A).  A "trade practice" is any act that, among other things, makes available, provides information about, or effectuates a transfer of goods or services.  *Id.* § 28-3901(a)(6).

18.     The CPPA declares it to be an "unlawful trade practice" and violation of law for any individual or entity to "misrepresent as to a material fact which has a tendency to mislead."  *Id.* § 28-3904(e). Another unlawful trade practice and violation of law is for any individual or entity to "fail to state a material fact if such failure tends to mislead."  *Id.* § 28-3904(f).  A third unlawful trade practice and violation is for any individual or entity to use innuendo or ambiguity as to a material fact, which has a tendency to mislead.  *Id.* § 28-3904(f-1).  A fourth  unlawful trade practice and violation is for any individual or entity to to "disparage the goods, services or business of another by false or misleading representations of material facts."  *Id.* § 28-3904(g).

19.     The CPPA authorizes any consumer to ". . . bring an action seeking relief from the use of a trade practice in violation of a law of the District."  *Id.* 28-3905(k)(1)(A). The CPPA also authorizes any individual, on behalf of both himself and the general public, to bring an action seeking relief from the use of a trade practice that violates D.C. law "when that trade practice involves consumer goods or services that the individual purchased or received in order

to test or evaluate qualities pertaining to use for personal, household, or family purposes." *Id.* § 28-3905(k)(1)(B). Any such claim must be brought in the courts of the District   *Id.* § 28-3905(k)(2). Remedies for unlawful trade practices include treble damages, punitive damages, injunctions, and any other relief that the court considers proper. *Id.*

20.     All Plaintiffs in this action are consumers of the Services provided by the YouTube website.

21.     G-Y uses Content submitted by consumers, for which it pays nothing, as the magnet to draw in millions of additional consumers interested in viewing original Content. That traffic enables G-Y to earn billions of dollars annually from advertisers whose ads G-Y places next to or within the Content uploaded by consumers. The Content submitted by consumers is also distributed through Google's internet assets, including G-mail and other e-mail services using You Tube's video embedding technology. There is no other Content-loading and -viewing website operating anywhere in the world that remotely rivals the YouTube site, especially with the assets and capabilities of Google behind it.

22.     For each item of Content that is available on the YouTube website, G-Y shows next to it the number of times it has been viewed by the public. This "view count" has a direct relationship to the amount of the revenue that G-Y can extract from advertisers. The higher the view count, the more advertising revenue G-Y takes down under a "pay for click" advertising scheme G-Y has created for generating fees. Thus the view count is a material part of G-Y's revenue-producing and billing scheme.

23.     G-Y is highly secretive about what constitutes a "view" in the count or what constitutes a "pay for click." The analytics behind these mechanisms are created, calculated, managed, and manipulated exclusively by G-Y with consumers and advertisers

having absolutely no control or input in the count. G-Y never discusses the count publicly or how views or pay-for-clicks are calculated. G-Y does not explain how long Content must be viewed before a "view" or "pay for click" is counted. G-Y does not explain whether adjustments are made to view counts and, if so, how and when this is done and by what criteria. G-Y does not explain by what physical or electronic means the counts are kept and how susceptible to error they are. In short, G-Y does nothing to make its view count and pay-for-click revenue-producing system transparent and trustworthy to consumers and advertisers. G-Y makes no attempt to reduce its control over and ability to manipulate and monetize such counts.

24.     The trust that YouTube demands from consumers and advertisers in connection with its view count and pay-for-click mechanisms is also reflected in the pay-for-click advertising scheme Google uses on its site.

25.     Through manipulation of the opaque, unregulated view count and the pay-for-click mechanisms and revenue producing system, G-Y is able to defraud advertisers through manipulated view counts and pay-for-click enhancement.

26.     In the Terms of Service on the YouTube website, G-Y forbids consumers to employ any kind of electronic "robots," "spiders," or other mechanisms to increase view counts at a rate faster than can be done by a human using a web browser. At the same time, G-Y knowingly and willingly receives revenues from advertisers on the Google website who offer to enhance the view count by the very same robotic means that G-Y prohibits in the Terms of Service on the YouTube website.

27.     In practice there is no way to determine who is responsible for any robotic view count enhancement should it take place. Anyone can simply copy the URL from a You-Tube video by clicking on the "share link" button and buy views from any of the third-party

advertisers on the Google website, whether or not the purchaser of the views is affiliated with the consumer who uploaded the Content.   Only G-Y makes the final determination of what the view count reads because G-Y has the sole duty, control, and responsibility for it.  Even if an outside party attempts to enhance the view count, the responsibility for the final count rests with G-Y and G-Y alone.  Further, section 4(H) of the YouTube Terms of Service identifies the uploader as "You," meaning the party bound by accepting the Terms of Service prior to uploading. Therefore, no other party who may have participated in robotic view count enhancement is legally bound by any aspect to the YouTube Terms of Service.  Outside the Terms of Service, however, G-Y assumes a further duty to advertisers who agree to pay G-Y by the view because G-Y collects money based upon its representation of each view counted.

   28. On information and belief, G-Y engages in willful blindness by allowing one or more of the major record companies ("Major Labels") and their agents to engage in enhancing the view counts of videos of their artists by using the same automated means that are prohibited in the YouTube Terms of Service.  The view counts for certain Major Labels are, on information and belief, artificially increased into the millions and billions as YouTube turns a blind eye.  The result is that view counts of many Major Labels and their artists are far beyond any counts that human viewing could possibly produce, while pay-for-click advertisers on the G-Y websites are therefore defrauded.

   29. Currently on the YouTube website, for instance, a video by "Psy," a South Korean entertainer, has almost two billion views.  A Canadian entertainer, Justin Bieber, has more than one billion views for his "Baby" video.  To reach view counts like these, some type of automated enhancement is required.  As this view count fraud takes place, the Major Labels

benefit because their videos and other works on YouTube appear to be more popular than they actually are. Meanwhile, G-Y is billing advertisers based on robotically enhanced view counts.

30.     While G-Y allows Major Labels to manipulate the view count, G-Y removes from YouTube certain videos that have been posted by artists not signed to Major Labels ("Independent Artists").   On information and belief, G-Y takes down certain videos of Independent Artists to prevent their view counts from rising to the levels of more established artists signed to Major Labels.   In effect, YouTube bullies small Independent Artists by taking takes down their videos wrongfully and then posting false and defamatory notices as to why the videos were taken down.

31.     On February 14, 2014, Song fi produced and uploaded  onto the YouTube website a Valentine's Day video titled "LuvYa LuvYa LuvYa" (hereafter,"LuvYa").  The video was billed as "featuring the Rasta Rock Opera." It also starred two children, one of whom was Plaintiff N.G.B., who go on a lunch date on Valentine's Day.  Young N.G.B. was very proud of having a video on YouTube, and he forwarded the link to many of his friends through the email of his parents.  His father, Plaintiff Joseph Brotherton, also appeared in the video.

32.     In  the eight weeks after "LuvYa" was uploaded, "LuvYa" gathered over 23,000 views worldwide.  During that time, no director, officer, employee or agent of Song fi or Rasta Rock Inc. employed any of the mechanical means prohibited by G-Y in order to artificially increase the view count for the "LuvYa" video, nor did Joseph or N.G.B. ever participate in or authorize anyone to robotically enhance the "LuvYa" view count.

33.     As the view count for "LuvYa" rose above 23,000, the presence of that count and the "likes" and positive comments from the public became essential to the credibility of Song fi and the Rasta Rock Opera in seeking sponsorships from companies.

34.     On April 18, 2014, without any prior notice to Song fi, YouTube took down the "LuvYa" video and left in its place a notice that stated the following: "This Video Has Been Removed Because its Content Violated YouTube's Terms of Service" . . . along with a sad face graphic that said "Sorry about that."

35.     The Terms of Service on the YouTube website incorporate G-Y's Community Guidelines, which list as content violations such things as pornography, sexually explicit content, child abuse, animal abuse, drug abuse, under-age drinking and smoking, and bomb making.  Also, paragraph 7b of the Terms of Service identifies  pornography and obscenity, among other things, as prohibited Content.  Any person viewing the false and defamatory notice would reasonably conclude that the Content of the LuvYa included one or more of these types of horrible Content.  "LuvYa," however, was a video about two six-year-olds with a mutual crush who go for a lunch together on Valentine's Day with parental oversight.  There was nothing in the Content of the "LuvYa" video or the musical score that remotely violated the Content prohibited by the Terms of Service of the YouTube website.

36.     G-Y's false and defamatory notice about the Content of "LuvYa" appeared on hundreds of social network sites and e-mail chains on which the LuvYa link had been shared.  The false and defamatory notice that replaced the LuvYa video was exclusively controlled by G-Y and was seen on those sites and e-mail chains every time anyone clicked on the original Luv ya link that G-Y had removed from its service.

37.     On April 22, 2014, Song fi and the Rasta Rock Opera sent an on-line protest to G-Y regarding its removal of the "LuvYa" video from the YouTube website.  G-Y responded by sending a confidential form e-mail asserting that "LuvYa" had been removed not because of its Content, but because the view count had been manipulated by use of robotic

means in violation of the YouTube's Terms of Service.  In those Terms, #4 Section H states in pertinent part as follows:

> You agree not to use or launch any automated system, including without limitation, "robots," "spiders," or "offline readers," that accesses the Service in a manner that sends more request messages to the YouTube servers in a given period of time than a human can reasonably produce in the same period by using a conventional on-line web server.

38.    This "view count" rationale for why the "LuvYa" video had been taken down contained no explanation of how it related, if at all,  to the "prohibited Content" rationale that G-Y had posted in place of the "LuvYa" video.

39.    Song fi completed and returned the G-Y appeal form.  In doing so, Song fi stated that no one connected with Song fi had ever attempted, nor had any agent of Song fi ever attempted, in any way to artificially inflate the number of views of "LuvYa" on YouTube. More generally, Song fi added that it was in full compliance with YouTube's Terms of Service in all aspects.

40.    Later on April 22, 2014, G-Y replied by saying that it had reviewed Song fi's  "appeal" and had "concluded that the decision to remove [sic] your video(s) was justified." G-Y again said nothing about the false and defamatory "content" notice that was still showing on the original LuvYa link that had been shared all over the Internet.   Instead, G-Y again asserted an alleged enhancement of the view count by automated means.  G-Y stated that such violations "are not ok" and that it was important for Song fi to be careful when hiring any agents who might engage in such violations on its behalf.  G-Y said that it had re-uploaded "LuvYa" to Song fi's Stevie Marco YouTube channel under a different link.  That upload, however did not contain the 23,000 view count, "likes," and comments that had appeared on the original "LuvYa" link.

41.     The re-uploading by G-Y of the LuvYa video under a new link did nothing to correct the false and defamatory "content" statement posted by G-Y on the original "LuvYa" link that had been distributed through hundreds of social media sites and personal e-mail chains.

42.     Nowhere in its April 22, 2014 e-mail did G-Y discuss the factual basis that led to its takedown of "LuvYa." More specifically, G-Y did not discuss any evidence that the alleged violation of #4 Section H had occurred, over what period of time the alleged violation had occurred, or what led G-Y to believe that it was Song fi or one of its agents that had engaged in such a violation of YouTube's Terms of Service.

43.     Approximately 44 minutes later on April 22, 2014, Song fi replied that litigation would ensue since it had done nothing wrong in connection with "LuvYa" and G-Y had not shown anything to the contrary.

44.     On May 12, 2014, Song fi's legal counsel communicated by letter to G-Y's chief legal officer. In that letter, Song fi's counsel protested G-Y's action in taking down the "LuvYa" video. Song fi's counsel noted that G-Y's content violation message had left a false and defamatory impression that the video had contained indecent material. Song fi's counsel also noted that the removal of "LuvYa" was interfering with Plaintiffs' prospective economic relationships.

45.     G-Y never responded to the letter from Song fi's counsel.

46.     Instead, on June 26, 2014, G-Y sent another e-mail through Song fi's Stevie Marco e-mail account stating that ". . . we will not be reinstating your video."

47.     Later on June 26, 2014, Song fi reiterated to G-Y its intention to sue for the takedown of the "LuvYa" video and the false and defamatory notice that subsequently appeared on the "LuvYa" video link.

48.     G-Y's takedown of the "LuvYa" video and associated comments, likes, and view count from the YouTube website caused serious harm to the business activities of Song fi and the Rasta Rock Opera as well as personal injury to Joseph Brotherton and N.G.B. Plaintiffs had featured "LuvYa," its comments, likes, and view count, and Song fi's YouTube Channel in negotiations with existing and potential funders, business partners, and the public generally.  All of these efforts were substantially and negatively impacted when G-Y took down "LuvYa" from the YouTube website and posted in its place a false and defamatory notice.

49.     Song fi and the Rasta Rock Opera had also featured "LuvYa" in attempting to secure a sponsorship by Nike, an international footwear company, of a July 4, 2014 performance of the "Star Spangled Banner" by members of the Rasta Rock Opera on the roof of the company's store in Washington D.C.  Nike had given its preliminary approval for the event, and a permit for the performance had been obtained from District authorities.  Song fi had spent a substantial amount of money in preparation for the event.  During its due diligence review of Song fi and the Rasta Rock Opera, however, Nike learned of G-Y's takedown notice of "LuvYa" because of its alleged content violation.  Uncertain what that notice meant but not wanting to risk a possible image problem in associating with Song fi and the Rasta Rock Opera, Nike cancelled the "Star Spangled Banner" event.

50.     G-Y's removal of "LuvYa" on grounds that it contained prohibited content also has caused Plaintiff's principal funder to suspend its financial support of the company.  That

suspension remains in effect today and is threatening the survival of Song fi and the Rasta Rock

Opera.

   51.    On August 1, 2014, the Court heard Song fi's motion for a temporary

restraining order. During the hearing, the Court indicated that it was "not persuaded . . . that the

flaw that You Tube found affected content in the way that the message that they left would

suggest. And so that misstatement, knowing misstatement, if you will—it had to be knowing,

somebody put it up—that misstatement might, in fact, be injurious."

   52.    On August 11, 2014, G-Y attempted to heed the Court's warning and

changed the false and defamatory notice on the original LuvYa link to a new defamatory notice

that now reads: "This Video has been Removed." G-Y again included a sad face and the

message "Sorry about that" with the second defamatory notice posted August 11, 2014. As a

matter of law the new notice that replaced the prior defamatory notice is also defamatory and a

violation of the CPPA.

   53.    G-Y's implicit acknowledgment of the false and defamatory nature of its

original message is too little, too late. The defamatory "Content" message was in place for

nearly four months, and it has damaged Plaintiffs' reputations and caused significant financial

harm to Song fi and the Rasta Rock Opera. Furthermore, G-Y's continued refusal to reinstate the

"LuvYa" video to its original link and take down the defamatory "Content" message has caused,

and continues to cause, significant financial harm to Song fi and the Rasta Rock Opera as well as

personal injury to Joseph and Nichlolas Brotherton.


### FIRST CLAIM FOR RELIEF
**(Violations of the D.C. Consumer Protection Procedures Act**

54.     Plaintiffs incorporate and re-allege paragraphs 1 through 53 as fully set forth herein.

55.     Defendants posted a notice on the YouTube website stating that the "Luv Ya" video had been removed because its "content" violated YouTube's Terms of Service.  In fact, the video's content did not violate YouTube's Terms of Service, and G-Y admitted that its reasons for removing the video had nothing to do with its content by specifying---falsely--that they had to do with purported view count violations.

56.     G-Y's "content" notice violated §§ 28-3904(e), (f) and (f-1) of the D.C. Code in that it misrepresented, sometimes actively and sometimes by omission of implication, the nature of the content on the "LuvYa" video with a tendency to mislead anyone who read that notice.

57.     That notice also violated § 28-3904(g) of the D.C. Code in that it disparaged the goods, services and business of Song fi, of The Rasta Rock Opera as well as Joseph Brotherton and N.G.B., by implying that they produced and/or appeared in a video that contained pornography, animal abuse, graphic violence, or other indecent or inappropriate material.

58,     G-Y's replacement notice saying that the "LuvYa" video had been "removed" is an unfair trade practice that violates D.C. Code § 28-3904 (e), (f), and (f-1) in that it uses ambiguity and omission and fails to state material facts in a way that tends to mislead.

59.     The business and reputations of Song fi, The Rasta Rock Opera and its individual musicians, Joseph Brotherton and N.G.B., were damaged by these violations of the D.C. Code  in an amount exceeding $75,000 for each that will be proved at trial.

### SECOND  CLAIM FOR RELIEF

**(Breach of Express Contract)**

60.     Plaintiff Song fi, the only plaintiff who is a party to the You Tube Terms of Service Contract, incorporates and re-alleges paragraphs 1 through 59 as fully set forth herein.

61.     Song fi and G-Y entered into an express contract when Song fi uploaded the "LuvYa" video on its Stevie Marco channel on the YouTube website.  Pursuant to that contract, G-Y agreed to Song fi's uploading of "LuvYa" onto YouTube so long as Song fi did not violate the site's Terms of Service.

62.     G-Y breached this contract when G-Y removed "LuvYa" from the YouTube site without cause.  G-Y's assertion that Song fi violated G-Y's Terms of Service in connection with "LuvYa" is unsubstantiated and false.

63.     YouTube's breach of its contract with Song fi has caused Song fi damages in an amount exceeding $75,000 that will be proved at trial.

### THIRD CLAIM FOR RELIEF
### (Breach of Implied-in-Fact Contract)

64.     Plaintiff Song fi incorporates and re-alleges paragraphs 1 through 63 as fully set forth herein.

65.     G-Y's course of conduct and representations manifested its assent to an agreement between Song fi and G-Y.  Specifically, in exchange for G-Y's agreement to allow the use of YouTube's website for the uploading of the "LuvYa" video and its dissemination to viewers worldwide, Song fi agreed to upload that video and make it available for viewing to the general public.  Song fi's uploading of "LuvYa" thereby facilitated G-Y's ability to charge third parties for advertising space next to or within the showing of "LuvYa" and other Song fi videos.

G-Y did in fact receive such advertising revenues from third parties, while Song fi received nothing.

66.     G-Y breached the parties' agreement by removing the "LuvYa" video from the YouTube website, thereby preventing Song fi from making its video available for viewing worldwide.  G-Y further breached its agreement with Song fi by posting in place of the "LuvYa" video a notice falsely implying that the "content" of the LuvYa video violated prohibitions established by G-Y in section 7b of the Terms and in the Community Guidelines. These actions of G-Y constituted a violation of the covenant of fair dealing inherent in all contracts.

67.     As a consequence of G-Y's breach of the implied agreement, Song fi is entitled to damages in an amount exceeding $75,000 that will be proven at trial.

### FOURTH  CLAIM FOR RELIEF
### (Libel)

68.     Plaintiffs incorporate and re-allege paragraphs 1 through 69 as if fully set forth herein.

69.     After removing Plaintiffs' "LuvYa" video from the YouTube website, G-Y on April 18, 2014, posted in its place a false and defamatory  notice stating that "[t]his video has been removed because its Content violated YouTube's Terms of Service."

70.     G-Y's notice was defamatory because it gave the impression to the reasonable average viewer that Plaintiff's Content in the video had been pornographic or otherwise beyond the bounds of decency when in fact it was a beautiful Valentine's Day video about two six year old children.

71.     G-Y knew this notice was false because G-Y had informed Song fi that the violation actually concerned robotic manipulations of the view count.  G-Y knew that its notice was defamatory because G-Y knew how it had defined content violations in its terms of service and community guidelines, and G-Y knew that "LuvYa" contained none of those prohibited types of content.

72.     After Plaintiffs called G-Y's attention to the first false and defamatory notice G-Y posted about "LuvYa," G-Y intentionally and maliciously continued to cause injury to Plaintiffs from April 18, 2014, to August 11, 2014, with blatant disregard for the reputations and business affairs of Plaintiffs.

73.     On August 11, 2014, G-Y took down its false and defamatory notice posted on April 18, 2014, and substituted a second notice that was true but defamatory by implication.  The second notice stated "This Video has been Removed."  The second notice was defamatory because it left the viewer with the impression that YouTube had removed the "LuvYa" video for prohibited content violations.

74.     G-Y's actions have damaged Plaintiffs' reputations among their business partners, sponsors, investors, friends, and acquaintances and destroyed Song fi's ability to fund its development.  Furthermore, the main financial backer of Song fi, having seen G-Y's content take-down notices and noting Nike's withdrawal from the "Star Spangled Banner" event, has withdrawn its further funding of Song fi.

75.     G-Y's defamation of Plaintiffs in this way has caused each Plaintiff damages in an amount exceeding $75,000 that will be proved at trial.

## FIFTH CLAIM FOR RELIEF
### (Tortious Interference with Business Relationships)

76.     Plaintiffs Song fi and the Rasta Rock Opera incorporate and re-allege paragraphs 1 through 75 as if fully set forth herein.

77.     Plaintiffs' counsel notified G-Y on May 12, 2014 that its action of removing the "LuvYa" video and leaving instead a message that the video had been removed because of its content was interfering with Song fi and the Rasta Rock Opera's business relationships.

78.     Following its receipt of the letter from Plaintiffs' counsel, G-Y was on notice of such interference with the business relationships and the damage that G-Y's actions were inflicting on those relationships, but G-Y refused to remove its false and defamatory message and reinstate the "LuvYa" video or even respond in any manner to the letter of Plaintiffs' counsel.

79.     G-Y's interference with the business relationships of Song fi and the Rasta Rock Opera was thus intentional and has damaged Song fi and the Rasta Rock Opera in an amount exceeding $75,000 that will be proved at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** with respect to its claims for relief, Plaintiffs respectfully request the entry of judgment against Defendants as follows:

1.     An order enjoining G-Y to reinstate Song fi's "LuvYa" video, together with its approximately 23,000 view count, likes, and comments, at the same Uniform Resource Locator address that "LuvYa" had on the YouTube website before G-Y's wrongful actions took place;

2.     An award of compensatory damages, in an amount to be proven at trial;

3.   An award of treble damages for G-Y's violation of the CPA, in an amount to be proven at trial;

4.   An award of punitive damages, to the extent authorized by law, based on G-Y's intentional, willful, and malicious action in removing the video "LuvYa" from its website and knowingly and willfully posting defamatory statements about its content;

5.   An award of costs and reasonable attorneys' fees for all Plaintiffs, and

6.   Such other relief as the Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiffs demand trial by jury in this case on all issues so triable.

Respectfully submitted,

/s/ Ronald F. Wick
Ronald F. Wick
COZEN O'CONNOR
D.C. Bar 439737
1627 I Street N.W., Suite 1100
Washington D.C. 20006
Telephone:   (202) 912 4800
Facsimile:   (202) 640-5526
E-mail:  *RWick@cozen.com*

/s/ Edward W. Lyle
Edward W. Lyle
LAW OFFICE OF EDWARD W. LYLE
D.C. Bar 025700

1250 Connecticut Avenue N.W., Suite 200
Washington DC 20036-2603
Telephone: (202) 333-4280
Facsimile:  (202) 333-4282
E-mail:  *ewlyle@west1805.com*

*Attorneys for the Plaintiffs*

August 15, 2014

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served via the Court's electronic case filing system this 15th day of August, 2014, on Michael H. Rubin, Wilson Sonsini Goodrich & Rosati, One Market Street (Spear Tower), Suite 3300, San Francisco, California 94105-1126, counsel for defendants. An unredacted copy of the foregoing document was served via email on this 15th day of August, 2014, to the email address on file with the Clerk.

　　　　　　　　　　　　　　　　　　/s/ Ronald F. Wick_____
　　　　　　　　　　　　　　　　　　Ronald F. Wick