Erik L. Jackson (SBN 166010)
ejackson@cozen.com
COZEN O'CONNOR
601 S. Figueroa Street, Suite 3700
Los Angeles, CA  90017
Telephone: 213.892.7900
Facsimile: 213.892.7999

OF COUNSEL:
Ronald F. Wick, appearance *pro hac vice*
rwick@cozen.com
COZEN O'CONNOR
1627 I Street, N.W., Suite 1100
Washington, D.C.  20006
Telephone:  202.912.4874

Edward W. Lyle, appearance *pro hac vice*
ewlyle@west1805.com
LAW OFFICE OF EDWARD W. LYLE
1250 Connecticut Avenue N.W., Suite 200
Washington, D.C.  20036
Telephone:  (202) 333-4280

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| SONG fi, et al., | ) Case No.: 3:14-CV-05080-CW |
| | ) |
| Plaintiffs, | ) **SECOND AMENDED COMPLAINT** |
| | ) **DEMAND FOR JURY TRIAL** |
| vs. | ) |
| | ) The Hon. Claudia Wilken |
| GOOGLE, INC. and YOUTUBE, LLC, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## SECOND AMENDED COMPLAINT FOR CONCEALMENT FRAUD, CARTWRIGHT ACT VIOLATIONS, LIBEL, TORTIOUS INTERFERENCE, AND VIOLATIONS OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT

1

Plaintiffs now submit a Second Amended Complaint ("SAC") to this Court pursuant to the Order of the Honorable Samuel Conti (DE 67).  This SAC adds to the litigation concealment fraud and Cartwright Act claims that relate back to the First Amended Complaint ("FAC"), which was filed under District of Columbia law before being transferred to California by the Honorable Rosemary Mayers Collyer.

This lawsuit arose from defendants' removal of a music video titled "LuvYa LuvYa LuvYa" ("LuvYa") from the YouTube service along with its 23,000 views, likes, and public comments. Defendants took down plaintiffs' video and posted in its place a false and defamatory notice that stated: "This video has been removed because its content violates YouTube's Terms of Service . . . Sorry about that" (hereinafter referred to as the "Notice").

Judge Conti ordered special damages pleadings in this SAC to perfect the libel per quod claim and to state the basis for wrongful harm in the plaintiffs' tortious interference claim.  Judge Conti also granted plaintiffs leave to amend their claim under California's Consumers Legal Remedies Act, which was previously pled under the District of Columbia's Consumer Protection Procedures Act.

## PARTIES

1.      Plaintiff Song fi, Inc. ("Song fi") is a District of Columbia corporation with its principal place of business at 1250 Connecticut Avenue, N.W., Suite 200, Washington, D.C. 20036. Song fi is in the business of broadcasting and distributing works of music and video art created by the independent artist community.

2.      Plaintiff Rasta Rock Corporation ("Rasta Rock"), d/b/a the Rasta Rock Opera, is a District of Columbia corporation with its principal place of business at 1250 Connecticut Avenue, N.W., Suite 200, Washington, D.C.  20036.

3.      Plaintiff Joseph N. Brotherton is an individual, a District of Columbia resident, and a former United States Marine who was honorably discharged from the United States Marine Corps

2

Band and who later appeared in the "LuvYa" music video.

4.      Plaintiff N.G.B. is a 6-year-old minor and a District of Columbia resident who is the son of Joseph N. Brotherton and his wife, Lisa M. Pellegrino.  N.G.B. is also a star of the "LuvYa" music video.

5.       Defendant Google, Inc. ("Google") is a California corporation with its principal place of business in Mountain View, California.

6.      Defendant YouTube, LLC ("YouTube") is a California limited liability company with its principal place of business in San Bruno, California and is wholly owned and operated by Google.

## JURISDICTION AND VENUE

7.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.

8.      This Court has *in personam* jurisdiction over Google since its principal place of business lies in Santa Clara County, California, one of the counties within the geographical jurisdiction of this Court.

9.      This Court has *in personam* jurisdiction over YouTube since its principal place of business lies in San Mateo County, California, also within this Court's jurisdiction.  Additionally, YouTube is *de facto* an operating division of Google rather than a subsidiary of it; therefore this Court has *in personam* jurisdiction over YouTube under the same legal authorities and for the same reasons that it has *in personam* jurisdiction over Google.

10.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(1) and (2) and by way of the choice of law and venue provisions in the Terms of Service ("TOS") agreement entered into by the parties.

## BACKGROUND

11.      Despite the fact that YouTube is legally a limited liability company in California, it is

3

a limited liability company in name only as YouTube is 100% owned and controlled by Google.

12.     The chief executive officer of YouTube, Susan Wojcicki, was appointed by Google and reports directly to Google's chief executive officer, Larry Page.

13.     YouTube's planning and operations are actively controlled by Google, and thus Google and YouTube are a single business entity hereinafter referred to as "G-Y."

14.     G-Y operates websites for both Google and YouTube (*www.google.com* and *www.youtube.com)*, respectively, hereinafter "the Google Website" and "the YouTube Website."

15.     G-Y, through its YouTube Website, is the dominant provider of on-line video hosting as well as a major advertising platform for industry and consumer ads, using music and entertainment videos as the magnet for consumer traffic.

16.     There is no other music or video website operating anywhere in the world that remotely rivals YouTube in viewership, market share, profitability or name recognition.

17.     G-Y profits from content contributed by uploaders at no cost to G-Y that draws in viewer traffic, and then G-Y sells pay-per-click advertising based on the number of views published by a YouTube counter that is found next to all YouTube videos ("View Count").

18.     YouTube's revenue model consists of advertisements being placed at the beginning of, interspersed with, or adjacent to videos posted by uploaders.

19.     Advertisers are charged money based on the published View Count of videos located with their advertisements.

## COUNT 1:   CONCEALMENT FRAUD

### (All Plaintiffs Against Both Defendants)

20.     For concealment fraud to be actionable under California law the defendant must be in a fiduciary relationship with the plaintiff.  Such relationship is present here in the form of a TOS contract.  The tort of deceit or "fraud by concealment" also requires that each and all of the following elements be proven in an actionable concealment fraud circumstance: (1) the defendant

must have concealed or suppressed a material fact, (2) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (3) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (4) as a result of the concealment or suppression of the fact(s), the plaintiff must have sustained damage.

21.     Users of YouTube must assent to a Terms of Service Agreement imposed by G-Y ("TOS") before interacting with the YouTube website.

22.     The TOS creates a binding contract between G-Y and any individual or entity who views, comments, uploads, or otherwise interacts with the YouTube service.

23.     Section 4H of the TOS states: "You agree not to use or launch any automated system, including without limitation, 'robots,' 'spiders,' or 'offline readers,' that accesses the Service in a manner that sends more request messages to the YouTube servers in a given period of time than a human can reasonably produce in the same period by using a conventional on-line web browser."

24.     Plaintiffs never violated any aspect of the TOS, including 4H.

25.     The entertainment industry recognizes the View Count as the benchmark of popularity for recording artists and their associated music and videos.

26.     The View Count is also the sole basis for pay per click advertising invoices charged by G-Y.

27.     The analytics behind the View Count are created, managed, and kept secret by G-Y.

28.     Neither the TOS nor any other source discloses to YouTube users, advertisers, or content uploaders what duration of time creates a "view" in the View Count.

29.     G-Y makes the final determination of the published View Count and has the sole authority, responsibility and control over it.

30.     G-Y represents that advertisers will be billed for "views" published in the View Count.

31.     G-Y defrauds advertisers by invoicing for fake robotic views that G-Y knows are fake and that consist of millisecond duration times.

32.     G-Y is the mastermind behind the fraud because anyone can simply copy the URL from the "share" icon of a YouTube video and then purchase fake robotic views by simply copying the video link and sending payment to the service provider.

33.     A search of "Buy YouTube Views" on Google displays hundreds of companies that are in the business of robotically inflating the View Count in violation of section 4H of the TOS.

34.     The Daily Dot trade publication has published two separate articles about the YouTube View Count fraud scheme that has defrauded plaintiffs, advertisers and the public at large. *See, e.g.,* http://www.dailydot.com/entertainment/how-to-buy-youtube-views/.

35.     An example of the pervasiveness of YouTube View Count fraud is seen at the website https://www.qqtube.com/, which advertises 1,000,000 robotically inflated views on YouTube for $450.

36.     Such companies are organizations promoted by Google to which G-Y sells "sponsored ads" and that profit, with the active support of Google, from robotic View Count fraud in direct violation of section 4H of the TOS.

37.     G-Y refuses to take any meaningful steps to eliminate the possibility of robotic View Count fraud, which could be instantly eradicated through, for instance, a minimum time limit in G-Y's algorithm for a "view" to be added to the View Count that conforms to the 4H TOS duration standard for human interaction.

38.     It takes approximately seven seconds (7) for a human being to access YouTube servers using a conventional online browser.

39.     When the View Count fraud occurs, thousands of views are robotically registered in fractions of a second, which is something G-Y could easily eliminate by simply programming its View Count algorithm to require a seven second delay for a view to be added to the View Count.

6

40.     Implementing this simple correction, however, would prevent G-Y from monetizing and profiting from fake robotic views.

41.     Judge Rosemary Mayers Collyer summarized from the bench at the TRO hearing in Washington, D.C., the duty G-Y assumes with respect to the View Count.  "The Counter is a YouTube thing. It's not the users. I have nothing to do with it no matter how many times I view the same video. It's YouTube's counter not mine. Even if I am malintentioned, there is, you know, I don't effect the counter. It's not my counter. It's your counter, your Client's counter. I think you [G-Y] have a major problem with your contract."

42.     Defendants failed to disclose and intentionally concealed within the TOS that Google sells sponsored ads on its search engine to companies that are in the business of robotically enhancing YouTube View Counts in violation of section 4H of the TOS.

43.     G-Y failed to include a disclaimer on the YouTube Website or anywhere else that View Counts on YouTube are not an accurate barometer of the popularity of an artist or his or her video because the View Count may contain robotic views *not* watched by human beings.

44.     Defendants also failed to disclose and intentionally concealed the fact that the published View Count on YouTube is fraud ridden and riddled with fake robotic views from cell phones and other computer robots that G-Y intentionally allows to be published in its View Count, knowing well that the published View Count is false.

45.     In jointly deciding to post the "LuvYa" video on the YouTube Website—with Joseph N. Brotherton representing his son N.G.B. in that decision--plaintiffs justifiably relied on G-Y's indication of its intent to police View Count fraud in Section 4H of the TOS such that any attempt from external sources to robotically enhance the View Count in violation of Section 4H of the TOS would not affect the View Count.

46.     Plaintiffs, as well as all uploaders and advertisers on YouTube, relied on G-Y's duty of care to publish a View Count that reflected views of a meaningful duration by human beings and

not millisecond views by computer robots.

47.     Plaintiffs justifiably relied on G-Y to enforce the TOS fairly among all users in an open, honest and non-prejudicial manner.

48.     Plaintiffs were fraudulently induced into assenting to the TOS by understanding that compliance with it would protect plaintiffs' video, views, likes and public comments from being arbitrarily removed by G-Y for no just cause or diminished through the robotic inflation of View Counts for competing videos of larger record labels.

49.     Plaintiffs were fraudulently induced into assenting to the TOS with the understanding and belief that compliance with the TOS would protect plaintiffs' reputations and their business interests from being publicly humiliated, such as through the false and defamatory Notice posted by defendants in place of the "LuvYa" music video.

50.     If defendants had stated in the TOS that "LuvYa" could be arbitrarily removed by G-Y, even if plaintiffs complied in all aspects with the TOS, then plaintiffs would have never assented to it and risked being harmed as they were.

51.     If defendants had disclosed to plaintiffs that G-Y allows fake robotic views to be instantly published in the View Count, then plaintiffs would have never assented to the TOS and incurred the damages they did.

52.     If defendants had disclosed in the TOS that G-Y sells sponsored ads on the Google website to companies that are in the business of robotically enhancing the View Count in violation of section 4H of the TOS, then plaintiffs would have never assented to the TOS and vested their careers in such a fraud ridden platform.

53.     G-Y intended to defraud plaintiffs, as well as other YouTube users and advertisers, by conspiring to publish knowingly false and grossly inflated robotic views regarding certain major record label videos and selected other videos posted on YouTube.

## COUNT 2:  VIOLATION OF THE CARTWRIGHT ACT

### (All Plaintiffs Against Both Defendants)

### <u>CONSPIRACY</u>

54.      Plaintiffs were harmed as part of a fraudulent anticompetitive conspiracy.

55.      The conspiracy created and implemented by G-Y, its co-conspirators and named individuals intentionally misled and defrauded plaintiffs, advertisers and the public as to the true popularity of recording artists and music videos in an effort to thwart fair competition and restrain trade.

56.      The conspirators have caused damage to plaintiffs, advertisers and other uploaders as well as violated the public trust as a result of their tortious and anticompetitive acts.

57.      The conspirators named herein include two or more participants in the relevant markets of music and video distribution in California and the United States who agreed to unreasonably restrain trade in those markets by fixing the popularity of selected artists through the use of the YouTube View Count.

58.      G-Y, the Universal Music Group ("Universal"), School Boy Records, and the Raymond Braun Media Group ("RBMG"), upon information and belief, have combined, agreed and conspired to publish fake robotic views for certain Universal recording artists on YouTube, such as Justin Bieber and Korean artist Psy.

59.      Additional individuals who participated in the conspiracy, upon information and belief, are Susan Wojcicki, Larry Page, and Sergey Brin ("Named G-Y Individuals").  These G-Y individuals have absolute control over the decisions made by G-Y and therefore, on information and belief, have direct knowledge of G-Y's participation in the View Count fraud alleged herein.

60.      All of the aforementioned companies and individuals are hereinafter collectively referred to as the "Conspirators."  Other conspirators may be named as discovery progresses with plaintiffs reserving the right to seek leave to further amend their complaint to add additional

9

conspirators and/or defendants.

61.    The basis for plaintiffs' information and belief is set forth in detail immediately below.

62.    Defendants are the central figures in the conspiracy because they control the publishing of the View Count in all aspects; without their knowledge and consent, fake robotic views could never be published on YouTube and thus promoted around the world.

63.    Defendants also are the collection agent for the conspiracy in the form of processing and collecting money from advertisers for fake robotic views.

64.    Other Conspirators are facilitators of the View Count fraud as they and their agents directly inflate the View Count in violation of the TOS using some of the very companies promoted on the Google search engine.

65.    Defendants' conspiracy inures to the benefit of the Conspirators and to the detriment of plaintiffs and the independent artist community, as well as to the detriment of a robust and competitive free enterprise marketplace based on trust and fair dealing in the relevant markets of the distribution and promotion of music and music videos in California and the United States.

66.    The conspiracy results to the detriment of any artist not signed to Universal or other companies controlled by the Conspirators, or otherwise selected by G-Y for robotic View Count enhancement.

67.    The absolute control that G-Y and the named G-Y individuals have over View Counts allows them to restrain trade by "fixing" perceived public popularity through intentionally false, deceptive, and manipulated View Counts.

68.    Upon information and belief, major record labels, including some of the Conspirators, have a contractually agreed upon split of the advertising revenues generated from View Counts. The higher the View Count, the more advertising revenue the Conspirators split between them.

69.    The conspiracy allows the Conspirators to control the popularity of artists and videos

through a fraudulent View Count to the detriment of well-intentioned uploaders on the YouTube website such as plaintiffs and the entire independent artist community as a whole.

70.     Justin Bieber, who is under contract with Universal, was a YouTube phenom created by the Conspirators, in part through the use of fake robotic views to help launch Bieber's music career.

71.     After Scooter Braun and his management company RBMG signed Bieber to Island Records under the Universal umbrella, the Conspirators actively sought to turn him into a musical superstar from the YouTube website, fueled in part by a false robotic View Count.

72.     In January 2010, the video "Baby" was released from Bieber's debut album *My World 2.0.*  The song featured Ludacris and charted at number five (5) on the US *Billboard* Hot 100 and peaked at number three (3) on the Canadian hot 100.

73.     Plaintiffs plead upon information and belief that the time and date the conspiracy was implemented as it relates to Bieber was on or before February 19, 2010, the day his "Baby" video was uploaded onto YouTube.  Plaintiffs allege that on that day, G-Y agreed to allow Universal and Scooter Braun, who is also Bieber's manager, to robotically and systematically inflate the "Baby" View Count to over a billion views.

74.     Plaintiffs plead on information and belief that G-Y and the named G-Y individuals on or before February 19, 2010, agreed to turn a blind eye to the 4H TOS violations of Universal and Scooter Braun in consideration for an agreement to split the fraudulently generated advertising revenues created from fake views.

75.     As of November 9, 2015, the "Baby" video distributed by Universal shows 1,233,251,462 views according to the YouTube View Count (https://youtu.be/kffacxfA7G4).

76.     Record sales*,* which are the barometer for the US *Billboard* Hot 100 for "Baby," in no way correlate to the popularity gauge claimed in the astronomical 1.2 billion plus human View Count published by G-Y for the Justin Bieber "Baby" music video.

SECOND AMENDED COMPLAINT
CASE NO: 3:14-CV-05080-CW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

77.    The "King of Pop," Michael Jackson, as of November 9, 2015, captured only 278,147,575 views for his legendary "Thriller" video, equaling only 22.5% of the views generated from Bieber's "Baby" video.

78.    It is not plausible to conclude that Michael Jackson's smash record "Thriller," which remained #1 on the Billboard charts for thirty seven (37) consecutive weeks, would get only 22.5% of the views of that of a passing teen idol like Bieber, whose "Baby" record peaked at number five (5) in the U.S. record market and then quickly fell off the charts.

79.    Defendants' attempt to explain their 1.2 billion plus views for the "Baby" music video in prior Court filings, compared to the dismal record sales of "Baby," renders the 1.2 billion human View Count to be implausible.

80.    Indeed, 1.2 billion views represent almost 4 times the number of people in the United States and one sixth the 7.2 billion world population.  It defies common sense and basic math to conclude Bieber's video was watched by that many human beings when Bieber's target market is adolescent girls between the ages of 7 and 16, which represents a total of only 3% of the United States population.

81.    More fictitious yet is the View Count for the "Gangnam Style" video https://youtu.be/9bZkp7q19f0 by Korean recording artist Psy, who is also signed to Universal and Scooter Braun.  The View Count on YouTube claims a staggering 2,448,433,758 human views for "Gangnam Style" as of November 10, 2015.

82.    The 2.4 billion plus views are a virtual impossibility, considering that the equivalent of one-third of the entire human race would have had to have viewed "Gangnam Style" on YouTube—a notion that becomes even more preposterous when one factors in the number of people who do not have access to the Internet.

83.    A common thread connecting all of the Conspirators is Scooter Braun, founder of RBMG, who discovered, signed and manages both Justin Bieber and Psy and has a close business

12

relationship with Universal and its Chairman Lucian Grainge.

84.    On May 15, 2012, Universal issued a press release titled "Universal Music Group UMG and Scooter Braun's School Boy Records Expand Their Strategic Partnership."   The release announced that Universal would invest in and distribute School Boy Records, which is the record company for "Gangnam Style" owned by Scooter Braun, and that Braun would serve as a direct consultant to Universal Music Group Chairman Lucian Grainge.

85.    The initial release of "Gangnam Style" on YouTube was July 15, 2012.  The video initially went semi-viral with over a million views.  At that time, Psy was not signed to RBMG, Braun, or Universal.

86.    On September 3, 2012, Braun made a public announcement that was uploaded onto YouTube, saying that he and Psy had decided to "make some history" by making Psy the first Korean artist to break a big record in the United States.

87.    Then, on September 4, 2012, it was confirmed that Psy had signed with Scooter Braun's School Boy Records under both RBMG management and the Universal record label umbrella.

88.    Plaintiffs plead on information and belief that the time and date the conspiracy was created as it relates to Psy was on or before September 4, 2012, the day the "Gangnam Style" video, already posted on YouTube, became the property of Scooter Braun and Universal.  Plaintiffs allege on information and belief that on or about that day G-Y agreed to allow one or more of the Conspirators to robotically inflate the "Gangnam Style" View Count without restriction.

89.    At the same time, plaintiffs allege on information and belief that G-Y and the named G-Y individuals, in furtherance of the conspiracy, agreed to turn a blind eye to the 4H TOS violations of the other Conspirators relating to Justin Bieber and Psy.

90.    On September 29, 2014, the Entertainment publication *Vocativ* published an article titled; "Psy, Bieber and My Journey Into the World of Fake YouTube Views."  This article states:

13

"About an hour later, an email came through containing two screen shots. The first was what appeared to be Scooter Braun—the well-known talent manager behind Justin Bieber and Psy—having a Skype conversation with a person named 'Kenzo.' Braun (if it was really him) appeared to be buying around 200 million YouTube views for an unnamed video. 'We do not want any traces or any low-quality views that can get us in trouble,' the screen shot showed Braun as saying."

91.     The article continues describing the actions of Braun, who is in a contractual relationship with G-Y, Universal, Psy and Justin Bieber and is a paid consultant to Universal chairman Lucian Grainge. The article states, "A second screen shot attached appeared to show Braun sending a PayPal payment for $150,000, though the recipient's address was blocked out and there was little else in the way of identification."

92.     The article further describes the reliance the entertainment industry places on the published YouTube View Count: "YouTube views aren't some quaint little marketing component or minor audience-building tool. They can make or break a new career—and add a lot of money to the bank accounts of existing stars. They've become so relevant to the industry that Billboard now factors in YouTube view counts when creating its Top 100 rankings."

93.     The article further describes the impact the financial fraud scheme formulated by G-Y and the named G-Y individuals has had on YouTube advertisers, quoting a source as saying, "The whole YouTube industry has been scamming billions from advertisers with fake views."

94.     While G-Y and the named G-Y individuals allow the Conspirators to robotically inflate the View Count of certain videos in violation of 4H of the TOS with impunity, G-Y at its whim removes certain videos of artists not signed to the Conspirators and who have not violated the TOS. After removing the videos of select unsigned artists from the YouTube platform for no just cause, G-Y then posts false and defamatory notices about them, as was the case with plaintiffs. G-Y does these things to keep videos of smaller record labels and the independent artist community from competing with videos of those in the Conspiracy.

14

## COUNT 3:  LIBEL PER QUOD

### (All Plaintiffs Against Both Defendants)

95.     On February 14, 2014, Plaintiffs uploaded "LuvYa," a children's Valentine's Day video onto the YouTube website featuring the Rasta Rock Opera and starring in particular six-year-old N.G.B.

96.     On the "LuvYa" video link, young N.G.B. was credited for his acting performance. He was very proud of starring in a YouTube video, which his parents forwarded to many of N.G.B's friends, their parents, and N.G.B.'s teachers, relatives and others.

97.     Once N.G.B's teacher learned that one of her kindergarten students had starred in a YouTube video, she showed "LuvYa" to N.G.B.'s entire class and also shared the video with facility and other administrators in N.G.B.'s school district.

98.     Rasta Rock and its publisher/distributor, Song fi, also promoted the "LuvYa" video link aggressively through e-mail chains and social network platforms wherein N.G.B was identified as being the star of the "LuvYa" music video along with the Rasta Rock Opera musical group.

99.     On Valentine's Day, February 14, 2014, Song fi and Rasta Rock launched a major social media promotion on Facebook, wherein the "LuvYa" video was distributed to over 108,000 Facebook followers.

100.    Promotions of "LuvYa" on other networking platforms and e-mail chains followed in the ensuing weeks, causing "LuvYa" to gather more than 23,000 views, likes, and public comments, all of which were earned without any robotic enhancement or any violation of the TOS.

101.    The tens of thousands of people who received the "LuvYa" video link through social network promotions and other distribution means knew the identities of the performers because they were described in the correspondence that contained the "LuvYa" music video link.

102.    As the View Count for "LuvYa" rose above 23,000, the presence of the views, likes and positive comments became essential to the credibility of Song fi and Rasta Rock in seeking

15

sponsorships and funding for their record, film and live performance projects.

103.   In mid-April 2014, a Google representative tried vigorously to persuade Song fi and Rasta Rock to advertise on the YouTube Website.  Song fi and Rasta Rock refused and a verbal confrontation ensued.

104.   Thereafter, on April 18, 2014 and without any prior notice, G-Y took down the "LuvYa" music video and in its place posted a false and defamatory Notice that stated: "This video has been removed because its content violates YouTube's Terms of Service . . . Sorry about that."

105.   G-Y then created a second and totally separate link for viewing "LuvYa" apart from the original "LuvYa" link and parked the newly created second link, less all of the views, likes and public comments for "LuvYa," in the private setting on the Stevie Marco YouTube channel owned by Song fi and Rasta Rock.

106.   The original "LuvYa" music video link, which contained the false and defamatory Notice that was distributed to over one-hundred and eight thousand (108,000) consumers and business associates of Plaintiffs, was kept live to show the libelous Notice.

107.   The false and defamatory Notice defendants posted on the live "LuvYa" link had a direct link within it to the TOS so viewers could learn more about the types of prohibited content that must have existed in "LuvYa" to warrant the removal and posted Notice.

108.   The Community Guidelines in the TOS specified content violations as including child pornography, child abuse, animal abuse, drug abuse, under-age drinking, under-age smoking, bomb making and terrorist activity.

109.   There was nothing whatsoever about the content of the "LuvYa" music video that violated any these or other content prohibitions incorporated by reference in the YouTube TOS.

110.   The Honorable Samuel Conti stated this about the content of the LuvYa video: "'Luv ya' is a music video by the Rasta Rock Opera featuring the dramatized tale of a five-year-old boy (played by Plaintiff N.G.B.) and five-year-old girl who dress up and go to a restaurant for lunch

16

on Valentine's Day. As the children eat their lunch, a guitarist and a trumpet player (played by Plaintiff Joseph N. Brotherton, N.G.B.'s father and the president of both Song fi and Rasta Rock Opera) serenade them."  (DE 53 Pg. 2 L 23 thru Pg. 3 L1.)

111.    There was no content violation in the LuvYa music video, yet G-Y's false and defamatory Notice claiming improper content continued to appear on thousands of social network pages and e-mail chains all over the internet.

112.    Song fi and Rasta Rock learned of the takedown and resulting Notice posted by G-Y on April 22, 2014, the same day Song fi and Rasta Rock submitted an appeal to G-Y.

113.    G-Y responded by sending a private e-mail the same day back to plaintiffs wherein G-Y asserted "LuvYa" had not been removed because of its "content," but rather because the View Count for "LuvYa" had purportedly been inflated by use of robotic means in violation of 4H of the TOS.

114.    G-Y's email response to Song fi that alleged a 4H TOS violation was in direct contradiction to G-Ys public statement claiming "LuvYa" was removed because its "content" violated the TOS.

115.    The fact that G-Y intentionally issued contradictory reasons, one private and one public, regarding the reason for the removal of "LuvYa" evidences the malicious intent behind the posting of the false and defamatory Notice.

116.    On May 12, 2014, Song fi's legal counsel sent a letter to G-Y's chief legal officer, Mr. David Drummond, demanding a retraction of defendants' false and defamatory Notice and also informing G-Y that it had wrongfully taken down the "LuvYa" music video.

117.    Song fi's counsel also put G-Y on notice that the removal of "LuvYa" and the subsequent posting of defendants' false and defamatory Notice were interfering with the existing and prospective economic business relationships of both Song fi and Rasta Rock.

118.    Song fi's counsel demanded in the May 12, 2014 letter to Mr. Drummond that the

17

SECOND AMENDED COMPLAINT
CASE NO: 3:14-CV-05080-CW

"LuvYa" video be re-posted on its original link that was then in the possession of over 108,000 consumers and that G-Y restore LuvYa's 23,000 views, likes and comments along with the video itself, and that G-Y retract the false and defamatory Notice.

119.    After G-Y was served with a demand for retraction by plaintiffs on May 12, 2014, within 20 days of defendants' posting of their Notice, defendants failed to retract, repost the LuvYa video with its View Count, likes and public comments, or even respond at all to plaintiffs' counsel, thereby giving rise to general damages and exemplary damages under California law to supplement the special damages pled in the libel per quod count.

## COUNT 4:  TORTIOUS INTERFERENCE

### (Plaintiffs Song fi and Rasta Rock Against Both Defendants)

120.    G-Y's actions wrongfully interfered with agreements plaintiff Song fi had at that time with the Nike Corporation and Precision Contracting Solutions ("PCS"), and with other business relationships that were ongoing and proposed among Song fi, Rasta Rock and sponsors.

121.    G-Y's actions were also wrongful because they constituted fraud by concealment and libel per quod, as well as violations of the Cartwright Act, and were the means by which the tortious interference was undertaken by G-Y.

122.    Prior to the takedown of "LuvYa," both Song fi and Rasta Rock had promoted the "LuvYa" music video, touting its View Count, likes and public comments, in negotiations with potential funders, business partners, sponsors and media organizations.

123.    All of these economic relationships were destroyed and catastrophic damages resulted when G-Y took down "LuvYa" from the YouTube service and posted in its place their false and defamatory Notice.

124.    Song fi and Rasta Rock had promoted "LuvYa" in securing a sponsorship with Nike, an international footwear company, for a July 4, 2014 performance of the "Star Spangled Banner" by Stevie Marco of the Rasta Rock Opera on the roof of Nike's store in Georgetown located in

18

Washington, D.C.

125.    Nike had given its approval for the event and a permit for the performance had been obtained from District of Columbia authorities.  Song fi spent a substantial amount of money in preparation for the event.

126.    During Nike's due diligence review of Song fi and Rasta Rock, Nike learned of G-Y's takedown Notice and as a result was unwilling to risk a possible image problem in associating Nike with inappropriate children's content.  Nike thus called off the 4th of July Star Spangled Banner event based on defendants' Notice.

127.    From the inception of its "Respect and Love Manifesto" project in 2012, and continuing up to G-Y's posting of its false and defamatory Notice, Song fi had been funded through an agreement with Precision Contracting Solutions L.P. ("PCS"), a construction firm headquartered in Silver Spring, Maryland.

128.    PCS shared the "LuvYa" music video with its customer base, highlighting its investment in the arts and, more specifically, the "LuvYa" music video as a public relations asset portraying the beauty and innocence of young children and family values on Valentine's Day.

129.    When G-Y removed "LuvYa" and posted its false and defamatory Notice, G-Y caused a major public relations problem for PCS and as a result, on May 10, 2014, PCS notified Song fi that it was suspending all further funding until a satisfactory retraction of G-Y's Notice could be realized, thus shutting down the business activities of Song fi indefinitely.

130.    G-Y's refusal to reinstate the "LuvYa" video to its original link and the false and defamatory Notice caused and continue to cause devastating financial harm to Song fi by the crippling of its business operations.

19

SECOND AMENDED COMPLAINT
CASE NO: 3:14-CV-05080-CW

1
2

## COUNT 5:  VIOLATIONS OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT

3

**(Plaintiffs Joseph N. Brotherton and N.G.B. Against Both Defendants)**

4       131.    The California Consumers Legal Remedies Act ("CCLRA"), California Civil Code

5  ("CCC") §§ 1750 *et seq.,* regulates the furnishing of consumer goods and services in the State of

6  California.

7       132.    The CCLRA explicitly states that it is to be liberally construed and applied to

8  promote its underlying purposes, which are to protect consumers against unfair and deceptive

9  business practices and to promote efficient and economical procedures to secure such protection. *Id.*

10  § 1760.

11       133.    Under the CCLRA, a "person" is defined broadly to include an "individual,

12  partnership, corporation, limited liability company, association, or other group, however organized."

13  *Id.* § 1761(c).

14       134.    A "consumer" is an individual who "seeks or acquires" by purchase or lease, any

15  goods or services for personal, family or household purposes." *Id.* § 1761(d).

16       135.    Plaintiffs Joseph N. Brotherton and his son N.G.B are "consumers" under the

17  meaning of the CCLRA and assented to the TOS in seeking to post, view, or otherwise interact with

18  the YouTube website for personal, family, and household purposes, as do millions of other YouTube

19  users.

20       136.    A "consumer service" is "work, labor or services for other than a business or

21  commercial use." § 1761(b).

22       137.    The products and services offered on the YouTube website qualify as consumer

23  services under the CCLRA.

24       138.    The consideration paid by plaintiffs and other YouTube users who assent to the TOS

25  comes in the form of a barter, which provides a very valuable form of financial consideration that

26
27
28

SECOND AMENDED COMPLAINT
CASE NO: 3:14-CV-05080-CW

equates to money.

139.    The bartered consideration is plaintiffs' consumer traffic on the YouTube website, as well as that of millions of other YouTube users.  This valuable consideration adds to G-Y's viewing totals and enables G-Y to sell advertising on the YouTube website based on those totals.

140.    The YouTube service is monetized by connecting the buying public to the ads of consumer and other product and service providers posted on YouTube with entertainment videos for consumer household use as the consumer traffic draw.

141.    The CCLRA prohibits certain "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in a sale or lease of goods or services to any consumer." *Id.* § 1770(a).

142.    "Transaction" within the meaning of the CCLRA means an agreement between a consumer and any other person, in this case G-Y, Mr. Brotherton, and N.G.B through the TOS, that is "intended to result" in the sale or lease of consumer goods.

143.    In this way, the "transaction" entails not merely the free viewing of videos, but also the intended sale (i.e., purchase) of goods or services shown in advertisements for all or most videos on the YouTube Website.

144.    Defendants display advertisements to viewers in connection with each video on the YouTube website.

145.    Those advertisements often urge the viewer to purchase consumer goods or services.

146.    The TOS contract between defendants and plaintiffs Joseph Brotherton and N.G.B. governing their viewing of the YouTube Website was thus a contract that was "intended to result" in the sale of consumer goods to them within the meaning of the CCLRA.

147.    Among the acts or practices prohibited by the CCLRA is the "disparaging the goods, services, or the business of another by false or misleading representation of fact." *Id.* §1770(a)(8).

148.    Defendants' Notice disparaged the goods, services, and business interests of Mr.

21

Brotherton and his son N.G.B. and harmed their personal reputations.

149.    The CCLRA also prohibits representations that goods or services have characteristics that they do not have, which includes false View Counts for consumer videos on the YouTube Website. *Id.* § 1770 (a)(5).

150.    The fraud ridden View Count published on the YouTube service intentionally deceives consumers through a false popularity gauge by which consumers make buying decisions about the popularity of the performer and associated products and services and are therefore intentionally deceived.

151.    G-Y's disparagement of the services and business interests of Mr. Brotherton and his son N.G.B, and its harm to their reputations, became willful and malicious after G-Y was notified about and ignored the injurious effects of its disparagement in a letter from Song fi's legal counsel on May 12, 2014 to the Chief Legal Officer of Google, Mr. David Drummond.

152.    Such unlawful and intentional disparagement caused major injury and damages to Mr. Brotherton and his son N.G.B. and to their business interests.

153.    G-Y also violated the CCLRA by representing that the content of the "LuvYa" music video was of a particular vile, inappropriate, or indecent standard when in fact the "LuvYa" music video was a respectful and loving family presentation. *Id.* § 1770(a)(7).

154.    The YouTube TOS also violates the CCLRA by including an unconscionable and deceptive provision in Section 4J. *Id.* § 1770(a)(19).

155.    Section 4J of the YouTube TOS unconscionably states: "YouTube reserves the right to discontinue any aspect of the Service at any time."  This provision is unconscionable because it renders the consideration for the TOS contract illusory.  It is unconscionable for G-Y, having received the benefit of the consumer traffic and advertising revenues from that traffic as a direct result of the uploader's video, to then remove the video, the View Count, the likes, and public comments after the uploader has complied in all aspects with the TOS.

22

## DAMAGES AND PRAYER FOR RELIEF

### Count 1:  Concealment Fraud

### (Brought by all Plaintiffs Against Both Defendants)

156.    Plaintiffs incorporate and re-allege paragraphs 1 through 155 as if fully set forth herein.

157.    California Civil Code § 3333 states that "[f]or the breach of an obligation not arising from contract, the measure of damages, except for otherwise expressly provided by the CCC is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."  Notwithstanding any more specific demands below, plaintiffs seek this full measure of damages for the injuries they have suffered.

158.    The concealment fraud claimed herein was the proximate cause of the damages claimed under this concealment fraud cause of action.

Fraud Count - Compensatory Damages

159.    Plaintiffs' hereby claim out of pocket expenses, in an amount to be proven at trial, incurred by all Plaintiffs as a proximate result of the tort of fraud by concealment by defendants.

160.    Plaintiffs' hereby claim compensatory damages for actual injury and economic loss in an amount to be proven at trial, resulting from defendants' fraud by concealment to compensate plaintiffs for defendants' devaluation of plaintiffs' intellectual property and the market value of plaintiffs' live performances.

Fraud Count - Punitive and Exemplary Damages under CCC § 3294 and/or CCC § 3948

161.    Defendants' acts were intentional, malicious, oppressive, fraudulent, wanton and grossly reckless.  Defendants' malicious intent is magnified by their decision to ignore the letter to them from plaintiffs' counsel of May 12, 2014, which placed them on notice that their View Count fraud and false and defamatory Notice were inflicting devastating harm upon plaintiffs.

162.    Exemplary damages are both appropriate and actionable under CCC § 3294 because the named G-Y individuals in the View Count fraud conspiracy include Susan Wojcicki, Larry Page, and Sergey Brin who are officers, directors and managing agents of G-Y, all of whom, upon information and belief, created and implemented the scheme and had advance knowledge of the harmful effects their scheme was having on plaintiffs, advertisers and all other YouTube users.

163.    The punitive damage award in this case should serve as both a punishment and as an important public example.  Due to defendants' size and net worth, the punitive damage award should be significant in order to have a "stinging" impact on defendants and to deter future wrongful conduct.  For example, a punitive damage award of $36 million would constitute less than 0.01 percent (one one-hundredth of one percent) of Google's net worth, according to published reports.

Concealment Fraud - Attorney's Fees

164.    Plaintiffs were required to retain counsel to bring this claim and seek reasonable attorney's fees in connection therewith.

## DAMAGES AND PRAYER FOR RELIEF

### Count 2:  Violation of the Cartwright Act

### (Brought by All Plaintiffs Against Both Defendants)

165.    Plaintiffs' incorporate and re-allege paragraphs 1 through 164 as if fully set forth herein.

166.    Section 3333 of the CCC states that "[f]or the breach of an obligation not arising from contract, the measure of damages, except for otherwise expressly provided by the this Code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."  Plaintiffs seek this measure of damages notwithstanding any more specific demands that they make in this Complaint.

167.    Plaintiffs' antitrust violations under the Cartwright Act were the proximate cause of the damages claimed herein whereby defendants intentionally restrained trade.

SECOND AMENDED COMPLAINT
CASE NO: 3:14-CV-05080-CW

1

2    Antitrust Count – Compensatory Damages

3        168.    Plaintiffs' hereby seek relief for the reasonably anticipated sales and resulting profits

4    from the intellectual property of Plaintiffs that was devalued by defendants' antitrust violations

5    under the Cartwright Act in an amount to be proven at trial and trebled pursuant to statute.

    Antitrust Count - Attorney's Fees
6
         169.    Plaintiffs were required to retain counsel to bring this claim and seek reasonable
7
    attorney's fees in connection therewith.
8
                    **DAMAGES AND PRAYER FOR RELIEF**
9
                        **Count 3:  Libel Per Quod**
10
                **(Brought by All Plaintiffs Against Both Defendants)**
11
         170.    Plaintiffs incorporate and re-allege paragraphs 1 through 169 as if fully set forth
12
    herein.
13
    Plaintiff Song fi – Libel - General Damages
14
         171.    The false and defamatory Notice posted by defendants in place of the "LuvYa" music
15
    video injured the reputation of Song fi by implying the company somehow violated community
16
    standards of decency through the "content" of the "LuvYa" music video.
17
         172.    The Notice inflicted shame, mortification and hurt feelings upon Song fi.
18
         173.    Song fi claims general damages in an amount to be proven at trial.
19
    Plaintiff Rasta Rock – Libel - General Damages
20
         174.    The false and defamatory Notice posted by defendants in place of the "LuvYa" music
21
    video injured the reputation of Rasta Rock by implying the company and all of the participating
22
    musicians violated community standards of decency through the "content" of the "LuvYa" video.
23
         175.    The Notice inflicted shame, mortification and hurt feelings upon Rasta Rock.
24
         176.    Rasta Rock claims general damages in an amount to be proven at trial.
25

26                                        25

27                           SECOND AMENDED COMPLAINT
                              CASE NO: 3:14-CV-05080-CW
28

Plaintiff Joseph N. Brotherton – Libel - General Damages

177.   The false and defamatory Notice injured the reputation of Joseph N. Brotherton by implying he somehow violated community standards of decency through the "content" of the "LuvYa" music video.

178.   The notice inflicted shame, mortification and hurt feelings upon Joseph N. Brotherton.

179.   Joseph N. Brotherton claims general damages in an amount to be proven at trial.

Plaintiff N.G.B. ("A Minor") – Libel - General Damages

180.   The false and defamatory Notice injured the reputation of N.G.B. by implying he somehow violated community standards of decency through the "content" of the "LuvYa" music video.

181.   The "LuvYa" music video N.G.B. starred in was shown to his entire kindergarten class and when the video was removed and the Notice posted, N.G.B was teased and humiliated by some of his classmates, causing him emotional pain and mental anguish.

182.   The Notice inflicted shame, mortification and hurt feelings upon young N.G.B.

183.   N.G.B. claims general damages in an amount to be proven at trial.               .

Plaintiff Song Fi – Libel - Special Damages

184.   Song fi owns 50% of the publishing and distribution rights for all of the music and video productions and other intellectual property created by Rasta Rock, which also includes a five year licensing agreement from the Jimi Hendrix Foundation to use the image and likeness of Jimi Hendrix in conjunction with the marketing of Rasta Rock products and services.

185.   Song fi planned to generate revenue from the intellectual property of Rasta Rock by licensing these assets by planning to place music and video on traditional radio and television platforms seeking ASCAP air play royalties.

186.   Song fi also intended to place musical works in the secondary market of digital juke

26

SECOND AMENDED COMPLAINT
CASE NO: 3:14-CV-05080-CW

boxes and to license the merchandising rights worldwide for products such as action figures, clothing, musical instruments, and other products branded under Rasta Rock.

187.    Song fi also was in the process of negotiating agreements with sponsors and funding sources in a worldwide marketing campaign of respect, love and family values under the name "Respect and Love Manifesto," all of which was destroyed by the posting of defendants' false and defamatory Notice in place of the "LuvYa" music video.

188.    Before entering into an agreement with Rasta Rock, Song fi and its experts appraised the musical and film works of Rasta Rock at a market value of $5,000,000.  The evaluation came from the quality of the music and film works and the fact the project was a true "Musical Rock Opera" that is rarely produced in the music and film industry.

189.    The "Respect and Love Manifesto" musical score consists of 16 compositions within 27 musical movements.  Only a few works of art in this arena have ever been created over the past three decades, namely "Jesus Christ Superstar" and "Tommy" by The Who musical group.  Therefor Song fi claims special damages in an amount to be proven at trial for the devaluation and destruction of the public image and residual marketability of the "Respect and Love Manifesto" music and film project.

190.    The "Respect and Love Manifesto" project took over 250 film and recording sessions to arrive at its current status and was financed through an equity arrangement among Song fi, Rasta Rock, and PCS.

191.    The publication of the false and defamatory Notice destroyed Song fi's ability to monetize the Rasta Rock asset.

192.    Furthermore, the public and industry perception of Song fi was destroyed when the "LuvYa" video link suddenly contained allegations of inappropriate content that substantially diminished the real value of Song fi's property as a direct result of the Notice posted by defendants.

193.    The published Notice also negatively impacted PCS, which had distributed the

27

1

2
"LuvYa" link to many key client families prior to defendants' posting the Notice, thereby causing

PCS to withdraw its funding commitment to Song fi and Rasta Rock.
3

4
194.    Song fi, relying on the PCS equity/finance agreement, had developed a carefully

crafted business plan including the systematic release of promotional music videos leading up to the
5

6
release of the completed album and film project that was originally set for release on May 11, 2014,

which is the anniversary of the death of Bob Marley.  The project has never been released due to
7

8
defendants' libelous Notice.

9
195.    Defendants' posting of their false and defamatory Notice just before the publicized

10
release date of the "Respect and Love Manifesto" music and film project destroyed the value of the

property as well as Song fi's ability to monetize the Rasta Rock asset.
11

12
196.    The termination of funding by PCS brought the "Respect and Love Manifesto" music

and film project to a dead standstill.
13

14
197.    The false and defamatory Notice posted by Defendants caused PCS to demand the

return of money invested from Song fi instead of a PCS long term equity investment that was
15

16
previously in place before defendants' Notice was posted.  This demand for the return of hundreds of

thousands of dollars by PCS with no additional funding in place made it impossible for Song fi to
17

18
complete, promote, and monetize the Rasta Rock asset as the original business plan called for.

19
198.    Song fi had heavily promoted a release date for the project on social networks and to

20
potential sponsors.  The failure to release of the new Song fi website and the failure to release the

"Respect and Love Manifesto" project as promised, combined with the false and defamatory Notice
21

22
posted by defendants, ruined the image, business, and credibility of Song fi in the marketplace.

23
199.    The posted Notice of defendants caused Song fi to be left with hundreds of thousands

of dollars of debt with no viable financial means to market the Rasta Rock asset or to repay the PCS
24

25
debt as a direct and proximate result of the Notice posted by defendants.

26
200.    Song fi therefore claims special damages in an amount to be proven at trial for the

28
27
SECOND AMENDED COMPLAINT

CASE NO: 3:14-CV-05080-CW
28

devaluation of the property, business, trade, profession, and valuation of the "Respect and Love Manifesto" project owned in part by Song fi, which was destroyed by the malicious acts of these defendants.

Plaintiff Rasta Rock – Libel - Special Damages

201.    Rasta Rock is the company that wrote, recorded and produced all of the music and video created for the "Respect and Love Manifesto" project.  Rasta Rock owns 50% of the publishing and associated rights to this work.  The value of these rights have been dramatically devalued by the false and defamatory Notice posted in place of the "LuvYa" music video in an amount that shall be proven at trial.

202.    The removal of the "LuvYa" music video and the issuance of defendants' false and defamatory Notice also destroyed the public perception of Rasta Rock and its performing musicians, chilled business relationships, destroyed sponsorship opportunities and licensing negotiations, and tainted the individual reputations of the musicians who performed on the project.

203.    Rasta Rock also invested out of pocket funds as well as money it obtained from an equity investment arrangement it had entered into with PCS in the amount of $350,000, with those monies being used for recording and film sessions, graphic creation for a published book about the "Respect and Love Manifesto," and the publication of other marketing materials in preparation for the music, literary, film and website releases.

204.    Rasta Rock therefore claims special out of pocket damages, in an amount to be proven at trial, for the liability of having to repay the PCS investment as a loan instead of PCS's continuing its investment into a long term equity position.

205.    Rasta Rock had also secured an internationally promoted performance of the Star Spangled Banner by Stevie Marco of the Rasta Rock Opera to be performed on the roof of the Nike footwear store in Georgetown in Washington D.C on July 4, 2014, overlooking the national fireworks display.

206. Rasta Rock had arranged financing through its relationship with PCS to supplement the out of pocket cash on hand that Rasta Rock had to pay for the permitting, erection of specialized scaffolding, and other items in preparation for the July 4, 2014 Star Spangled Banner rooftop performance.

207. Rasta Rock had tendered deposits for that performance to Blue Room Music Studios and the Studio 51 film company through PCS loan proceeds and cash on hand to record and film the performance of the Star Spangled Banner Jimi Hendrix style for republishing and distribution.

208. The film that was to be created from the Nike rooftop performance was to include the image of Jimi Hendrix performing with Stevie Marco using advanced video merging technology with rights from the Jimi Hendrix Foundation to use Hendrix's image having been obtained.

209. All of these factors together created a golden marketing and promotion opportunity to launch the "Respect and Love Manifesto project," all of which was ruined by the posting of defendants' false and defamatory public Notice.

210. Rasta Rock expended monies through PCS loan proceeds in the amount of $46,000 to pay deposits in preparation for the Star Spangled Banner performance, and plaintiffs now seek recovery for those damages including lost wages and devaluation of property to be proven at trial.

211. Rasta Rock seeks damage recovery for all of the special damages that were a direct and proximate result of the Notice posted about the Rasta Rock Opera in place of the "LuvYa" music video in an amount to be proven at trial.

Plaintiff Joseph N. Brotherton – Libel - Special Damages

212. Mr. Brotherton is a full-time professional musician, which is his only means of income. G-Y's false and defamatory Notice issued by defendants and the negative public image resulting therefrom resulted in lost wages and performance opportunities for Mr. Brotherton.

213. Mr. Brotherton therefore claims special damages, in an amount to be proven at trial, for lost and future earnings as a result of the Notice posted by defendants.

Plaintiff N.G.B. ("Minor") – Libel - Special Damages

214.     N.G.B. aspires to be an actor, and the "LuvYa" video was his first opportunity.

215.     N.G.B.'s performance in "LuvYa," prior to the video's removal by Defendants put N.G.B. in the public eye and opened opportunities for paid acting projects that included a PCS commercial to be distributed on the HomeAdvisor website under the PCS profile.

216.     After defendants' Notice was posted, PCS abandoned its plans to feature N.G.B. in a HomeAdvisor commercial and as a result N.G.B. lost $10,000 in acting compensation for his college fund as a direct result of defendants' Notice.

217.     N.G.B. therefore claims special damages, in an amount to be proven at trial, that resulted from lost earnings from the terminated PCS Home Advisor commercial as a direct result of the false and defamatory Notice posted about young N.G.B. by Defendants.

Exemplary Damages – Libel - All Plaintiffs

218.     Through their counsel, plaintiffs served on May 12, 2014, a demand for retraction on Mr. David Drummond, Google's chief legal officer, specifying the libelous actions of defendants and demanding that the same be corrected.  Said notice and demand was served within 20 days after plaintiffs' knowledge of the publication in conformance with CCC § 48(a) to qualify for general and exemplary damages.

219.     Defendants failed within three weeks after such service, as CCC § 48(a) requires, to correct the false and defamatory publication; therefore, plaintiffs may recover not only special and general damages, but also exemplary/punitive damages.

220.     Defendants acted with actual malice when posting their intentional false and defamatory Notice in place of the "LuvYa" music video.

221.     The exemplary/punitive damage award in this case should serve as both a punishment and as an important public example.  Due to defendants' size and net worth, this damage award should be significant in order to have a "stinging" impact on defendants and to deter future wrongful

conduct.  For example, an exemplary/punitive damage award of $36 million would constitute less than 0.01 percent (one one-hundredth of one percent) of Google's net worth, according to published reports.

Libel - Attorney's Fees

222.    Plaintiffs were required to retain counsel to bring this claim and seek reasonable attorney's fees in connection therewith.

## DAMAGES AND PRAYER FOR RELIEF

### Count 4:  Tortious Interference

### (Brought By Plaintiffs Song fi and Rasta Rock Against Both Defendants)

223.    Plaintiffs incorporate and re-allege paragraphs 1 through 222 as if fully set forth herein.

224.    In his Order of June 10, 2015 (DE 53), Judge Conti granted plaintiffs leave to amend their tortious interference claims with instructions that plaintiffs "must also show that YouTube's conduct was "wrongful by some legal measure other than the fact of interference itself." (DE 53 Pg. 18 L 11 thru L13.)

225.    Defendants wrongfully interfered with agreements that plaintiffs Song fi and Rasta Rock had with Nike Corporation and PCS as well as other ongoing and prospective business relationships that include Blue Room Music Studios and Studio 51.

226.    Defendants' actions also were wrongful because they constituted fraud by concealment, libel per quod, and violations of the Cartwright Act and the CCLRA, as set forth above.  Such actions were the means by which the tortious interference was undertaken by these defendants.

227.    Song fi and Rasta Rock put G-Y on notice that its actions were having harmful effects on plaintiffs' prospective and ongoing business relationships in their May 12, 2014 retraction demand, yet G-Y has persisted in publishing its false and defamatory Notice.

32

228.    G-Y's interference with the business relationships of Song fi and Rasta Rock was intentional and malicious and has damaged Song fi and Rasta Rock, and therefore these plaintiffs seek financial relief including compensatory and punitive damages in an amount to be proven at trial.

Tortious Interference - Attorney's Fees

229.    Plaintiffs were required to retain counsel to bring this claim and seek reasonable attorney's fees in connection therewith.

## DAMAGES AND PRAYER FOR RELIEF

### Count 5:  Violations of CCC §§ 1750 *et seq.*

### (Brought by Plaintiffs Joseph N. Brotherton and his son N.G.B.)

230.    Plaintiffs incorporate and re-allege paragraphs 1 through 229 as if fully set forth herein.

231.    The CCLRA must be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to promote efficient and economical procedures to secure such protection.  *Id.* § 1760.

232.    Defendants' tortious acts contravene the mission of the CCLRA with a pattern of self-interest, defamation, fraud, theft and arrogance intended to harm consumers of the State of California as well as consumers in the whole of the United States of America.

233.    Plaintiffs Joseph N. Brotherton and N.G.B. claim actual damages suffered as a result of defendants' violations of the CCLRA in an amount to be proven at trial.  CCC § 1780(1).

234.    Plaintiffs Joseph N. Brotherton and N.G.B. seek an order declaring the YouTube TOS, as written, to be an unconscionable contract that is intentionally deceptive and therefore unenforceable with respect to any and all consumers obligations henceforth.  *Id.* §§ 1780(2) and § 1770(a)(19).

235.    Plaintiffs Joseph N. Brotherton and N.G.B. seek restitution of their property that was

33

SECOND AMENDED COMPLAINT
CASE NO: 3:14-CV-05080-CW

stolen from them by defendants in the form of removing their legitimate View Count, likes and public comments and hereby request this Court order defendants to re-post the LuvYa link with the 23,000 views, likes, and public comments on the YouTube landing page the for the same period of time LuvYa's views, likes and comments were removed by defendants. *Id.* § 1780(3).

236.    Plaintiffs Joseph N. Brotherton and N.G.B. also seek punitive damages. *Id.* § 1780(4).

237.    Plaintiffs were required to retain counsel to bring this claim and seek reasonable attorney's fees in connection therewith.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury for the resolution of this litigation.

Respectfully submitted,

COZEN O'CONNOR

Dated:  November 27, 2015

By:    /s/ Ronald F. Wick    _____
Ronald F. Wick
Attorneys for Plaintiffs