IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SONG FI, INC., JOSEPH N.
BROTHERTON, LISA M. PELLEGRINO,
N.G.B., RASTA ROCK, INC.,

     Plaintiffs,

   v.

GOOGLE, INC., YOUTUBE LLC,

     Defendants.

_____/

No. C 14-5080 CW

ORDER GRANTING
MOTION TO DISMISS
SECOND AMENDED
COMPLAINT

(Docket No. 77)

    Song fi, Inc., the Rasta Rock Corporation, Joseph N.
Brotherton, president of both Song fi and Rasta Rock, and
Brotherton's six-year-old son N.G.B. (collectively Plaintiffs)[1]
filed a complaint against Google, Inc. and YouTube, LLC.[2]
Defendants moved to dismiss the 2AC under Federal Rule of Civil
Procedure 12(b)(6).  The Court grants the motion, with leave to
amend.

BACKGROUND

I.   Google, YouTube and the alleged conspiracy

    This case concerns Defendants' removal of a music video
entitled "LuvYa LuvYa LuvYa" (hereafter LuvYa) from its original
page on YouTube's website.  The Court recites the facts as alleged
in the 2AC, Docket No. 70.

---

[1] Lisa Pellegrino, N.G.B.'s mother, is no longer a plaintiff.

[2] YouTube is wholly owned and operated by Google.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

Defendant Google, through Defendant YouTube's website, is "the dominant provider of on-line video hosting as well as a major advertising platform for industry and consumer ads, using music and entertainment videos as the magnet for consumer traffic."  2AC ¶ 15.  Defendants profit from contributors' uploaded video content by selling pay-per-click advertising at prices that are based on the number of times a given video has been viewed, tracked by the visible "view count."  Id. ¶ 17-19, 26.  Defendants control this view count, id. ¶ 62, and also receive money from advertisers, id. ¶ 63.

Before interacting with YouTube's website, users must assent to a Terms of Service Agreement.  Id. ¶ 21.  It states, in part: "You agree not to use or launch any automated system, including without limitation, 'robots,' 'spiders,' or 'offline readers,' that accesses the Service in a manner that sends more request messages to YouTube servers in a given period of time than a human can reasonably produce in the same period by using a conventional on-line web browser."  Id. ¶ 23.

View counts can be inflated by the use of such automated systems.  Plaintiffs allege that Defendants commit fraud by "invoicing for fake robotic views" that they know "are fake and that consist of millisecond duration times."  Id. ¶ 31. Defendants sell "sponsored ads" to organizations they promote; these organizations profit from robotic view count fraud that Defendants do not attempt to eliminate.  Id. ¶¶ 36-37.  These promoted organizations include Universal Music Group (Universal), School Boy Records and Raymond Braun Media Group, all of which allegedly conspired to promote certain artists signed to

Universal.  Id. ¶ 58.  On Defendants' side of the conspiracy, the 2AC names Susan Wojcicki, Larry Page and Sergey Brin, who allegedly have direct knowledge of Defendants' participation in the view count fraud.  Id. ¶ 59.  The existence of view count fraud is not disclosed on Defendants' websites or within the Terms of Service.  Id. ¶¶ 42-44.

According to Plaintiffs, this conspiracy benefits the conspirators to the detriment of Plaintiffs, the independent artist community and any artist not signed to Universal or other aligned companies.  Id. ¶¶ 65-66, 69.  The 2AC names as "the relevant markets . . . music and video distribution in California and the United States."  Id. ¶ 57; see also id. ¶ 65.  It alleges that the conspiracy allows Defendants "to restrain trade by 'fixing' perceived public popularity through intentionally false, deceptive, and manipulated View Counts."  Id. ¶ 67.

As examples, the 2AC points to Justin Bieber's "Baby" and Psy's "Gangnam Style" videos, both of which achieved fame on YouTube.  Plaintiffs allege that, on or before the date that Bieber's "Baby" video was uploaded, Defendants agreed to allow Universal and Bieber's manager, Scooter Braun, "to robotically and systematically inflate the 'Baby' View Count to over a billion views."  Id. ¶¶ 70-75.  Plaintiffs bolster this allegation by comparing the "Baby" view count to Bieber's record sales, the view count for Michael Jackson's "Thriller" video and the populations of the United States, the world and Bieber's target audience.  Id. ¶¶ 76-80.  Even more incredible, according to Plaintiffs, is the 2.4 billion view count displayed for Psy's "Gangnam Style" video. Id. ¶¶ 81-82.  The alleged conspiracy among Braun's management

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

company, with whom Psy signed, Universal and Defendants permitted robotic view count inflation.  Id. ¶¶ 83-89.

As further proof of the conspiracy, Plaintiffs mention an article entitled "Psy, Bieber and My Journey Into the World of Fake YouTube Views."  Id. ¶ 90.  The article describes Braun possibly purchasing 200 million YouTube views for $150,000.  Id. ¶¶ 90-91.  The article further describes the "YouTube industry" as having "been scamming billions from advertisers with fake views."  Id. ¶ 93.  Plaintiffs do not attach the article or explain how its author obtained this information.

In furtherance of this conspiracy, Defendants remove videos from artists not signed with conspirators and post false and defamatory notices about them "to keep videos of smaller record labels and the independent artist community from competing with videos of those in the Conspiracy."  Id. ¶ 94.

II.  Plaintiffs' LuvYa Video

Plaintiffs uploaded LuvYa, "a children's Valentine's Day video" on February 14, 2014.  Id. ¶ 95.  The video featured members of a musical group called the Rasta Rock Opera.  The 2AC explains that the Rasta Rock Corporation does business as the Rasta Rock Opera.  The video starred Plaintiff N.G.B.  Id. Brotherton played the trumpet.  Id. ¶ 110.  Song fi is Rasta Rock's publisher and distributor.  Song fi owns fifty percent of the publishing and distribution rights for all music, video productions and other intellectual property created by Rasta Rock. 2AC ¶ 184.

Plaintiffs allege that, in deciding to assent to the Terms of Service and to post LuvYa on YouTube, they relied on Defendants'

4

**United States District Court**
For the Northern District of California

"indication of its intent to police View Count fraud" and to enforce the Terms of Service "fairly among all users in an open, honest and non-prejudicial manner."[3]  Id. ¶¶ 45-53.

Brotherton and N.G.B.'s mother shared the video with family and friends; Rasta Rock and Song fi shared it as well.  Id. ¶¶ 96-99.  The video ultimately gathered over 23,000 views, likes and public comments, "all of which were earned without any robotic enhancement or any violation" of the Terms of Service.  Id. ¶ 100.

Song fi and Rasta Rock promoted LuvYa "in negotiations with potential funders, business partners, sponsors and media organizations."  Id. ¶ 122.  In particular, promoting LuvYa helped Rasta Rock secure a sponsorship from Nike for a planned July 4, 2014 performance by Stevie Marco, a member of the Rasta Rock Opera musical group, on the roof of Nike's Georgetown store in Washington, D.C.  Id. ¶ 124.  The 2AC does not allege that any payment was anticipated for this performance.

In April 2014, a Google representative contacted Song fi and Rasta Rock to persuade them to advertise on YouTube, an offer that Song fi and Rasta Rock refused.  Id. ¶ 103.  Thereafter, Defendants removed LuvYa and posted a notice in its place that stated: "This video has been removed because its content violates YouTube's Terms of Service . . . Sorry about that."  Id. ¶ 104. The notice contained a link to the Terms of Service.  The Terms of Service contained a link to and incorporated the Community Guidelines, which described "content violations as including child

---

[3] Plaintiffs make these characterizations, but the Terms of Service do not include these representations.

pornography, child abuse, animal abuse, drug abuse, under-age drinking, under-age smoking, bomb making and terrorist activity." Id. ¶¶ 107-08. The notice was "kept live" on the original web address of the music video. Id. ¶ 106. Plaintiffs allege that LuvYa did not violate any content prohibitions, id. ¶ 109, and that they have never violated any aspect of the Terms of Service, id. ¶ 24. Defendants sent a private email to Plaintiffs that clarified that LuvYa was removed because its view count was improperly inflated in violation of the Terms of Service. Id. ¶ 113.

Following the video removal, Nike cancelled Marco's Fourth of July performance citing "a possible image problem in associating Nike with inappropriate children's content." Id. ¶ 126. Additionally, Song fi's funder, a construction firm which had shared LuvYa to highlight its investment in the arts and family values, suspended all funding until the notice could be retracted. Id. ¶ 129.

  III. Procedural History

Plaintiffs originally filed their complaint in the District Court for the District of Columbia. Docket No. 1. Defendants moved to enforce the contract's forum selection clause, which required that all disputes be decided in Santa Clara County in California. Plaintiffs argued that the contract with YouTube, including both the forum selection clause and the Terms of Service, was unconscionable. Applying the law of the District of

Columbia,[4] Docket No. 19, District of Columbia Opinion at 11, the District of Columbia court concluded that the Terms of Service were not unconscionable, and that the venue selection clause requiring litigation in Santa Clara County was enforceable, id. at 14-15.  The court transferred the case to the Northern District of California.  Id. at 16.

On June 10, 2015, Northern District of California Judge Conti ruled on Defendants' motion to dismiss Plaintiffs' First Amended Complaint, which Plaintiffs filed before the case was transferred. Docket No. 53, Order Dismissing First Amended Complaint (1AC). That complaint alleged five causes of action: libel, breach of express contract, breach of implied contract, tortious interference with business relationships, and violations of the D.C. Consumer Protection Procedures Act.  Id. at 6.

The court dismissed the breach of express and implied contract claims.  It found that "the Terms of Service permitted YouTube to remove 'Luv ya' and eliminate its view count, likes, and comments."  Id. at 13.  "As a result," the court concluded, "Plaintiffs cannot state a claim for breach of the Terms of Service in removing the video, because conduct authorized by a contract cannot give rise to a claim for breach of the agreement." Id.  Further, Plaintiffs did not have a cause of action for breach of contract based on the video's relocation because, under the Terms of Service, "the specific location of a video is an aspect

---

[4] The District of Columbia court concluded that "California and District of Columbia law on the issue of unconscionability do not conflict."  D.C. Opinion at 11.

United States District Court
For the Northern District of California

of YouTube's 'Service' that it retains the right to discontinue at any time." Id. at 14.

Regarding the libel claim, the court found "that YouTube's allegedly libelous statement is not libelous on its face . . . Instead, to the extent Plaintiffs have an actionable libel claim it is a claim for libel per quod." Id. at 16.  Because libel per quod requires pleading special damages, the court dismissed Plaintiffs' libel claims but granted leave to amend.  Id. at 17.

A tortious interference claim requires an allegation that the defendant's conduct was "wrongful by some legal measure other than the fact of interference itself." Id. at 18 (quoting Della Penna v. Toyota Motor Sales, U.S.A., Inc., 11 Cal. 4th 376, 385 (1995)). Because Plaintiffs had not adequately alleged any of their other legal theories, Judge Conti concluded that they did not satisfy this element.  The court granted leave to amend the tortious interference claim, too.  The court also dismissed the District of Columbia Consumer Protection Procedures Act claim, but granted leave to amend to plead a similar California consumer protection claim.  Id. at 20.

In July 2015, Plaintiffs filed a motion for leave further to amend their complaint by adding a fraud claim, a California Cartwright Act claim and a California Consumer Legal Remedies Act claim.  The proposed complaint still contained the tortious interference claim and the libel claim.  The court granted leave to amend to allow the additional claims, but stated that "allowing additional new claims after this amendment would be too prejudicial to Defendants and no longer in the interests of justice, and cautions Plaintiffs against any such future request."

Docket No. 67, Order on Motion to File Second Amended Complaint at 8.  Because Judge Conti was about to retire and the case would be transferred to a new judge, the court declined to make any findings with respect to the sufficiency of the fraud and Cartwright Act claims in the proposed Second Amended Complaint filed with the motion.  Id.  The court also granted leave to amend the proposed complaint attached to the motion to allow counsel "a chance to ensure that the actual [2AC] filed is refined in light of arguments by counsel and law cited by the Court."  Id.  Plaintiffs' 2AC does add factual allegations beyond those in the proposed amended complaint filed with their motion for leave to amend.  However, as discussed below, their allegations are still insufficient to state a claim.

Plaintiffs allege five legal claims: fraudulent concealment, violation of the Cartwright Act, libel per quod, tortious interference and violation of the California Consumers Legal Remedies Act.  Defendants filed this motion to dismiss, Docket No. 77, Plaintiffs responded, and Defendants replied.  The Court held oral argument on February 23, 2016.

LEGAL STANDARD

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  On a motion under Rule 12(b)(6) for failure to state a claim, dismissal is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  In considering whether the complaint is sufficient to state a claim, the court will take all

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

material allegations as true and construe them in the light most
favorable to the plaintiff.  NL Indus., Inc. v. Kaplan, 792 F.2d
896, 898 (9th Cir. 1986).  However, this principle is inapplicable
to legal conclusions.  "Threadbare recitals of the elements of a
cause of action, supported by mere conclusory statements," are not
taken as true.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)
(citing Twombly, 550 U.S. at 555).

In Iqbal, 556 U.S. at 679, the Supreme Court laid out the
following approach for assessing the adequacy of a plaintiff's
complaint:

> a court considering a motion to dismiss can choose to begin
> by identifying pleadings that, because they are no more than
> conclusions, are not entitled to the assumption of truth.
> While legal conclusions can provide the framework of a
> complaint, they must be supported by factual allegations.
> When there are well-pleaded factual allegations, a court
> should assume their veracity and then determine whether they
> plausibly give rise to an entitlement to relief.

A claim has facial plausibility "when the plaintiff pleads factual
content that allows the court to draw the reasonable inference
that the defendant is liable for the misconduct alleged."  Id. at
678.  "The plausibility standard is not akin to a 'probability
requirement,' but it asks for more than a sheer possibility that a
defendant has acted unlawfully."  Id. (quoting Twombly, 550 U.S.
at 556).  Determining whether a complaint states a plausible claim
for relief is "a context-specific task that requires the reviewing
court to draw on its judicial experience and common sense."  Id.
at 679.

When granting a motion to dismiss, the court is generally
required to grant the plaintiff leave to amend, even if no request
to amend the pleading was made, unless amendment would be futile.

**United States District Court**
For the Northern District of California

Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc., 911
F.2d 242, 247 (9th Cir. 1990).   In determining whether amendment
would be futile, the court examines whether the complaint could be
amended to cure the defect requiring dismissal "without
contradicting any of the allegations of [the] original complaint."
Reddy v. Litton Indus., Inc., 912 F.2d 291, 296 (9th Cir. 1990).
Leave to amend should be liberally granted, but an amended
complaint cannot allege facts inconsistent with the challenged
pleading.   Id. at 296-97.   Courts consider whether the plaintiffs
have previously amended the complaint in determining whether to
grant leave to amend.   See, e.g., Fid. Fin. Corp. v. Fed. Home
Loan Bank of S.F., 792 F.2d 1432, 1438 (9th Cir. 1986) ("The
district court's discretion to deny leave to amend is particularly
broad where the court has already given the plaintiff an
opportunity to amend his complaint.").

DISCUSSION

I.   Preliminary Matters

Plaintiffs allege that the Court has diversity jurisdiction
over this lawsuit.   2AC ¶ 7.   This allegation is based in part on
the assertion that Brotherton and N.G.B. are "residents" of
Washington, D.C.   Id. ¶¶ 3-4.   However, the Ninth Circuit requires
an allegation of citizenship, rather than mere residency.   See
Mantin v. Broad. Music, Inc., 248 F.2d 530, 531 (9th Cir. 1957).
Individual residents of Washington, D.C. can be citizens of
Washington, D.C. for diversity jurisdiction purposes and must so
allege.   See Draim v. Virtual Geosatellite Holdings, Inc., 522
F.3d 452, 454 n.1 (D.C. Cir. 2008) (granting an unopposed motion
to amend the complaint to state that an individual "resides in,

**United States District Court**
For the Northern District of California

and is a citizen of, Washington, D.C."). Thus, for the Court's jurisdiction to be proper, Plaintiffs must allege that Brotherton and N.G.B. are citizens of Washington, D.C.

In addition, if N.G.B. is to continue as a plaintiff, a qualified adult must move the court to be appointed N.G.B.'s guardian <u>ad litem</u>.

II. Cartwright Act

The Cartwright Act, codified at California Business and Professions Code section 16700 <u>et seq.</u>, was "enacted to promote free market competition and to prevent conspiracies or agreements in restraint or monopolization of trade." <u>Exxon Corp. v. Super. Ct.</u>, 51 Cal. App. 4th 1672, 1680 (1997). To state a claim under the Cartwright Act, Plaintiffs must allege: "(1) the formation and operation of the conspiracy; (2) illegal acts done pursuant thereto; and (3) damage proximately caused by such acts." <u>In re High-Tech Emp. Antitrust Litig.</u>, 856 F. Supp. 2d 1103, 1126 (N.D. Cal. 2012) (quoting <u>Kolling v. Dow Jones & Co.</u>, 137 Cal. App. 3d 709, 718 (1982)). "Cartwright Act claims are properly dismissed 'where the complaint makes conclusory allegations of a combination and does not allege with factual particularity that separate entities maintaining separate and independent interests combined for the purpose to restrain trade.'" <u>In re Netflix Antitrust Litig.</u>, 506 F. Supp. 2d 308, 320 (N.D. Cal. 2007) (quoting <u>Freeman v. San Diego Ass'n of Realtors</u>, 77 Cal. App. 4th 171, 189 (1999)); <u>see also</u> <u>Medina v. Microsoft Corp</u>, 2014 WL 4243992, at *3 (N.D. Cal.) ("Litigants must plead Cartwright Act violations with a high degree of particularity, alleging factual allegations of specific conduct directed toward the furtherance of the conspiracy, in more

United States District Court
For the Northern District of California

than conclusory terms." (citing <u>G.H.I.I. v. MTS, Inc.</u>, 147 Cal. App. 3d 256, 265-66 (1978))).

Defendants argue that the Cartwright Act allegations in the 2AC are insufficient with respect to causation and damages. Plaintiffs respond that part of the alleged conspiracy was that Defendants removed videos of artists not signed with their co-conspirators; allegedly, Plaintiffs were injured by both the removal of the video and the devaluation of their intellectual property resulting from inflated view counts of other videos. <u>See</u> 2AC ¶ 94 ("While G-Y and the named G-Y individuals allow the Conspirators to robotically inflate the View Count of certain videos in violation of 4H of the TOS with impunity, G-Y at its whim removes certain videos of artists not signed to the Conspirators and who have not violated the TOS.").[5]

Under the Cartwright Act, a proximate cause requirement, frequently referred to as the "standing to sue" requirement, requires that the party bringing the action must be within the "target area" of the antitrust violation rather than "incidentally injured thereby." <u>Kolling</u>, 137 Cal. App. 3d at 723. The injury must be the "direct result of the unlawful conduct," rather than "secondary," "consequential" or "remote." <u>Id.</u> at 724. In other words, an antitrust plaintiff "must show that it was injured by the anticompetitive aspects or effects of the defendant's conduct, as opposed to being injured by the conduct's neutral or even procompetitive aspects." <u>Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.</u>, 198 Cal. App. 4th 1366, 1380 (2011).

---

[5] The 2AC refers to Defendants as "G-Y."

For example, consumers who alleged paying excessive prices for cellular service due to a price fixing agreement claimed a direct injury. <u>Cellular Plus v. Super. Ct.</u>, 14 Cal. App. 4th 1224, 1234-35 (1993). Corporations that effected sales that were impacted by a price fixing agreement likewise alleged injury adequately. <u>Id.</u> at 1235. However, "not all business entities claiming sales were lost due to price fixing" have necessarily suffered a direct antitrust injury. <u>Id.</u>

The allegations in the 2AC do not support that Plaintiffs' injuries were proximately caused by the alleged conspiracy. The facts alleged in the 2AC relate to a conspiracy to inflate the YouTube view counts of Universal artists such as Psy and Justin Bieber. No factual allegations support that these conspirators also agreed to remove music videos from non-Universal artists. Thus, the 2AC does not allege that the conspiracy directly injured Plaintiffs.

Plaintiffs have also insufficiently alleged that the alleged conspiracy caused harm to competition. Although Plaintiffs argued at the hearing that YouTube is an important vehicle for music distribution, the conspiracy allegations relate not to YouTube as a whole but to view count manipulation. Plaintiffs must allege with greater particularity how the view count manipulation conspiracy allegedly harmed competition.

In addition to alleging harm stemming from the video's removal, Plaintiffs allege that they are entitled to damages based on their "intellectual property . . . that was devalued by defendants' antitrust violations under the Cartwright Act." 2AC ¶ 168. Plaintiffs' devaluation theory goes as follows.

Defendants permitted their co-conspirators to use robotic view count inflation for some videos, like "Baby" and "Gangnam Style." This caused other videos, like Plaintiffs', to appear by comparison less popular than they otherwise would.  This in turn would reduce future sales of other music that Plaintiffs would try to sell.  The Court concludes that any damages alleged under this theory are, at most, remote and speculative.

Further, the Court finds that the factual allegations are insufficient to support a claim that Google or YouTube were involved in a conspiracy to inflate view counts.  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007) (holding that stating a claim under the Sherman Act "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made").  The 2AC fails to provide facts with any particularity supporting that Google or YouTube entered into the conspiracy. Further, it does not allege sufficiently how Defendants worked with the other alleged conspirators.  Finally, Plaintiffs' description of view counts suggests that the number of "views" is equal to the number of viewers.  It is probable that these view counts encapsulate more views than viewers because viewers may view a video multiple times.

Because Plaintiffs have failed to allege facts supporting that the alleged antitrust violation proximately caused them injury, and failed to allege facts with particularity that would support a conspiracy including Defendants, Defendants' motion to dismiss Plaintiffs' Cartwright Act claim is GRANTED with leave to amend.

United States District Court
For the Northern District of California

III. Fraudulent Concealment[6]

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  The allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." Semegen v. Weidner, 780 F.2d 727, 731 (9th Cir. 1985). Statements of the time, place and nature of the alleged fraudulent activities are sufficient, id. at 735, provided the plaintiff sets forth "what is false or misleading about a statement, and why it is false." Ebeid v. Lungwitz, 616 F.3d 993, 998 (9th Cir. 2010). Scienter may be averred generally, simply by saying that it existed. See Odom v. Microsoft Corp., 486 F.3d 541, 554 (9th Cir. 2007) (en banc); Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally").  As to matters peculiarly within the opposing party's knowledge, pleadings based on information and belief may satisfy Rule 9(b) if they also state the facts on which the belief is founded. Moore v. Kayport Package Express, Inc., 885 F.2d 531, 540 (9th Cir. 1989).

To be liable for fraudulent concealment under California law, "(1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose

---

[6] Defendants state that Plaintiffs "vacillate between advancing an implied misrepresentation and a fraudulent concealment theory." Reply Br. at 6.  Because there is no implied misrepresentation theory in the 2AC, the Court discusses only the fraudulent concealment theory.

the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." Hahn v. Mirda, 147 Cal. App. 4th 740, 748 (2007).  Plaintiffs must plead facts supporting these elements.

A duty may arise where there is a fiduciary or confidential relationship, where a defendant does not disclose facts that materially qualify a separate disclosure or render that disclosure likely to mislead, where a defendant knows that facts not reasonably discoverable by the plaintiff are only known or accessible to the defendant, and where a defendant actively conceals discovery from the plaintiff. Warner Constr. Corp. v. City of L.A., 2 Cal. 3d 285, 294 (1970).  Where there is no fiduciary or confidential relationship, there must be "some relationship between the parties which gives rise to a duty to disclose such known facts." Hoffman v. 162 N. Wolfe LLC, 228 Cal. App. 4th 1178, 1187 (2014) (emphasis in original).  This duty "may arise from the relationship between . . . parties entering into any kind of contractual agreement." Id.  Thus, although a contractual relationship may lay the groundwork for a duty to disclose, it does not necessarily create a fiduciary duty.

Defendants argue that Plaintiffs did not properly plead damages from the fraudulent concealment.  Under California law, when no fiduciary relationship exists, a fraudulent concealment plaintiff may only recover out-of-pocket losses. Daly v. Viacom,

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

*Inc.*, 238 F. Supp. 2d 1118, 1126 (N.D. Cal. 2002); see also

*Alliance Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1240 (1995)

("In California, a defrauded party is ordinarily limited to

recovering his 'out-of-pocket' loss."). Out-of-pocket damages are

"directed to restoring the plaintiff to the financial position

enjoyed by him prior to the fraudulent transaction, and thus

awards the difference in actual value at the time of the

transaction between what the plaintiff gave and what he received."

*Alliance Mortg.*, 10 Cal. 4th at 1240; see also *Fladeboe v. Am.*

*Isuzu Motors Inc.*, 150 Cal. App. 4th 42, 66 (2007). Out-of-pocket

damages are usually calculated as of the time of the transaction.

*Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1032 (9th

Cir. 1999) (citing *Salahutdin v. Valley of Cal., Inc.*, 24 Cal.

App. 4th 555, 568 (1994)); see also *Negrete v. Allianz Life Ins.*

*Co. of N. Am.*, 2011 WL 4852314, at *9 (C.D. Cal.).

        As a threshold matter, the 2AC does not support that

Plaintiffs and Defendants were in a fiduciary relationship. The

2AC states that a fiduciary relationship "is present here in the

form of a [Terms of Service] contract." 2AC ¶ 20. This is a

legal conclusion that does not suffice. Further, under California

law, a contract, without more, does not create a fiduciary

relationship. *Oakland Raiders v. Nat'l Football League*, 131 Cal.

App. 4th 621, 633-34 (2005) (collecting cases).[7]  Although the
contract may have created a relationship from which a duty to
disclose arises, Plaintiffs have not properly alleged a fiduciary
duty.  Thus, the 2AC must allege out-of-pocket losses to satisfy
the damages element of fraudulent concealment.

Plaintiffs do not allege any out-of-pocket damages from
Defendants' alleged fraudulent concealment of inflated view
counts.  The mentions of "out of pocket" damages and expenses
throughout the 2AC constitute legal conclusions.  See, e.g., 2AC
¶¶ 159; 203-206.  The damages Plaintiffs describe do not amount to
out-of-pocket damages because they do not reflect the difference
between what Plaintiffs paid YouTube and what they received.
Instead, they relate to potential losses of future income and
financial relationships with others.  See, e.g., 2AC ¶¶ 160
("devaluation of plaintiffs' intellectual property and the market
value of plaintiffs' live performances"), 203-04 (money lost from
Rasta Rock's arrangement with its construction firm funder).  Some
of the damages alleged reflect money that Plaintiffs paid after
they agreed to the Terms of Service.  See id. ¶¶ 205-06
(discussing money paid in preparation for the July 4, 2014
performance on Nike's roof).  Finally, it is not clear which
Plaintiffs, if any, suffered any alleged out-of-pocket damages.

---

[7] Indeed, the California Court of Appeal held that a typical
film distribution contract does not create a fiduciary
relationship between the owner of the film and the distributor.
Recorded Picture Co. v. Nelson Entm't, Inc., 53 Cal. App. 4th 350,
370 (1997).  In light of this conclusion, it cannot be said that
Plaintiffs and Defendants were in a fiduciary relationship based
on a contract that permitted Plaintiffs to upload a video onto
YouTube for public viewing.

United States District Court
For the Northern District of California

In sum, no damages alleged constitute out-of-pocket losses proximately caused by Defendants' alleged concealment of their own complicity in and facilitation of artificial view count inflation. See 2AC ¶¶ 42-44.  Rather, any damages were allegedly proximately caused by the video's removal and the notice.

Plaintiffs make two additional arguments regarding the damages they plead.  They argue that a complaint need not allege a precise calculation of damages and that they are entitled to exemplary damages under California Civil Code section 3343. Neither argument circumvents the out-of-pocket damages requirement.

In addition, Plaintiffs' allegations of fraudulent concealment are not particular enough to satisfy Rule 9(b).  The 2AC states that Defendants promote companies that robotically inflate their view counts, 2AC ¶¶ 35-36, 42, but it is not clear which companies these are.  Plaintiffs fail to allege when the alleged fraudulent scheme began.  Further, as the Court pointed out at the hearing, the 2AC does not sufficiently allege detrimental reliance.  Plaintiffs explained at the hearing that they would not have used YouTube as a central component of their promotional efforts had they known of Defendants' view count practices, but they do not allege the more advantageous marketing they would have pursued had they not posted LuvYa on YouTube.

Plaintiffs also fail to allege that they were unaware of the facts that Defendants concealed.

For these reasons, Defendants' motion to dismiss with respect to the fraudulent concealment claim is GRANTED with leave to amend.

**United States District Court**
For the Northern District of California

IV.   Libel <u>Per Quod</u>

     "Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation."  Cal. Civ. Code § 45.   Libel that is not defamatory on its face, that is, libel <u>per quod</u>, "is not actionable unless the plaintiff alleges . . . that he has suffered special damage as a proximate result thereof."  <u>Id.</u> § 45a.  Judge Conti found that the libel allegations were not defamatory <u>per se</u>, and explained that this claim could move forward only if Plaintiffs properly plead special damages.[8]  Order Dismissing 1AC at 16-17; <u>see</u> <u>Newcombe v. Adolf Coors Co.</u>, 157 F.3d 686, 694 (9th Cir. 1998) (explaining that, under California law, "a plaintiff may only prevail on a claim for libel if the publication is libelous on its face or if special damages have been proven").  Defendants do not dispute that Plaintiffs plead special damages in the 2AC.  <u>See</u> Docket No. 80, Reply Br. at 10.

     However, Defendants argue that the 2AC pleads insufficient facts to allege both defamatory meaning and reference to Plaintiffs.

//

//

---

     [8] Plaintiffs argue that Judge Conti implicitly found that "the [1AC] as pled adequately established the capacity of the Notice to be defamatory."  Response Br. at 19.  The Court reads no such implicit ruling into Judge Conti's order.

A. Defamatory Meaning

Defamatory meaning deals with "the impact of communications between ordinary human beings." MacLeod v. Tribune Pub. Co., 52 Cal. 2d 536, 550 (1959). The meaning must be measured "by the natural and probable effect upon the mind of the average reader." Id. at 551. Implied defamatory meaning may exist even when there is "room for an innocent interpretation." Id. at 549.

Although the existence of a defamatory meaning is generally a question of fact for the jury, federal courts may consider the issue at the motion to dismiss stage. Church of Scientology of Cal. v. Flynn, 744 F.2d 694, 696 (9th Cir. 1984) (citing Forsher v. Bugliosi, 26 Cal. 3d 792, 803, 806 (1980)). It is improper for a district court to dismiss a complaint for lack of defamatory meaning if "by reasonable implication a defamatory meaning may be found in the communication." Id. (quoting Forsher, 26 Cal. 3d at 806).

At the outset, Judge Conti explained in his order that the Community Guidelines "are incorporated in the Terms of Service by reference." Order Dismissing 1AC at 21. Thus, this Court considers the Community Guidelines, to which Plaintiffs refer in the operative complaint. See 2AC ¶ 108. The Community Guidelines contain a bullet point list of "some common-sense rules that will help you steer clear of trouble." Docket No. 78, Veltman Dec., Ex. 1, Community Guidelines. In order, the bullet points discuss the following topics: "pornography or sexually explicit content," "bad stuff like animal abuse, drug abuse, under-age drinking and smoking, or bomb making," "[g]raphic or gratuitous violence,"

**United States District Court**
For the Northern District of California

"gross-out videos . . . intended to shock or disgust," copyright violations, "hate speech," "predatory behavior," and spam.  Id.

Defendants mention two related California Superior Court cases which concluded that no reasonable reader would find a defamatory meaning in the Community Guidelines.  In Bartholomew v. YouTube, LLC, No. 15-275833 (Cal. Super. Ct. 2015) (Bartholomew I), the court dismissed a claim for libel per se based on these Community Guidelines.  Veltman Dec. Ex. 2.  It reasoned that, even assuming the Community Guidelines were not extrinsic evidence, "a reasonable reader would not infer that the Video contained the specific kinds of improper content mentioned in the 'Community Guideline Tips' subsection because the subsection explicitly states that the categories listed are merely examples set forth." Id. at 8 (emphasis in original).  Further, the court explained, it is "readily apparent" that the examples "do not constitute an exhaustive list."  Id.  Finally, the list includes spam.  Id.

Thereafter, Bartholomew amended her complaint to include a libel per quod claim.  The Superior Court's August 5, 2015 order (Bartholomew II) sustained YouTube's demurrer, this time without leave to amend, for several reasons.  Veltman Dec. Ex. 3.  First, it stated that the notice on the web page referred to YouTube's Terms of Service, rather than its Community Guidelines.  Id. at 2. As explained above, this Court finds this distinction unpersuasive.  Second, the Superior Court explained that although some categories on the list could be deemed libelous, such as "Sex and Nudity" and "Hate Speech," other categories, such as "Children," "Copyright" and "Privacy," do not necessarily evoke offensiveness.  Id. at 2-3.  Ultimately, the court held that a

reference to the Community Guidelines as a whole is not reasonably susceptible to a defamatory interpretation.  Id. at 3.

This Court disagrees; it would not be unreasonable for an average reader to find defamatory meaning in an accusation of violation of the Community Guidelines.  Of the eight bullet points listed, the first four mention pornography, child exploitation, animal abuse, bomb making, violence and intent to shock or disgust.  The sixth and seventh bullet points mention hate speech, as well as "predatory behavior, stalking, threats, harassment, intimidation, invading privacy, revealing other people's personal information, and inciting others to commit violent acts." Community Guidelines.  That the fifth and eighth bullet points refer to copyright violations and spam does not render the other six bullet points non-defamatory.  Nor does the non-exhaustive nature of the list obviate any defamatory meaning.  A fact-finder could reasonably infer defamatory meaning here.  See Flynn, 744 F.2d at 696 (citing Forsher, 26 Cal. 3d at 806).

B. Reference to Plaintiffs

Plaintiffs must plead that the allegedly defamatory statements are "of and concerning" them.  Flynn, 744 F.2d at 697. A "defamatory statement that is ambiguous as to its target not only must be capable of being understood to refer to the plaintiff, but also must be shown actually to have been so understood by a third party."  SDV/ACCI, Inc. v. AT&T Corp., 522 F.3d 955, 960 (9th Cir. 2008).

Here, Plaintiffs have not alleged facts sufficient to satisfy these requirements.  Plaintiffs allege that Defendants posted the notice in the music video's original place, 2AC ¶ 104, and that

United States District Court
For the Northern District of California

24

**United States District Court**
For the Northern District of California

the notice remained "live" there, id. ¶ 106.  However, it is not
clear from the complaint who kept the notice "live" or for how
long.  Plaintiffs also allege that N.G.B. was credited for his
acting performance "[o]n the 'LuvYa' video link," id. ¶ 96, and
that Song fi had "promoted" the link "aggressively through e-mail
chains and social network platforms wherein N.G.B. was identified
as being the star of the 'LuvYa' music video along with the Rasta
Rock Opera musical group," id. at 98.  However, it is not clear
from these allegations how a third party viewer would have
connected each Plaintiff to the video and the notice or how a
third party would have arrived at the video's original web page
and then associated the notice with each Plaintiff.  Plaintiffs
should quote or attach the emails and Facebook messages that
disseminated the link to the web page that contained the notice,
as well as any relevant text that remained on the web page along
with the notice after the video's removal, that could link each
Plaintiff to the notice.  See Darnaa LLC v. Google, 2015 WL
7753406, at *9-*10 (N.D. Cal.) (granting leave to amend in a libel
per quod claim where plaintiff did not allege how YouTube notice
identified plaintiff).

     The Court GRANTS Defendants' motion to dismiss Plaintiffs'
libel per quod claim, with leave to amend.

     V.   California Consumer Legal Remedies Act (CLRA)

     "The CLRA makes unlawful certain 'unfair methods of
competition and unfair or deceptive acts or practices' used in the
sale of goods or services to a consumer."  Wilens v. TD Waterhouse
Grp., Inc., 120 Cal. App. 4th 746, 753 (2003) (quoting Cal. Civ.
Code § 1770(a)).  "By definition, the CLRA does not apply to

unfair or deceptive practices that occur <u>after</u> the sale or lease
has occurred."  <u>Moore v. Apple, Inc.</u>, 73 F. Supp. 3d 1191, 1201
(N.D. Cal. 2014) (collecting cases) (emphasis in original).
Section 1780(a) provides, "Any consumer who suffers any damage as
a result of the use or employment by any person of a method, act,
or practice declared to be unlawful by Section 1770 may bring an
action" under the CLRA.  Thus, to pursue a CLRA claim, plaintiffs
must have been "exposed to an unlawful practice" and "some kind of
damage must result."  <u>Meyer v. Sprint Spectrum L.P.</u>, 45 Cal. 4th
634, 641 (2009).

To state a claim under the CLRA, plaintiffs must be
"consumers."  "Consumer" is defined as "an individual who seeks or
acquires, by purchase or lease, any goods or services for
personal, family, or household purposes."  Cal. Civ. Code
§ 1761(d).  "Goods" are "tangible chattels bought or leased for
use primarily for personal, family, or household purposes."  <u>Id.</u>
§ 1761(a).  The CLRA defines "services" as "work, labor, and
services for other than a commercial or business use, including
services furnished in connection with the sale or repair of
goods."  <u>Id.</u> § 1761(b).

Plaintiffs Brotherton and N.G.B. allege that YouTube provides
consumer services, 2AC ¶ 137, and that they purchased or leased
the services by providing consideration in the form of
"plaintiffs' consumer traffic on the YouTube website," <u>id.</u> ¶ 139.
Plaintiffs' allegations do not support standing for their CLRA
claim.

Plaintiffs have not alleged facts sufficient to support that
YouTube provides a service under the CLRA.  Although Plaintiffs

**United States District Court**
For the Northern District of California

may have entered into a contract with YouTube, not all contracts are for goods or services.  See, e.g., Broberg v. Guardian Life Ins. Co. of Am., 171 Cal. App. 4th 912, 924-25 (2009) (concluding that insurance agreements are not "services furnished in connection with the sale or repair of goods" because they "are simply agreements to pay if and when an identifiable event occurs").  Nor is Plaintiffs' use of the YouTube website the use of a service.  "California law is clear that software is not a tangible good or service for the purposes of the CLRA."  In re Sony Gaming Networks & Customer Data Sec. Breach Litig., 903 F. Supp. 2d 942, 972 (S.D. Cal. 2012) (holding that the computer network system used to provide PlayStation Network services, which permitted access to various third party services, did not constitute a "service" under the CLRA).

Even if YouTube provided a service, Plaintiffs did not use YouTube "for other than a commercial or business use."  Cal. Civ. Code § 1761(b).  The thrust of the 2AC is that Plaintiffs uploaded the video and promoted it for commercial purposes.  The 2AC contains no facts supporting that Plaintiffs uploaded the video for any other purpose.  See, e.g., Pers. v. Google, Inc., 2007 WL 832941, at *7 (N.D. Cal.) (holding that because plaintiff's stated purpose for using a computer program was commercial and political, plaintiff was not a consumer and did not have standing under the CLRA).

Further, the facts alleged do not support that Plaintiffs entered into the relationship with YouTube "by purchase or lease."  Cal. Civ. Code § 1761(d).  The "more generalized notion that the phrase 'purchase' or 'lease' contemplates any less than tangible

form of payment--finds no support under the specific statutory language of the CLRA." Claridge v. RockYou, Inc., 785 F. Supp. 2d 855, 864 (N.D. Cal. 2011); see also In re Zynga Privacy Litig., 2011 WL 7479170, at *1-*2 (N.D. Cal.) (granting motion to dismiss a CLRA claim where the plaintiffs "alleged that they received Facebook's services 'free of charge'"). Providing consumer traffic for YouTube, Plaintiffs' alleged consideration, is certainly a less than tangible form of payment. See, e.g., Yunker v. Pandora Media, Inc., 2013 WL 1282980, at *12 (N.D. Cal.) (concluding that plaintiff lacked standing because the personally identifiable information that Pandora gathered when plaintiff registered for Pandora was a "less than tangible form of payment"). So is uploading the video. Plaintiffs have failed to allege facts sufficient to support CLRA standing.

The 2AC's CLRA allegations are insufficient in other ways, too. The CLRA claim contains allegations of fraud. See, e.g., 2AC ¶ 149-50 (alleging that false view counts deceive consumers, thereby representing that videos have characteristics that they do not have). The fraud-based portion does not meet the standards of Rule 9(b) enunciated above.

In addition, Plaintiffs cannot base a CLRA claim on an allegedly unconscionable contract clause. See id. ¶¶ 154-55 (alleging that the following clause is unconscionable: "YouTube reserves the right to discontinue any aspect of the Service at any time."). The District of Columbia court ruled that the "discontinue service" provision of the contract is not unconscionable, District of Columbia Opinion at 13, and Judge Conti reasoned that this clause supported dismissing Plaintiffs'

United States District Court
For the Northern District of California

breach of contract claim.  Further, applying California law, it is not plausible that this contract term is unconscionable because no allegations support that the term is "so one-sided as to 'shock the conscience.'"  Pinnacle Museum Tower Ass'n v. Pinnacle Market Dev. (US), LLC, 55 Cal. 4th 223, 246 (2012) (quoting 24 Hour Fitness, Inc. v. Super. Ct., 66 Cal. App. 4th 1199, 1213 (1998)).

For all these reasons, the Court GRANTS Defendants' motion to dismiss Plaintiffs' CLRA claim.  Because Plaintiffs cannot allege facts which would establish their standing, dismissal is without leave to amend.

VI.  Tortious Interference with Business Relationships

Judge Conti outlined the elements for a tortious interference claim.  Order Dismissing 1AC at 18.  Plaintiffs still fail to allege any wrongful conduct other than the fact of interference itself, although they may be able to remedy this shortcoming. Thus, the Court GRANTS Defendants' motion to dismiss Plaintiffs' tortious interference claim, with leave to amend.  Plaintiffs may move forward on this claim if they successfully allege one of the remaining causes of action.

CONCLUSION

The Court GRANTS Defendants' motion to dismiss Plaintiffs' Cartwright Act claim, Plaintiffs' fraudulent concealment claim, Plaintiffs' libel per quod claim and Plaintiffs' tortious interference with business relationships claim, with leave to amend; Plaintiffs' CLRA claim is dismissed without leave to amend.

Within fourteen days of the date of this order, Plaintiffs may file an amended complaint to remedy the deficiencies identified above.  They may not add further claims.  If Plaintiffs

file an amended complaint, Defendants shall respond to it within fourteen days after it is filed.  If Defendants file a motion to dismiss, Plaintiffs shall respond to the motion within fourteen days after it is filed.  Defendants' reply, if necessary, shall be due seven days thereafter.  Any motion to dismiss will be decided on the papers.

IT IS SO ORDERED.

Dated: April 4, 2016

CLAUDIA WILKEN
United States District Judge

United States District Court
For the Northern District of California