**United States District Court**
For the Northern District of California

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4  SONG FI, INC., JOSEPH N.                     No. C 14-5080 CW
   BROTHERTON, LISA M. PELLEGRINO,
5  N.G.B., RASTA ROCK, INC.,                    ORDER ON MOTION TO
                                                DISMISS THIRD
6        Plaintiffs,                            AMENDED COMPLAINT

7      v.                                       (Docket No. 107)

8  GOOGLE, INC., YOUTUBE LLC,

9        Defendants.

10 _____/

11

12      Defendants Google, Inc. and YouTube LLC move to dismiss

13 Plaintiffs' Third Amended Complaint (3AC).  The Court grants

14 Defendants' motion in part, and denies it in part.

15                          BACKGROUND

16      The Court described this case's factual and procedural

17 background in its order granting Defendants' motion to dismiss

18 Plaintiffs' Second Amended Complaint (2AC).  There, the Court

19 dismissed Plaintiffs' Cartwright Act, fraudulent concealment,

20 libel per quod and tortious interference claims, with leave to

21 amend.  The Court ruled that Plaintiffs may not add further

22 claims.  Plaintiffs filed timely their 3AC.

23                        LEGAL STANDARD

24      A complaint must contain a "short and plain statement of the

25 claim showing that the pleader is entitled to relief."  Fed. R.

26 Civ. P. 8(a).  On a motion under Rule 12(b)(6) for failure to

27 state a claim, dismissal is appropriate only when the complaint

28 does not give the defendant fair notice of a legally cognizable

claim and the grounds on which it rests.  <u>Bell Atl. Corp. v.</u>

<u>Twombly</u>, 550 U.S. 544, 555 (2007).  In considering whether the

complaint is sufficient to state a claim, the court will take all

material allegations as true and construe them in the light most

favorable to the plaintiff.  <u>NL Indus., Inc. v. Kaplan</u>, 792 F.2d

896, 898 (9th Cir. 1986).  However, this principle is inapplicable

to legal conclusions.  "Threadbare recitals of the elements of a

cause of action, supported by mere conclusory statements," are not

taken as true.  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)

(citing <u>Twombly</u>, 550 U.S. at 555).

In <u>Iqbal</u>, 556 U.S. at 679, the Supreme Court laid out the

following approach for assessing the adequacy of a plaintiff's

complaint:

> a court considering a motion to dismiss can choose to begin
> by identifying pleadings that, because they are no more than
> conclusions, are not entitled to the assumption of truth.
> While legal conclusions can provide the framework of a
> complaint, they must be supported by factual allegations.
> When there are well-pleaded factual allegations, a court
> should assume their veracity and then determine whether they
> plausibly give rise to an entitlement to relief.

A claim has facial plausibility "when the plaintiff pleads factual

content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged."  <u>Id.</u> at

678.  "The plausibility standard is not akin to a 'probability

requirement,' but it asks for more than a sheer possibility that a

defendant has acted unlawfully."  <u>Id.</u> (quoting <u>Twombly</u>, 550 U.S.

at 556).  Determining whether a complaint states a plausible claim

for relief is "a context-specific task that requires the reviewing

court to draw on its judicial experience and common sense."  <u>Id.</u>

at 679.

United States District Court
For the Northern District of California

1    When granting a motion to dismiss, the court is generally

2 required to grant the plaintiff leave to amend, even if no request

3 to amend the pleading was made, unless amendment would be futile.

4 Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc., 911

5 F.2d 242, 247 (9th Cir. 1990).  In determining whether amendment

6 would be futile, the court examines whether the complaint could be

7 amended to cure the defect requiring dismissal "without

8 contradicting any of the allegations of [the] original complaint."

9 Reddy v. Litton Indus., Inc., 912 F.2d 291, 296 (9th Cir. 1990).

10 Leave to amend should be liberally granted, but an amended

11 complaint cannot allege facts inconsistent with the challenged

12 pleading.  Id. at 296-97.  Courts consider whether the plaintiffs

13 have previously amended the complaint in determining whether to

14 grant leave to amend.  See, e.g., Fid. Fin. Corp. v. Fed. Home

15 Loan Bank of S.F., 792 F.2d 1432, 1438 (9th Cir. 1986) ("The

16 district court's discretion to deny leave to amend is particularly

17 broad where the court has already given the plaintiff an

18 opportunity to amend his complaint.").

19                            DISCUSSION

20   I.   Cartwright Act

21    In its previous order, the Court dismissed Plaintiffs'

22 Cartwright Act claim because it did not support that

23 1) Plaintiffs' injuries were proximately caused by the alleged

24 conspiracy for view count inflation; 2) the conspiracy harmed

25 competition; and 3) Defendants were involved in the conspiracy or

26 worked with other alleged conspirators.

27    In the 3AC, Plaintiffs reframe the alleged conspiracy as

28 follows.  The conspiring entities include Defendants, at the

                                3

**United States District Court**
For the Northern District of California

1  direction of various executives; Universal Music Group and its

2  subsidiaries, associated record labels and distribution partners;

3  other major music labels, referred to as "Major Labels"; Raymond

4  Braun Media Group and Scooter Braun personally; and the Fake View

5  Facilitators.[1]   Together, these parties conspired to restrain the

6  following market: "the sale, promotion, and distribution of

7  recorded music and music videos in the United States."   3AC ¶ 17.

8  They did so largely by manipulating view counts on YouTube.

9  Plaintiffs allege that Defendants, through YouTube, are "the

10  dominant provider of online video hosting services" and that there

11  is "no other music or video website operating anywhere in the

12  world that remotely rivals Youtube's viewership, market share,

13  profitability, and name recognition."   Id. ¶ 15.   Notably,

14  Plaintiffs' description of YouTube does not connect YouTube to the

15  relevant market or describe its share of that market.   The

16  conspiracy allegedly benefitted the conspirators to the detriment

17  of advertisers on YouTube as well as Plaintiffs and others in the

18  independent artist community.

19      The conspiracy began in 2006, when Google acquired YouTube

20  and transformed it into a vehicle to effectuate the conspiracy.

21  At this point, Google entered into contracts with the Major

22  Labels, "which called for the splitting of advertising revenues

23  from Major Label videos posted on YouTube."   Id. ¶ 28.

24      Under these contractual agreements, Defendants and the Major

25  Labels split revenue from the pay-per-click advertisements that

26  

27  [1] Fake View Facilitators are shell companies set up by the
conspirators so hackers can create fake views.   Id. ¶¶ 76-77.

28  

4

run alongside the music videos.  Id. ¶ 29.  Defendants' role in

the conspiracy included selectively enforcing the Terms of Service

by allowing fake views to inflate Major Labels' artists' view

counts and collecting the money from the advertisers.  Defendants

did not enforce Term of Service § 4H, the prohibition of automated

view counts, against the Major Labels and their artists.

Defendants' executives refused to implement any fake view count

filter.  YouTube's set-up allowed "anyone to simply copy the URL .

. . and purchase Fake Views by sending payment to the service

provider."  Id. ¶ 38.  Defendants publish no guidelines as to how

views are counted, which supported the conspiracy.  Finally,

Defendants split the money from the advertisers with the

conspiring entities.

     The inflated view counts also changed the perceived

popularity of the Major Labels' artists, which encouraged

purchases that may not have otherwise occurred.  This prevented

"the Independent Artists from competing fairly in the relevant

market."  Id. ¶ 35.  The conspirators aimed to minimize the

popularity of independent artists in relation to the Major Labels'

artists.  Id. ¶ 31.  To this end, Defendants "employ[ed]

aggressive and contrived enforcement action against Plaintiffs and

others in the Independent Artist community" by accusing them of

violating § 4H, removing their view counts, likes and public

comments, and then libeling them.  Id. ¶ 23.  Plaintiffs link this

aim of the conspiracy with the defrauding of the YouTube

advertisers by describing Defendants as "holding members of the

Independent Artist community down and using them as diversionary

scapegoats."  Id. ¶ 24.

United States District Court
For the Northern District of California

1       Plaintiffs allege that they suffered the following damages

2   proximately caused by this two-pronged conspiracy: loss to the

3   value of the "Respect and Love Manifesto" and the music and film

4   score "Rasta Rock Opera"; and loss of funds owed to Song fi and

5   Rasta Rock as a result of the termination of funding arrangements

6   by Precision Contracting Solutions (PCS).[2]   Id. ¶ 85.

7       Plaintiffs attempt to bolster the plausibility of this two-

8   part conspiracy in several ways.  First, they attach the Vocativ

9   article that they cited in the 2AC.  See id. ¶ 33; Ex. 2.  The

10  article explains that "YouTube views . . . can make or break a new

11  career – and add a lot of money to the bank accounts of existing

12  stars."  3AC ¶ 33 (quoting Ex. 2).  This article does not help

13  Plaintiffs.  The email from Scooter Braun, described in the

14  article, stated: "We do not want any traces or any low-quality

15  views that can get us in trouble."  Ex. 2.  The article also

16  mentions a "Google crackdown," and that companies are "trying to

17  stay one step ahead of YouTube."  Id.  These statements do not

18  make it plausible that Defendants were part of this alleged

19  conspiracy in the ways alleged.  Second, the 3AC incorporates

20  Exhibit 3, which contains print-outs of advertisements for fake

21  view facilitators.  Id. ¶ 39.  According to Plaintiffs, this

22  paragraph "proves" that Defendants were selling sponsored ads to

23  companies in the business of selling fake views.  However, Exhibit

24  3 evinces no link to Google; nor does it show that YouTube was

25  involved in any conspiracy.  Third, Plaintiff Brotherton has

26  _____

27      [2] Plaintiffs also claim a loss in "live performance revenues
    for shows that were canceled," but the only show specifically
    alleged, the Nike show, did not involve revenue.
28

1 allegedly tested the claim that view counts count actual views;

2 when he has watched videos multiple times, the view count

3 increases by one.  Id. ¶ 47.[3]

4        A. Injuries and proximate cause

5     Plaintiffs' alleged injuries do not fall within the "target

6 area" of the antitrust claim.  Kolling v. Dow Jones & Co., 137

7 Cal. App. 3d 709, 723 (1982).  In the 3AC, Plaintiffs describe the

8 alleged conspiracy as promoting Major Labels' artists while

9 suppressing independent artists' participation by removing videos

10 and selectively enforcing the Terms of Service.  However, the

11 allegations suggest that Defendants' goal in the alleged

12 conspiracy was to defraud advertisers in order to make more money,

13 not to suppress competition within the music market.  It is not

14 plausible that Defendants intended to defame independent artists

15 as part of this conspiracy.

16        B. Harm to competition

17     In addition to the flaws described above, the 3AC fails to

18 allege with sufficient particularity how the conspiracy harmed

19 competition.  Antitrust law protects competition, not competitors.

20 Injuries to Plaintiffs are insufficient to demonstrate that

21 competition was harmed.  Further, Plaintiffs' description of

22 YouTube's position in the relevant market is inadequate.

23 YouTube's prominence as a "music or video website" does not

24 explain its market share in "the sale, promotion, and distribution

25

26     [3] Defendants argue that Plaintiffs' allegation that view
counts represent users and not views is false.  However, in a
27 motion to dismiss the Court takes as true all of Plaintiffs'
allegations.
28

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  of recorded music and music videos in the United States."  3AC

2  ¶¶ 15, 17.  Plaintiffs failed to allege plausibly that this

3  conspiracy harmed competition in the relevant market.

4       Because the 3AC is still flawed with respect to proximate

5  cause and harm to competition, the Court need not discuss

6  Defendants' involvement with the conspiracy.  The Court GRANTS

7  Defendants' motion to dismiss Plaintiffs' Cartwright Act claim,

8  without leave to amend, because Plaintiffs have already had an

9  opportunity to amend.  See Fid. Fin. Corp., 792 F.2d at 1438.

10    II.  Fraud

11      In their 2AC, Plaintiffs alleged a count of "Concealment

12 Fraud."  This Court dismissed Plaintiffs' fraudulent concealment

13 claim with leave to amend, but stated that Plaintiffs could not

14 add further claims.  Rather than amending their fraudulent

15 concealment claim, Plaintiffs plead one count of fraud, which

16 encompasses two new theories: intentional fraud and promissory

17 fraud.  3AC ¶¶ 88-121.  It is too late for Plaintiffs to add new

18 claims.

19      Plaintiffs argue that they are reverting to their Proposed

20 Second Amended Complaint, Docket No. 54-1.  That proposal

21 contained a fraud claim that described both an "intentional

22 misrepresentation" and an implicit representation.  Judge Conti

23 granted leave to file a revised version of the Proposed Second

24 Amended Complaint.  Docket No. 67.  Plaintiffs then filed their

25 2AC, which this Court dismissed.  Plaintiffs did not include

26 promissory fraud and intentional fraud in their Second Amended

27 Complaint.  They cannot incorporate these new theories now.

28

8

United States District Court
For the Northern District of California

1    Additionally, the new theories' allegations are insufficient.

2 Under the intentional fraud theory, Plaintiffs base their reliance

3 on a view count free from outside manipulation "on the security

4 safeguards of other G-Y services, such as G-mail."  3AC ¶ 96.  It

5 is not plausible that users would extrapolate from G-mail

6 safeguards that view counts would be accurate or rely on that

7 conclusion in posting videos to YouTube.  Further, Plaintiffs

8 describe an implied promise that YouTube would be free from fake

9 views.  Plaintiffs allegedly found this implied promise in section

10 4H of the terms of service, the absence of any disclosure

11 statement alerting users that the view count might be inaccurate

12 and Defendants' control over the view count.  These allegations

13 are not sufficiently particular under Federal Rule of Civil

14 Procedure 9 to claim an implied promise that was false when made.

15    These new theories also fail for some of the same reasons

16 Plaintiffs' fraudulent concealment claim failed.  Plaintiffs still

17 do not allege out-of-pocket damages.  Their allegations include

18 the following proposed damages: payments to technical personnel to

19 convert, condense and upload the LuvYa video and manage comments

20 and responses on the Stevie Marco YouTube channel; loss of

21 advertising expenses paid to Facebook to promote LuvYa; the

22 "views, likes, and favorable public comments that are the property

23 of Plaintiffs"; the fair market value of these likes and comments;

24 and attorneys' fees.  3AC ¶ 117.  None of these enumerated alleged

25 damages, nor any other damages listed in the 3AC, reflect "the

26 difference in actual value at the time of the transaction between

27 what the plaintiff gave and what he received" due to the allegedly

28 fraudulent nature of the transaction.  See Order Dismissing 2AC at

United States District Court
For the Northern District of California

1  18 (quoting <u>All. Mortg. Co. v. Rothwell</u>, 10 Cal. 4th 1226, 1240

2  (1995)).[4]  Further, the 3AC still fails to allege detrimental

3  reliance.  <u>See</u> Order Dismissing 2AC at 20.  Like the 2AC,

4  Plaintiffs' 3AC does "not allege the more advantageous marketing

5  they would have pursued had they not posted LuvYa on YouTube."

6  <u>Id.</u>

7       The Court GRANTS Defendants' motion to dismiss Plaintiffs'

8  fraud claim, without leave to amend.

9   III. Libel Per Quod

10      Libel <u>per quod</u> requires that a defamatory statement is

11 capable of being understood to refer to each plaintiff and was so

12 understood.  Plaintiffs previously failed to satisfy this "of and

13 concerning" requirement for a libel <u>per quod</u> claim.  Order

14 Dismissing 2AC at 24-25.  The 3AC elaborates their allegations

15 regarding this requirement as follows.

16      On February 14, 2014, Plaintiffs uploaded LuvYa to YouTube.

17 The "Title" and "More" section of the video on YouTube "listed

18 Song fi, the Rasta Rock Opera, young N.G.B, and musicians from the

19 Rasta Rock Opera musical group, including Plaintiff Joe

20 Brotherton, as performers."  <u>Id.</u> ¶ 124.  Plaintiffs describe the

21 various forms of dissemination, and attach emails and Facebook

22 messages.  Exhibit 5 is an email that Brotherton sent to N.G.B.'s

23

24       [4] Plaintiffs argue that the damages for their fraud claim
   should be calculated under California Civil Code section 3333,
25 which "will compensate for all the detriment proximately caused
   thereby, whether it could have been anticipated or not."  This
26 section applies to non-contract torts in general, whereas <u>Alliance</u>
   <u>Mortgage</u> squarely discusses the monetary loss that a plaintiff
27 alleging fraud must suffer for relief.
28

United States District Court
For the Northern District of California

1  teacher, identifying N.G.B.  The forwarded message also mentions

2  the Rasta Rock Opera.  Exhibit 6 contains several emails sent by

3  Stevie Marco (a member of the Rasta Rock Opera) that share the

4  video link.  These emails mention Rasta Rock Opera and N.G.B.

5  Exhibit 7 contains emails from Brotherton disseminating the video

6  link, stating that he and N.G.B. are in the video together, and

7  that the song in the video is part of the Rasta Rock Opera album.

8  Song fi and Rasta Rock Opera also disseminated printed materials

9  at shows, which stated, "Song fi, in association with the Rasta

10  Rock Opera present 'LuvYa,'" and instructed attendees to log onto

11  the Stevie Marco Channel on YouTube to view it.  3AC ¶ 130.

12      On April 18, 2014, Defendants took down LuvYa and posted the

13  allegedly defamatory notice.  Id. ¶ 135.  Fans asked Brotherton

14  "what was the problem with the content of the 'LuvYa' video

15  involving young kids."  Id. ¶ 131.  The notice remained "live" on

16  the original LuvYa link until August 11, 2014.  Id. ¶ 150.

17      These allegations are sufficient to show that the notice was

18  capable of being understood to refer to each Plaintiff, and that

19  it actually was so understood.  See Order Dismissing 2AC at 24

20  (quoting SDV/ACCI, Inc. v. AT&T Corp., 522 F.3d 955, 960 (9th Cir.

21  2008)).  Plaintiffs identified themselves when circulating the

22  LuvYa video link before Defendants replaced the video with the

23  notice.  Fans asked Brotherton about the problem with the video's

24  content, which demonstrates that third parties connected the

25  notice to Brotherton.  See 3AC ¶ 131.  Additionally, the 3AC

26  alleges that N.G.B. had an agreement with PCS to perform in a

27  series of commercials on the company's webpage.  The performance

28  was "cancelled when PCS clients saw the Notice on the original

United States District Court
For the Northern District of California

'LuvYa' video link."  3AC ¶ 153(b).  The inference here is that

PCS saw the notice and attributed it to N.G.B.  See also id. ¶ 167

(explaining that Nike saw the notice and canceled a Rasta Rock

Opera event because it did not want to be associated with

inappropriate children's content).

Defendants argue that the defamatory statement must say

something about Plaintiffs, rather than about the video itself.

However, as the California Court of Appeal has recognized,

statements may simultaneously result in "personal aspersion and

commercial disparagement."  Polygram Records, Inc. v. Super. Ct.,

170 Cal. App. 3d 543, 550 (1985).  Here, the Community Guidelines

implicated in the notice list many forms of depravity that may

appear in a video; an average reader may find defamatory meaning

in an accusation of posting a video that violates these

guidelines.  See Order Dismissing 2AC at 24.

Defendants also argue that Plaintiffs manufactured a libel

claim by disseminating the link in emails and messages naming

Plaintiffs.  However, as explained above, Plaintiffs spread the

link before Defendants replaced the video with the notice.

The Court DENIES Defendants' motion to dismiss Plaintiffs'

libel per quod claim.

IV.  Tortious Interference with Business Relationships

Plaintiffs Song fi and Rasta Rock allege that Defendants

intentionally interfered with their business relationships "with

the Nike Corporation and with other business partners, both

existing and in negotiation and with Precision Contracting

Solutions ('PCS'), the funding entity for Song fi and Rasta Rock."

3AC ¶ 160.  David Drummond, Defendants' Chief Legal Officer, Board

**United States District Court**
For the Northern District of California

1   Member and Executive was notified in writing on May 12, 2014 about

2   the impact that the allegedly libelous notice was having on Song

3   fi's and Rasta Rock's business relationships.  Id. ¶ 161; Ex. 9.

4   The letter states that the removal interfered, "without

5   justification, with Song fi and Mr. Marco's prospective economic

6   relationships."  Id. Ex. 9.  The letter mentions no specific

7   economic relationships.

8       Economic relationships "were seriously damaged, and in some

9   cases destroyed, as a result of [Defendants'] false and defamatory

10  Notice."  Id. ¶ 164.  For example, Song fi and Rasta Rock had

11  promoted LuvYa in persuading Nike to allow Stevie Marco to perform

12  the Star Spangled Banner on July 4, 2014 on the roof of its store

13  in Georgetown.  Id. ¶ 165.  Nike called off the event because it

14  learned of the notice "and as a result was unwilling to risk a

15  possible image problem in associating Nike with inappropriate

16  children's content."  Id. ¶ 167.  Additionally, on May 10, 2014,

17  PCS notified Song fi and Rasta Rock that it was suspending all

18  further funding until the notice was retracted.  Id. ¶ 171.

19      Under California law, a claim for tortious interference

20  requires: "(1) an economic relationship between the plaintiff and

21  some third party, with the probability of future economic benefit

22  to the plaintiff; (2) the defendant's knowledge of the

23  relationship; (3) intentional acts on the part of the defendant

24  designed to disrupt the relationship; (4) actual disruption of the

25  relationship; and (5) economic harm to the plaintiff proximately

26  caused by the acts of the defendant."  Korea Supply Co. v.

27  Lockheed Martin Corp., 29 Cal. 4th 1134, 1153 (2003).  Because

28  Plaintiffs' libel per quod claim survives this motion to dismiss,

13

**United States District Court**
For the Northern District of California

1 Plaintiffs have sufficiently alleged that YouTube's conduct was

2 "wrongful by some legal measure other than the fact of

3 interference itself."  Della Penna v. Toyota Motor Sales, U.S.A.,

4 Inc., 11 Cal. 4th 376, 393 (1995).

5      Here, Song fi's and Rasta Rock's allegations are sufficient

6 to support that some economic relationship existed, at least as to

7 PCS, which was funding them.  They are also sufficient to convey

8 actual disruption of the relationship and economic harm

9 proximately caused by Defendants' acts.  Further, as Judge Conti

10 concluded in his order dismissing the First Amended Complaint,

11 Plaintiffs' allegations could satisfy the knowledge and

12 intentional act requirements.  For these reasons, the Court DENIES

13 Defendants' motion to dismiss Song fi's and Rasta Rock's tortious

14 interference claim.

15                          CONCLUSION

16      The Court GRANTS Defendants' motion to dismiss Plaintiffs'

17 Cartwright Act claim and fraud claim, without leave to amend.  It

18 DENIES Defendants' motion to dismiss Plaintiffs' libel per quod

19 claim and the claim for tortious interference with business

20 relations.

21      IT IS SO ORDERED.

22

23 Dated: June 27, 2016                 _____
                                        CLAUDIA WILKEN
24                                      United States District Judge

25

26

27

28

                              14