DAVID H. KRAMER, State Bar No. 168452
SAMUEL J. DIPPO, State Bar No. 310643
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone:  (650) 493-9300
Facsimile:   (650) 565-5100
Email:  dkramer@wsgr.com
          sdippo@wsgr.com

BRIAN M. WILLEN, (admitted *pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas
New York, NY 10019
Telephone: (212) 999-5800
Email: bwillen@wsgr.com

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| SONG FI, et al., | CASE NO.:  4:14-CV-05080-CW |
| Plaintiffs, | **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| GOOGLE INC. and YOUTUBE, LLC, | |
| Defendants. | Hearing Date: December 19, 2017 |
| | Time: 2:30 p.m. |
| | Before: Hon. Claudia Wilken |
| | REDACTED VERSION OF DOCUMENT PROVISIONALLY FILED UNDER SEAL |

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ............................................................................................................... ii

TABLE OF AUTHORITIES ....................................................................................................... iii

GLOSSARY OF ABBREVIATIONS ......................................................................................... vi

NOTICE OF MOTION AND MOTION .................................................................................... 1

STATEMENT OF ISSUES TO BE DECIDED ......................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................... 1

UNDISPUTED FACTS SUPPORTING SUMMARY JUDGMENT ....................................... 4

      A.    YouTube and Its Efforts to Combat View Count Spam ................................ 4

      B.    Plaintiffs and the LuvYa Video ................................................................... 5

      C.    The LuvYa Video Is Found in Violation of YouTube's Terms of Service ................ 6

      D.    Plaintiffs' Response To the Relocation of the LuvYa Video ......................... 8

      E.    Procedural History ....................................................................................... 9

ARGUMENT ............................................................................................................................. 10

I.    The Court of Appeal's Decision in *Bartholomew* Disposes of Plaintiffs' Claims .............. 10

II.    YouTube Is Entitled To Summary Judgment on Plaintiffs' Defamation Claim ................. 12

      A.    YouTube Did Not Intentionally or Negligently Make a False Statement ................. 12

      B.    No Third Parties Imputed a Defamatory Meaning To the Notice .................. 14

      C.    No Third Parties Read the Notice As "Of And Concerning" Plaintiffs ............... 16

      D.    Plaintiffs Have No Evidence of Special Damages Resulting From the Notice ......... 17

III.    YouTube Is Entitled To Summary Judgment on Tortious Interference ................................ 18

      A.    There Is No Evidence That YouTube Had Knowledge of Any Economic Relationship Between Plaintiffs and a Third Party ......................... 19

      B.    There Is No Evidence That YouTube's Notice Was Intended To Disrupt Plaintiff's Business Relationships ......................................... 21

      C.    There Is No Evidence That the Notice Harmed Plaintiffs' Relationships ............... 22

IV.    Plaintiffs' Motion for Partial Summary Judgment Should Be Denied ........................ 24

CONCLUSION ......................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Barnes-Hind, Inc. v. Superior Court,*
    181 Cal. App. 3d 377 (1986) ...........................................................................................14

*Bartholomew v. YouTube, LLC,*
    No. H042775, 2017 WL 4988177 (Cal. Ct. App. Nov. 2, 2017) ........................................passim

*Blatty v. New York Times Co.,*
    42 Cal. 3d 1033 (1986) ...................................................................................................16

*Blue Dolphin Charters, Ltd. v. Knight & Carver Yachtcenter, Inc.,*
    No. 11-cv-565-L(WVG), 2011 WL 5360074 (S.D. Cal. Nov. 3, 2011) ..............................20, 21

*Carvalho v. Equifax Info. Servs., LLC,*
    629 F.3d 876 (9th Cir. 2010) ..........................................................................................12

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) .......................................................................................................10

*City of Los Angeles v. Santa Monica BayKeeper,*
    254 F.3d 882 (9th Cir. 2001) ..........................................................................................11

*Cunha v. IntelliCheck, LLC,*
    254 F. Supp. 3d 1124 (N.D. Cal. 2017) ...........................................................................11

*Damabeh v. 7-Eleven, Inc.,*
    No. 5:12-CV-1739-LHK, 2013 WL 1915867 (N.D. Cal. May 8, 2013) ..................................20

*Darnaa, LLC v. Google, Inc.,*
    No. 15-cv-03221-RMW, 2016 WL 6540452 (N.D. Cal. Nov. 2, 2016) ..................................13

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.,*
    11 Cal. 4th 376 (1995) ...................................................................................................19

*Dooley v. Crab Boat Owners Ass'n,*
    271 F. Supp. 2d 1207 (N.D. Cal. 2003) ...........................................................................20

*Dunbar v. Google, Inc.,*
    No. 5:12-cv-003305-LHK, 2012 WL6202797 (N.D. Cal. Dec. 12, 2012) ..............................11

*Ellis v. Starbucks Corp.,*
    No. 15-cv-3451-PJH, 2015 WL 8293965 (N.D. Cal. Dec. 9, 2015) .................................13, 17

*Emp'rs Ins. of Wausau v. Granite State Ins. Co.,*
    330 F.3d 1214 (9th Cir. 2003) ........................................................................................11

*EPIS, Inc. v. Fid. & Guar. Life Ins. Co.,*
    156 F. Supp. 2d 1116 (N.D. Cal. 2001) .......................................................................15, 16

*Erlich v. Etner,*
    224 Cal. App. 2d 69 (1964) ............................................................................................17

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974) ............................................................................13

*Gomes v. Fried*,
    136 Cal. App. 3d 924 (1982) .......................................................... 17, 18

*Gregory v. McDonnell Douglas Corp.*,
    17 Cal. 3d 596 (1976) ......................................................................16

*Grewal v. Jammu*,
    191 Cal. App. 4th 977 (2011) ............................................................12

*Hecimovich v. Encinal Sch. Parent Teacher Org.*,
    203 Cal. App. 4th 450 (2012) ............................................................12

*Kerr v. City & Cty. of San Francisco*,
    No. C 10-5733 CW, 2012 WL 3877752 (N.D. Cal. Sept. 6, 2012)............................10

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (2003) .............................................................. 18, 21

*Lewis v. YouTube, LLC*,
    244 Cal. App. 4th 118 (2015) ............................................................13

*Live Oak Publ'g Co. v. Cohagan*,
    234 Cal. App. 3d 1277 (1991) ...........................................................17

*Meza v. Portfolio Recovery Assocs., LLC*,
    125 F. Supp. 3d 994 (N.D. Cal. 2015) ...................................................11

*Mooney v. Caspari*,
    138 Cal. App. 4th 704 (2006) ............................................................11

*Name.Space, Inc. v. Internet Corp. For Assigned Names & Nos.*,
    795 F.3d 1124 (9th Cir. 2015) ...........................................................19

*Nelson v. Pima Cmty. Coll.*,
    83 F.3d 1075 (9th Cir. 1996) ............................................................10

*Nissan Fire & Marine Ins. Co., v. Fritz Cos.*,
    210 F.3d 1099 (9th Cir. 2000) ...........................................................10

*Palm Springs Tennis Club v. Rangel*,
    73 Cal. App. 4th 1 (1999) ............................................................ 12, 14

*R Power Biofuels, LLC v. Chemex LLC*,
    No. 16-CV-00716-LHK, 2016 WL 6663002 (N.D. Cal. Nov. 11, 2016)................................20

*Roth v. Rhodes*,
    25 Cal. App. 4th 530 (1994) ............................................................21

*Roy Allan Slurry Seal, Inc. v. Am. Asphalt S., Inc.*,
    2 Cal. 5th 505 (2017) ..................................................................21

*Ryman v. Sears, Roebuck & Co.*,
    505 F.3d 993 (9th Cir. 2007) ............................................................12

*SDV/ACCI, Inc. v. AT&T Corp.*,
    522 F.3d 955 (9th Cir. 2008) ...................................................................................16

*Smith v. Maldonado*,
    72 Cal. App. 4th 637 (1999) ...................................................................................17

*Trindade v. Reach Media Grp., LLC*,
    No. 12-CV-4759-PSG, 2013 WL 3977034 (N.D. Cal. July 31, 2013) .......................20

*United States v. Smith*,
    389 F.3d 944 (9th Cir. 2004) ..................................................................................11

*Vedovi v. Watson & Taylor*,
    104 Cal. App. 80 (1930) .........................................................................................16

*Walker v. Boeing Corp.*,
    218 F. Supp. 2d 1177 (C.D. Cal. 2002) ..................................................................15

*Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*,
    42 Cal. App. 4th 507 (1996) ...................................................................................21

*Wheeler v. Home Depot U.S.A., Inc.*,
    No. 15cv2236-CAB-AGS, 2017 WL 1080691 (S.D. Cal. Mar. 22, 2017) ................12

*Winchester Mystery House, LLC v. Glob. Asylum, Inc.*,
    210 Cal. App. 4th 579 (2012) .......................................................................20, 21, 22

**STATUTES**

Cal. Civ. Code § 45a ....................................................................................................17

Cal. Civ. Code § 48a(d)(2) ...........................................................................................17

Cal. Civ. Code § 1668 ..................................................................................................13

Cal. Civ. Code § 3294(a) ..............................................................................................25

**RULES**

Fed. R. Civ. P. 56 .................................................................................................1, 10, 25

Fed. R. Evid. 701(c) ......................................................................................................4

**MISCELLANEOUS**

CACI VF-1705 (2017) ...........................................................................................12, 17

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| Plaintiffs' Motion for Partial Summary Judgment, Dkt. 209-3 | PPMSJ |
| Declaration of Stephen C. Sieber in Support of Plaintiffs' Motion for Partial Summary Judgment, Dkt. 209-6 | Sieber Decl. |
| Declaration of Joseph Brotherton in Support of Plaintiffs' Motion for Partial Summary Judgment, Dkt. 209-6 | Brotherton Decl. |
| Declaration of Mohith Rao Kotagiri in Support of Defendants' Motion for Summary Judgment and Opposition to Plaintiffs Motion for Partial Summary Judgment | Kotagiri Decl. |
| Declaration of Katie Hushion Haas in Support of Defendants' Motion for Summary Judgment and Opposition to Plaintiffs Motion for Partial Summary Judgment | Haas Decl. |
| Declaration of Samuel J. Dippo in Support of Defendants' Motion for Summary Judgment and Opposition to Partial Plaintiffs Motion for Summary Judgment | Dippo Decl. |
| Transcript of the Deposition of Joseph Brotherton, attached as Exhibit 1 to the Dippo Decl. | Brotherton Tr. |
| Transcript of the Deposition of Song fi, Inc. through its 30(b)(6) witness Stephen Sieber, attached as Exhibit 2 to the Dippo Decl. | Song fi Tr. |
| Transcript of the Deposition of Rasta Rock Corporation through its 30(b)(6) witness Stephen Sieber, attached as Exhibit 3 to the Dippo Decl. | RRC Tr. |
| Transcript of the Deposition of YouTube, LLC through its 30(b)(6) witness Mohith Rao Kotagiri, attached as Exhibit 4 to the Dippo Decl. | YT Tr. |
| Transcript of the Deposition of Conrad Osipowicz, attached as Exhibit 5 to the Dippo Decl. | Osipowicz Tr. |
| Transcript of the Deposition of Derrick Sieber, attached as Exhibit 6 to the Dippo Decl. | D. Sieber Tr. |
| Transcript of the Deposition of Ben Kibour, attached as Exhibit 7 to the Dippo Decl. | Kibour Tr. |
| Transcript of the Deposition of Katie Hushion Haas, attached as Exhibit 8 to the Dippo Decl. | Haas Tr. |
| Plaintiffs' Answers to Defendants' Interrogatories, attached as Exhibit 9 to the Dippo Decl. | Pls.' Interrog. Response |

1

2

Plaintiffs' Answers to Defendants' Requests for Admission, attached as Exhibit 10 to the Dippo Decl.

Pls.' RFA Response

3

4

Defendants' Responses and Objections to Plaintiffs' Interrogatories, attached as Exhibit 11 to the Dippo Decl.

Defs.' Interrog. Response

5

Declaration of Carol Kauffman dated November 28, 2016, attached as Exhibit 12 to the Dippo Decl.

Kauffman Decl.

6

7

Declaration of Ryan Schafer dated December 12, 2016, attached as Exhibit 13 to the Dippo Decl.

Schafer Decl.

8

9

Declaration of Katie Hushion in Opposition to Plaintiff's Temporary Restraining Order and Preliminary Injunction, Dkt. 8-3, attached as Exhibit 14 to the Dippo Decl.

Hushion (PI) Decl.

10

11

Declaration of Brianna C. Kohr in Opposition to Plaintiffs' Motion for Sanctions, Dkt. 165, (and selected exhibits) attached as Exhibit 15 to the Dippo Decl.

Kohr Decl.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**NOTICE OF MOTION AND MOTION**

2      TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD: PLEASE TAKE

3   NOTICE that on December 19, 2017, before the Honorable Claudia Wilken of the U.S. District

4   Court for the Northern District of California, Defendants Google Inc. and YouTube, LLC

5   ("Defendants" or "YouTube") will, and hereby do, move pursuant to Fed. R. Civ. P. 56 for

6   summary judgment in this action. The motion is based upon this Notice of Motion, the supporting

7   Memorandum of Points and Authorities and attached declarations and supporting documents, all

8   pleadings, records, and papers on file in this action, and any other matters properly before the Court.

9

**STATEMENT OF ISSUES TO BE DECIDED**

10      1.      Does the California Court of Appeal's recent decision in *Bartholomew v. YouTube*

11   require judgment in favor of YouTube?

12      2.      Can Plaintiffs carry their burden of establishing triable issues on their claims for libel

13   *per quod* and tortious interference?

14      3.      Are Plaintiffs entitled to partial summary judgment on YouTube's affirmative

15   defenses or on a "fact" related to their claim for exemplary damages?

16

**MEMORANDUM OF POINTS AND AUTHORITIES**

17      Discovery has confirmed that Plaintiffs' claims in this case are unsupported and that the

18   allegations that allowed them to survive a motion to dismiss are false. On top of that, a directly on-

19   point ruling from the California Court of Appeal has made clear that Plaintiffs' claims fail as a

20   matter of law. The Court should put a stop to Plaintiffs' vexatious litigation efforts and grant

21   summary judgment to YouTube.

22      Plaintiffs are individuals and entities associated with an obscure musical venture called Rasta

23   Rock Opera. The principal force behind this venture—and this case—is Stephen Sieber, also known

24   as Stevie Marco. Mr. Sieber is a former building contractor with a long history of litigation

25   misconduct. In February 2014, Mr. Sieber uploaded a music video called "LuvYa" to YouTube.

26   Over the next two months, YouTube's systems determined that an overwhelming number of the

27   viewing requests for that video were "spam"—playbacks fraudulently designed to inflate the video's

28   view count to make it seem more popular. ██████████████████████████████

1   ██████████████████████████████████ and a further examination

2   by YouTube determined that many of the views actually recorded for the video were also the

3   product of spam. As a result, in April 2014, YouTube concluded that the LuvYa video was in

4   violation of YouTube's Terms of Service. While YouTube could have removed the video altogether,

5   it chose a more modest remedy: YouTube moved the LuvYa video to a new location where its

6   inflated view count could be reset. YouTube also posted a brief notice at the video's original

7   location, which read, in full: "This video has been removed because its content violated YouTube's

8   Terms of Service. Sorry about that."

9        Rather than work to promote their video in its new location, Mr. Sieber and his associates

10   have spent the last three and a half years trying to transform YouTube's routine informational notice

11   into a sprawling federal lawsuit. After the case was transferred from the District of Columbia, where

12   Plaintiffs improperly filed it, this Court trimmed it down to two related causes of action, imposing

13   Rule 11 sanctions on Plaintiffs' counsel in the process. With discovery now complete, it is clear that

14   Plaintiffs' remaining claims—for libel *per quod* and tortious interference—fail for multiple reasons.

15        As an initial matter, the California Court of Appeal's very recent decision in *Bartholomew v.*

16   *YouTube, LLC*, No. H042775, 2017 WL 4988177 (Cal. Ct. App. Nov. 2, 2017), confirms that

17   Plaintiffs' whole case is inconsistent with California law. *Bartholomew* rejected an identical libel claim

18   arising from the exact same statements at issue here, holding as a matter of law that YouTube's

19   Notice is *not* defamatory—whether on its own or in light of the YouTube's Community Guidelines

20   "Tips" page. The Court of Appeal disagreed with this Court's prior ruling that had allowed

21   Plaintiffs' libel *per quod* claim to survive a motion to dismiss. This intervening decision categorically

22   defeats not only Plaintiffs' claim for defamation, but also their tortious interference claim, which

23   depends on it. The Court need go no further to grant summary judgment to YouTube.

24        Plaintiffs' libel *per quod* claim is also wholly unsupported by the evidence. After years of

25   litigation, Plaintiffs cannot carry their burden on multiple elements of their claim. First, YouTube

26   did not intentionally or negligently make a false statement. The undisputed record makes clear that

27   YouTube justifiably believed that its notice was true—the LuvYa video was, in fact, removed

28   because YouTube determined that its content (a term YouTube uses to include view counts) was in

violation of the Terms of Service, which prohibit artificial view count inflation. Second, no matter how someone *might* in theory have understood the notice, when coupled with the Community Guidelines, there is no evidence that any third party *actually* read those two statements as conveying a defamatory accusation, much less one aimed at Plaintiffs personally. Third, discovery has revealed that Plaintiffs' allegations about "special damages" are simply untrue: there is nothing in the record credibly suggesting that any of the Plaintiffs suffered a tangible economic injury because of aspersions supposedly conveyed by YouTube's notice.

While the tortious interference claim falls with the predicate libel claim, it also has independently been discredited by discovery. Despite what Plaintiffs alleged in their complaint, there is not a shred of evidence that YouTube, at any relevant time, had knowledge of specific business relationships between Plaintiffs and any third party. Plaintiffs point to an after-the-fact demand letter that their counsel sent to Defendants, but under California law, that letter's vague references to "financial supporters" and "customers" are simply too general to sustain an interference claim. Nor can Plaintiffs muster any evidence that YouTube intended its notice to impair any third-party relationships Plaintiffs might have had, or that the Notice actually had that effect. At the pleading stage, Plaintiffs told elaborate stories about a deal they allegedly had to perform for Nike, and about a funding agreement that was supposedly suspended shortly after the Notice was published, but it is now clear that those were fictions invented by Plaintiffs and decisively refuted by the record.

Finally, Plaintiffs' own motion for partial summary judgment is meritless. The Court need not address YouTube's affirmative defenses, given that Plaintiffs cannot carry their burden of establishing their claims in the first place. In any event, the undisputed record raises triable issues on YouTube's defenses, where it does not establish them outright. And Plaintiffs' cryptic request for summary judgment on a "fact" relating to exemplary damages should be rejected out of hand. This request is not only premature, it is simply wrong: the fact that YouTube used the same Notice for other videos—including in the *Bartholomew* case—provides no basis for exemplary damages. To the contrary, as the California Court of Appeal has now held, the generic nature of the Notice only underscores why it is not defamatory and thus provides no basis for either liability or damages.

## **UNDISPUTED FACTS SUPPORTING SUMMARY JUDGMENT**

Plaintiffs' motion includes four pages of purported "undisputed facts." PPMSJ at 6-9. Not only are many of those "facts" disputed (if not demonstrably false) and unsupported even by what Plaintiffs purport to cite, most of them are irrelevant to Plaintiffs' affirmative claims.[1] Rather than exhaustively cataloguing Plaintiffs' largely irrelevant distortions, YouTube sets out below the material and undisputed facts on which its motion for summary judgment is based.

### A.      **YouTube and Its Efforts to Combat View Count Spam**

The YouTube service allows users to upload videos that can be viewed by people around the world. Haas Decl. ¶ 2. The relationship between YouTube and its users is governed by YouTube's Terms of Service Agreement ("TOS"). *Id.* Users accept the TOS when they create a YouTube account, which they must do before uploading videos. *Id.* ¶ 3. Among other things, the TOS forbids the use of automated systems or other methods to artificially inflate video view counts. *Id.* ¶ 8; Dippo Decl. Ex. 16 (§ 4.H.). This prohibition is important, as view-count inflation harms YouTube and its users by undermining the integrity of the service and making certain videos seem more popular than they are. Haas Decl. ¶¶ 6-7; Defs.' Interrog. Response No. 4.

To stop such abuses, YouTube maintains a team that uses ███████████████████ ███████████████████████████████ Kotagiri Decl. ¶¶ 1, 5; Haas Decl. ¶¶ 1, 9. These enforcement efforts are prophylactic and remedial: ███████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████ Kotagiri Decl. ¶¶ 5-7; Haas Decl. ¶¶ 9-10. YouTube deems a video to violate the TOS when its views are found to have been artificially inflated via an

---

[1] Examples of Plaintiffs' misrepresentations are discussed below (*infra* nn. 5-6). To highlight some other (especially perplexing) ones: (1) Plaintiffs' suggestion that YouTube's CEO and Google's Chief Legal Officer were involved in approving a declaration submitted by YouTube employee Katie Hushion (PPMSJ at 7) is unsupported, untrue, and utterly immaterial (Haas Decl. ¶ 27); (2) Plaintiffs assert (though it is relevant to nothing in the case) that all YouTube views less than 6 seconds long must be fake because the "minimum time it takes a person to access the YouTube website from an internet browser is approximately 6 seconds." PPMSJ at 9. The only "support" that Plaintiffs offer are declarations baldly stating this "fact" with no further explanation. Sieber Decl. ¶ 36; Brotherton Decl. ¶ 42. Not only are these statements inadmissible (technical opinions offered by unqualified witnesses (*see* Fed. R. Evid. 701(c)), they are demonstrably false: indeed, many *whole videos* on YouTube are less than 6 seconds. *See* http://www.adweek.com/digital/videos-under-7-seconds/.

1   automated system. Haas Tr. 97:9-99:25, 106:2-23; Kotagiri Decl. ¶¶ 8-9; Haas Decl. ¶¶ 11, 17. When

2   YouTube finds a TOS violation, whether arising from spam or otherwise, the TOS expressly

3   authorizes YouTube to remove the offending video from the service and/or terminate the user's

4   account. Dippo Decl. Ex. 16 (§ 7.B.); Haas Decl. ¶ 11; *accord* Dkt. 53 at 13.

5       **B.**       **Plaintiffs and the LuvYa Video**

6       Plaintiffs are various companies and individuals associated with Steven Sieber's musical

7   ventures. Plaintiff Rasta Rock Corp. ("Rasta Rock") owns the intellectual property associated with

8   Mr. Sieber's musical group Rasta Rock Opera. Pls.' RFA Response No. 2. Plaintiff Song fi, Inc.

9   ("Song fi") claims to be Rasta Rock Opera's publisher and distributor, as well as a fledgling online

10   platform for the distribution of other artists' music. Song fi Tr. 48:4-51:1.[2] Both companies are

11   principally owned and controlled by Mr. Sieber, who is the driving force behind this litigation,

12   despite himself not being a named plaintiff. Pls.' Interrog. Response No. 5.[3]

13       Mr. Sieber has repeatedly failed to deliver on his promises for these ventures. Since long

14   before the events giving rise to this litigation, Mr. Sieber, again and again, announced the imminent

15   launch of Song fi, a supposedly revolutionary music platform. Dippo Decl. Ex. 17 ("Song fi is a site

16   for all music and goes live on December 14th 2012"); *id.* Ex. 18 ("Song fi will launch May 11th

17   2013"); *id.* Ex. 19 (Jan. 10, 2014: "Song fi is right around the corner"). But none of that ever

18   happened. Even today, the Song fi website still says that "The Revolution Begins August 1st 2017,"

19   but there is no functioning service. *Id.* ¶¶ 21-22 & Ex. 20. Mr. Sieber's announcements of an album

20   from Rasta Rock Opera have similarly fizzled. Since at least 2012, Mr. Sieber has repeatedly

21   announced the imminent release of the album, *Respect and Love Manifesto. E.g.*, *id.* Ex. 17. Those

22   promises continued into early 2014, with Mr. Sieber vowing that the album would be released on

23   February 6, 2014 (*id.* Ex. 21), and when that deadline came and went, he shifted the promised release

24

25       [2] The two individual Plaintiffs are minor players. Plaintiff Joseph Brotherton is a member of
    Rasta Rock Opera. Brotherton Tr. 52:5-8. He and his minor son, Plaintiff N.G.B., both performed

26   in the LuvYa video. *Id.* at 63:3-11.

27       [3] Mr. Sieber is no stranger to litigation. He is a serial and abusive litigant, who has been involved
    in no fewer than 50 cases and has been sanctioned for litigation misconduct countless times, with

28   courts noting his "pattern of frivolous and vexatious filings" and finding that he "fraudulently made
    false oaths and accounts." Kohr Decl. ¶¶ 6-23, Ex. 12 at 6, Ex. 17 at 35; Dkt. 164 at 2-5, 9.

1   date to November 27, 2014 (*id.* Ex. 22). The album *still* has not come out. RRC Tr. 25:25-27:18,

2   28:21-29:5, 44:13-45:6.

3         In early 2014, Mr. Sieber created a music video for a Rasta Rock song called "LuvYa LuvYa

4   LuvYa" ("LuvYa"), one of the tracks on the *Respect and Love Manifesto*. Song fi Tr. 78:15-18; RRC Tr.

5   74:9-18. On February 14, 2014, Plaintiffs uploaded the LuvYa video to YouTube, as part of the

6   "rastarockopera" channel that Mr. Sieber had created. Song fi Tr. 88:25-89:20. During the account

7   creation process, Plaintiffs had accepted the TOS. TAC ¶ 123; Haas Decl. ¶¶ 3-4. LuvYa was just

8   one of several music videos posted on Rasta Rock's YouTube channel; others reside there to this

9   day. Kotagiri Decl. ¶ 19.

10         **C.**   **The LuvYa Video Is Found in Violation of YouTube's Terms of Service**

11         In April 2014, YouTube determined that the LuvYa video's view count had been artificially

12   inflated in violation of the YouTube Terms. Hushion (PI) Decl. ¶ 10; Haas Decl. ¶ 15. This

13   determination was based on overwhelming and undisputed evidence. Defs.' Interrog. Response Nos.

14   4-5[4]; Kotagiri Decl. ¶¶ 10-17; YT Tr. 49:15-50:6, 63:1-10, 135:8-138:2.  First, ██████████████

15   ███████████████████████████████████████████████████████████████████████████████████████

16   ███████████████████████████████████████████████████████████████████████████████████████

17   ████████████████████   Defs.' Interrog. Response No. 5; Kotagiri Decl. ¶ 11; YT Tr. 33:17-34:6.[5] By

18   April 18, 2014, however, Plaintiffs' video had a published view count of approximately 23,300 views.

19   Kotagiri Decl. ¶ 14; Defs.' Interrog. Response No. 4. Those views were not necessarily legitimate;

20   ████████████████████████████████████████████████████████████████   Kotagiri Decl.

21   ¶ 14; Haas Decl. ¶ 23; YT Tr. 137:21-138:2; Haas Tr. 207:24-208:4. But the disproportionately high

---

[4] Plaintiffs say that YouTube "refused" to have its interrogatory responses signed by a fact witness (PPMSJ at 4), but that is untrue. At Plaintiffs' counsel's request, and in advance of their summary judgment motion, YouTube served signed versions of its responses. Dippo Decl. Ex. 11.

[5] Plaintiffs assert, without any evidence, that ████████████████████████████████████████████ PPMSJ at 8. That is demonstrably wrong: █████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████   Dippo Decl. Ex. 23; Kotagiri Decl. ¶ 12. YouTube certainly has no policy that prevents (or prevented) legitimate views for videos embedded on Facebook from being included in view counts. Kotagiri Decl. ¶ 12; YT Tr. 130:23-131:7, 132:11-12. Plaintiffs' suggestion to the contrary (PPMSJ at 8) is false and supported by no competent evidence—just self-serving declarations from Mr. Sieber and Mr. Brotherton, who are not remotely qualified to testify about YouTube's technical operations.

1 ████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████

3 ████████████████████████████████████████ Defs.' Interrog. Response

4 Nos. 4-5; YT Tr. 137:21-138:2; Haas Decl. ¶ 15.[6]

5 ████████████████████████████████████████████

6 ███ Defs.' Interrog. Response Nos. 4-5. For one thing, ████████████████

7 ████████████████████████████████████████████████

8 █████████████████ *Id.*; Kotagiri Decl. ¶¶ 15-16; YT Tr. 135:8-136:5, 207:14-

9 208:6. ████████████████████████████████████

10 ████████████████████████████████████████████████████

11 ████████████████████████████████████ Defs.' Interrog. Response

12 No. 4; Kotagiri Decl. ¶ 17; Dippo Decl. Ex. 24; YT Tr. 49:15-50:6. In YouTube's experience, these

13 were not ████████████████ and were clear indications of artificial viewing activity. YT Tr.

14 79:24-80:1 ("the shear probability of [this] sequence of events occurring [naturally] makes it almost

15 distinctly impossible"); Kotagiri Decl. ¶¶ 10-11, 14-17; Haas Tr. 127:23-130:25; Haas Decl. ¶ 22.

16      Having found clear evidence of a scheme to inflate the video's view count, YouTube

17 exercised its rights under the TOS by removing the LuvYa video from its original location to a new

18 URL (still associated with rastarockopera's channel), where it would no longer be paired with the

19 inflated view count. Haas Decl. ¶ 16. YouTube also posted a short informational message (the

20 "Notice") at the LuvYa video's original URL, which explained that the video had been removed

21 "because its content violated YouTube's Terms of Service." Haas Decl. ¶¶ 18-19. This Notice also

22 linked to YouTube's Community Guidelines, which provides further information about YouTube's

23

24 ───────────────────

25   [6] Plaintiffs claim that "Katie Hushion testified that the 23,300 'LuvYa' views were legitimate and not spam after being shown the 'LuvYa' analytics chart." PPMSJ at 9. That is false. Ms. Hushion

26 testified that the 23,300 views were ████████████████ Haas Tr. 207:24-208:4, 209:17-21. She did *not* say the views were actually legitimate; to the contrary, both

27 her testimony, and all the other evidence, makes clear that a significant number of the 23,300 views in the public view count were determined, after further review, to be spam. *See id.* at 129:9-130:25,

28 210:6-14; Haas Decl. ¶¶ 22-23; Defs.' Interrog. Response Nos. 4-5.

1 policies on spam and other kinds of conduct that violates YouTube's rules. Dippo Decl. Ex. 25;

2 Haas Decl. ¶ 18.

3       Both the Notice and the Guidelines were general-use documents. Haas Decl. ¶¶ 18-19.

4 YouTube posted the same notice in many other instances where it removed videos for view count

5 inflation as well as other content violations. YT Tr. 125:19-126:2; Haas Tr. 310:6-13; Haas Decl.

6 ¶ 19. That is why the Notice does not refer to any specific violation or user. YT Tr. 159:23-160:3;

7 Haas Decl. ¶ 19. It is undisputed that at the time YouTube posted the Notice, it knew nothing about

8 Plaintiffs, was not aware of any business ventures they were engaged in, and had no intent to disrupt

9 such ventures. Haas Decl. ¶ 26. The Notice's purpose was simply to inform other users who might

10 come to the page, in a very general way, why there was no longer a video there. *Id.* ¶¶ 18-19.

11      **D.**     **Plaintiffs' Response To the Relocation of the LuvYa Video**

12       Shortly after the video was moved, Mr. Sieber used YouTube's appeal process to protest the

13 decision. Dippo Decl. Ex. 26; Haas Decl. ¶ 21; Haas Tr. 67:14-68:13. Consistent with its normal

14 policies, a member of YouTube's spam team re-reviewed the information available for the LuvYa

15 video. Haas Decl. ¶ 22. That review confirmed that the video had been the subject of significant

16 view-count spam that had artificially inflated its public view count. *Id.* ¶¶ 22-23. YouTube informed

17 Mr. Sieber of this decision, and also invited him to share the video at its new location. *Id.* ¶¶ 23-24;

18 Dippo Decl. Ex. 26. Mr. Sieber did not take up YouTube's invitation; indeed, Plaintiffs have

19 admitted that they made no effort whatsoever to promote the LuvYa video after it was relocated or

20 even to remove the old URL from websites they controlled. RRC Tr. 76:5-79:13; Sieber Decl. ¶ 38.

21       Mr. Sieber responded with a flurry of intemperate communications, culminating in a May 12,

22 2014 letter that Song fi's counsel, Ronald Wick, sent to David Drummond, Google's Chief Legal

23 Officer. Dippo Decl. Ex. 27. Mr. Wick's letter did not identify any actual contracts or business

24 relationships that Plaintiffs supposedly had with third parties, nor did it point to any harm that

25 Plaintiffs were experiencing as a result of YouTube's Notice. *Id.* The letter also included baseless

26 allegations of conspiracy (*id.* at 3) many of the same allegations that this Court later sanctioned Mr.

27 Wick for including in a pleading (Dkt. 127 at 3-7). On July 22, 2014, Plaintiffs' counsel, Ed Lyle sent

28 a copy of Mr. Wick's letter to both Mr. Drummond and Susan Wojcicki, YouTube's CEO. Mr.

1   Lyle's cover letter stated that Song fi was about to file a lawsuit against YouTube and attached a

2   draft version of the complaint. Dippo Decl. Exs. 28-29.

3       **E.**    <u>**Procedural History**</u>

4         Three days later, on July 25, 2014, Song fi filed this lawsuit in the U.S. District Court for the

5   District of Columbia. Dkt. 1. After that court denied Song fi's motion for a TRO and preliminary

6   injunction (Dkts. 2, 3, 12), Plaintiffs filed a First Amended Complaint (FAC), which added Rasta

7   Rock Corp., Joe Brotherton, and N.G.B. as plaintiffs. Dkts. 13, 14. On October 29, 2014, Judge

8   Collyer transferred the case to this Court, as required by YouTube's TOS. Dkts. 19, 20.

9         On June 10, 2015, Judge Conti dismissed Plaintiffs' claims for breach of contract with

10  prejudice after finding that YouTube was specifically authorized by the Agreement to remove videos

11  that it determines have inflated view counts. Dkt. 53 at 13-14.[7] The Court also dismissed Plaintiffs'

12  claim for libel *per se* because it concluded that the Notice was not libelous on its face and dismissed

13  Plaintiffs' tortious interference claim based on the failure of the predicate defamation claim. Dkt. 53

14  at 17-19. In the same ruling, Judge Conti also denied a "motion for partial summary judgment" that

15  Plaintiff had hurriedly proffered without support. *Id.* at 20-22. On November 27, 2015, Plaintiffs

16  filed a Second Amended Complaint (SAC), which asserted new claims for libel per quod, fraud, and

17  violation of the Cartwright Act and the California Consumer Legal Remedies Act (CLRA); Plaintiffs

18  also tried to reassert their tortious interference claim. Dkt. 70. On April 4, 2016, this Court again

19  granted YouTube's motion to dismiss. Dkt. 97. The Court dismissed the CLRA claim with prejudice,

20  but gave Plaintiffs another chance to plead their other claims. *Id.* at 29.

21        On April 18, 2016, Plaintiffs filed their (now operative) Third Amended Complaint (TAC).

22  Dkt. 101. In response to YouTube's motion to dismiss, the Court dismissed the Cartwright Act and

23  fraud claims with prejudice. Dkt. 115 at 3-10. The Court also imposed significant Rule 11 sanctions

24  on Plaintiffs' counsel for including a host of baseless factual allegations in the TAC. Dkts. 127, 143.

25

26       [7] In light of that ruling, Plaintiffs are barred from trying to support their remaining claims based

27  on the *removal* of the video. Those claims relate only to the Notice, and any harm that Plaintiffs claim
    to have suffered from the removal itself is irrelevant. Plaintiffs now try to evade that ruling in
    seeking exemplary damages. PPMSJ at 14. But they cannot premise a claim for exemplary damages

28  on conduct that this Court has (correctly) held cannot be a valid basis for liability.

1  All that now remains in this case are claims for libel *per quod* (on behalf of all Plaintiffs) and for

2  tortious interference (on behalf of Song fi and Rasta Rock).

3  **ARGUMENT**

4  Summary judgment is properly granted when no genuine disputes of material fact remain

5  and when, viewing the evidence most favorably to the non-moving party, the movant is entitled to

6  prevail as a matter of law. Fed. R. Civ. P. 56. "[M]ere allegation and speculation do not create a

7  factual dispute for purposes of summary judgment." *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075,

8  1081-82 (9th Cir. 1996); *see also Kerr v. City & Cty. of San Francisco*, No. C 10-5733 CW, 2012 WL

9  3877752, at *14 (N.D. Cal. Sept. 6, 2012) (same). Where, as here, the plaintiff bears the burden of

10 proof on an issue at trial, the defendant is entitled to summary judgment by producing evidence

11 negating an essential element of the plaintiff's case or by showing that the plaintiff lacks sufficient

12 evidence to prove an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23

13 (1986); *Nissan Fire & Marine Ins. Co., v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000).

14 YouTube is entitled to summary judgment. Plaintiffs' claims fail as a matter of law based on

15 the California Court of Appeal's ruling in *Bartholomew*. Beyond that, discovery has confirmed that

16 Plaintiffs cannot carry their burden of creating a triable issue as to either of their remaining claims.

17 **I.    The Court of Appeal's Decision in *Bartholomew* Disposes of Plaintiffs' Claims**

18 Plaintiffs' libel *per quod* claim is based on the theory that the Notice is defamatory when read

19 in light of the YouTube Community Guidelines. TAC ¶¶ 140-141. While this Court allowed that

20 claim to survive a motion to dismiss (Dkt. 97 at 22-24), Plaintiffs' defamation theory has now been

21 definitively rejected, as a matter of law, by the California Court of Appeal.

22 *Bartholomew,* brought by the same counsel representing Plaintiffs here, involved an identical

23 claim arising from the same Notice. As here, the plaintiff in *Bartholomew*, who had posted a video on

24 YouTube that was removed for view count inflation, alleged that the Notice was defamatory. The

25 trial court sustained YouTube's demurrer, holding that the Notice "was not libelous whether or not

26 it is interpreted in light of the Community Guideline Tips" page. *Bartholomew*, 2017 WL 4988177,

27 at *3 (internal quotation marks omitted). In a comprehensive decision, the Court of Appeal affirmed

28 that ruling. After a detailed analysis of California law, the court concluded that no claim for libel *per*

1    *se* or libel *per quod* could be pleaded based on YouTube's Notice. Expressly disagreeing with this

2    Court's ruling allowing Plaintiffs' claims to survive a motion to dismiss, *Bartholomew* held that the

3    Notice, whether on its own or combined with the Guidelines, was not capable of conveying a

4    defamatory meaning and was not a statement "of and concerning" the plaintiff. *Id.* at *5-8 & n.9. As

5    the Court explained, "the Community Guideline Tips cannot reasonably be understood as imputing

6    any particular wrongdoing to Bartholomew." *Id.* at *7; *see also id.* at *6 (a reasonable reader "would

7    have understood that the list on the Community Guideline Tips page is in fact general—that no one

8    particular offense could be reasonably read to apply to *Bartholomew's* video" (emphasis in original)).[8]

9         In light of *Bartholomew*, this Court should revisit its decision allowing Plaintiff's libel *per quod*

10   claim to proceed. "[A]s long as a district court has jurisdiction over the case, then it possesses the

11   inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by

12   it to be sufficient." *City of Los Angeles v. Santa Monica BayKeeper*, 254 F.3d 882, 889 (9th Cir. 2001); *see*

13   *also United States v. Smith*, 389 F.3d 944, 949 (9th Cir. 2004); *Dunbar v. Google, Inc.*, No. 5:12-cv-

14   003305-LHK, 2012 WL6202797, at *9 (N.D. Cal. Dec. 12, 2012). Here, this Court did not have the

15   benefit of the Court of Appeal's decision when it ruled on the viability of Plaintiffs' claim. There is

16   ───────────────────

17      [8] While the Court of Appeal is currently deciding whether to publish its opinion, *Bartholomew's* current publication status makes it no less relevant. In carrying out its duty to ascertain California law, this federal court "may consider unpublished state decisions." *Emp'rs Ins. of Wausau v. Granite*

18   *State Ins. Co.*, 330 F.3d 1214, 1220 n.8 (9th Cir. 2003); *accord Cunha v. IntelliCheck, LLC*, 254 F. Supp. 3d 1124, 1134 n.6 (N.D. Cal. 2017) ("Whatever the rule in state court may be, in this federal district

19   court unpublished decisions may be considered in determining the nature of California law."); *Meza v. Portfolio Recovery Assocs., LLC*, 125 F. Supp. 3d 994, 1006 (N.D. Cal. 2015) (court may consult

20   unpublished California appellate court opinions to assess California law). That rule applies with particular force in this case. *Bartholomew* sets forth the Court of Appeal's application of California law

21   to the identical statements and claims at issue. This Court need not close its eyes to a detailed and persuasive ruling that conclusively resolves the exact issues presented here. That is especially so

22   given that *Plaintiffs affirmatively point to the Bartholomew case* in their own motion, arguing that they are entitled to exemplary damages because Joyce Bartholomew allegedly suffered "the same harmful

23   results" from the supposedly "defamatory" Notice. PPMSJ at 22. The premise of Plaintiffs' argument was, of course, squarely rejected in *Bartholomew*. That ruling is controlling here inasmuch as

24   Plaintiffs seek to rely on Ms. Bartholomew's claims as a basis for their own. Beyond that, the relationship between Plaintiffs and Ms. Bartholomew appears sufficiently close that Plaintiffs may be

25   barred by collateral estoppel from relitigating the issues conclusively resolved in *Bartholomew*. Not only is Plaintiffs' and Ms. Bartholomew's representation the same, they are working together behind

26   the scenes to support one another's (materially identical) cases, such that Plaintiffs have now secured a declaration from Ms. Bartholomew (PPMSJ Ex. 34), which seeks to use her purported injuries at

27   the hands of YouTube's Notice as support for Plaintiffs' own recovery. *See, e.g.*, *Mooney v. Caspari*, 138 Cal. App. 4th 704, 717-21 (2006) (applying collateral estoppel based on "privity" of interests).

28

1   no reason why that ruling should now produce an outcome squarely at odds with the definitive

2   rejection of an identical claim by the state appellate court. To the contrary, this Court is required to

3   "follow the decisions of the California Court of Appeal unless there is convincing evidence that the

4   California Supreme Court would hold otherwise." *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876,

5   889 (9th Cir. 2010); *accord Ryman v. Sears, Roebuck & Co.*, 505 F.3d 993, 995 (9th Cir. 2007).

6   *Bartholomew* is well reasoned and considered all relevant precedents. Plaintiffs have no grounds to

7   suggest that the California Supreme Court would reach a different result.

8          *Bartholomew* makes clear that Plaintiffs' defamation claim is not viable under California law.

9   And because Plaintiffs' tortious interference claim is premised solely on the defamation claim

10   (Dkt. 115 at 13-14), it too fails. This Court need go no further to deny Plaintiffs' motion and grant

11   summary judgment to YouTube.

12   **II.    YouTube Is Entitled To Summary Judgment on Plaintiffs' Defamation Claim**

13          Even apart from the Court of Appeal's decision, Plaintiffs' claim also fails on the facts. "In a

14   motion for summary judgment on a defamation claim, plaintiff bears a heavy burden to show a

15   triable issue of fact, as summary judgment is a favored remedy in defamation cases." *Wheeler v. Home*

16   *Depot U.S.A., Inc.*, No. 15cv2236-CAB-AGS, 2017 WL 1080691, at *11 (S.D. Cal. Mar. 22, 2017).

17   Plaintiffs cannot meet that burden. They have no evidence to support key elements of their claim:

18   (1) that YouTube failed to use reasonable care to determine the truth of the Notice; (2) that any

19   third party actually understood the Notice in a defamatory sense; (3) that any third party

20   independently understood the Notice as referring to Plaintiffs; and (4) that any Plaintiff suffered

21   "special damages" as a result of the Notice. *Accord Palm Springs Tennis Club v. Rangel*, 73 Cal. App. 4th

22   1, 5 (1999); CACI VF-1705 (2017). Each of these deficiencies warrants summary judgment.

23          **A.    YouTube Did Not Intentionally or Negligently Make a False Statement**

24          Defamation always requires a showing of fault. Under California law, even false statements

25   are actionable only if "defendants failed to use reasonable care to determine the truth or falsity."

26   *Hecimovich v. Encinal Sch. Parent Teacher Org.*, 203 Cal. App. 4th 450, 470 (2012); *see also Grewal v. Jammu*,

27   191 Cal. App. 4th 977, 990 (2011) ("[t]o prevail on a claim for libel, plaintiff must show ... that

28   defendants failed to use reasonable care to determine the truth or falsity" of the allegedly libelous

1    statements); *Ellis v. Starbucks Corp.*, No. 15-cv-3451-PJH, 2015 WL 8293965, at *5 (N.D. Cal. Dec. 9,

2    2015) (same). Plaintiffs cannot make that showing here.[9]

3         Section 4.H. of YouTube's TOS prohibits the use of artificial means in an effort to inflate a

4    video's view count. Haas Tr. 100:9-22; Haas Decl. ¶¶ 7, 20. There is extensive and undisputed

5    evidence about the investigation that YouTube conducted to determine that the view count for the

6    LuvYa video had been artificially inflated in violation of that rule. *See supra* pp. 6-8. Based on that

7    investigation— ███████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████

10   ███████████████████████—it was clear to YouTube that the LuvYa video (and its view count) had

11   been the subject of significant illegitimate view count inflation. Haas Decl. ¶¶ 15-16. Accordingly,

12   YouTube had ample grounds to believe that the video was in violation of YouTube's Terms of

13   Service. And that is what the Notice reported. It explained that "This video has been removed

14   because its content violates YouTube's Terms of Service." That simple statement contains no

15   falsehood at all—and certainly not one that resulted from intentional or negligent conduct on

16   YouTube's part.

17        In claiming otherwise, Plaintiffs have focused on the word "content," arguing that the

18   substance of the LuvYa video was not objectionable. But the issue here is YouTube's state of mind,

19   what it reasonably understood the Notice to say. And there is no dispute that YouTube believed that

20   view counts are "content" on the YouTube service and that a video with an artificially inflated view

21   count is an example of "content" that violates YouTube's Terms of Service. YT Tr. 115:11-116:3;

22   Haas Tr. 76:10-14, 81:13-87:22, 307:3-308:20, 327:4-330:6; Haas Decl. ¶ 20. That understanding is

23   clear from § 2.A of the TOS itself, which defines "content" to include view counts, as courts have

24   repeatedly held. *Darnaa, LLC v. Google, Inc.*, No. 15-cv-03221-RMW, 2016 WL 6540452, at *9 (N.D.

---

26   [9] Plaintiffs' suggestion that they need not prove fault—for which they cite no authority (PPMSJ

27   at 14)—is wrong. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347 (1974) (First Amendment does not allow defamation plaintiffs to "impose liability without fault"). That suggestion is also contrary to Plaintiffs' argument about California Civil Code Section 1668, which is premised on the idea that

28   their claims are for *intentional* torts—and thus not allegedly barred by the limitation on liability provision in YouTube's TOS. PPMSJ at 12-13.

Cal. Nov. 2, 2016); *Lewis v. YouTube, LLC*, 244 Cal. App. 4th 118, 126 (2015). In short, therefore, when the Notice said that the video's "content violated YouTube's Terms of Service," YouTube was expressing its good-faith (and accurate) belief that the video's view count had been inflated in violation YouTube's rules. Haas Decl. ¶¶ 15-16, 20.[10] Because there is no evidence that YouTube did not reasonably believe that statement to be true, there can be no defamation.

## B.   No Third Parties Imputed a Defamatory Meaning To the Notice

At the pleading stage, the Court held that the Notice was not defamatory on its face (Dkt. 53 at 20-21), but allowed Plaintiff to proceed with a libel *per quod* claim on the theory that a *hypothetical* reader encountering the Notice might read that statement in reference to YouTube's Community Guidelines and *could* "find defamatory meaning in an accusation of violation of the Community Guidelines." Dkt. 97 at 24.[11] At this stage of the case, however, Plaintiffs must do more than speculate about hypotheticals. They must come forward with actual evidence that some third party in fact understood YouTube's statement in a defamatory sense. *See, e.g.*, *Palm Springs Tennis Club*, 73 Cal. App. 4th at 5-7 (libel *per quod* requires plaintiff to prove that readers of the statement understood it as defamatory); *Barnes-Hind, Inc. v. Superior Court*, 181 Cal. App. 3d 377, 387 (1986) (libel *per quod* requires proof of "circumstances which would indicate that the words *were understood* in a defamatory sense showing *that the situation or opinion of the readers was such that they derived a defamatory meaning from them*"). That is, Plaintiffs must show that someone who saw the Notice also read the

---

[10] Plaintiffs seek summary judgment on Defendants' defense of unclean hands, claiming that YouTube has "no evidence" that Plaintiffs themselves were responsible for the spam affecting LuvYa. PPMSJ at 10-11. While the Court need not reach any issue relating to affirmative defenses given that Plaintiffs cannot carry their burden of establishing their claims in the first place, there is ample evidentiary basis for this defense. There is no dispute about the multitude of invalid views for the LuvYa video. *See supra* pp. 6-8. And those with the most obvious incentive for trying to inflate the view count for that video are Plaintiffs (or their agents). Kotagiri Decl. ¶ 9; Haas Decl. ¶ 17; Haas Tr. 158:4-9; *accord* Dippo Decl. Ex. 26. There is also undisputed evidence that Plaintiffs knew that they could try to purchase fake views for YouTube videos, something that a member of Rasta Rock Opera actually tried to do for one of Plaintiffs' videos. Dippo Decl. Ex. 30. Perhaps most damningly, ███████████████████████████████████████████ *Id.* Ex. 23; Kotagiri Decl. ¶ 13; YT Tr. 63:20-64:8. Given all that, it is certainly a reasonable—if not overwhelming—inference that Plaintiffs themselves orchestrated the view count inflation activity that YouTube observed.

[11] As discussed above, this aspect of the Court's ruling has been superseded by the Court of Appeal's decision in *Bartholomew*, which holds that the Notice, whether on its own or in light of the Guidelines, is not capable of a defamatory meaning. 2017 WL 4988177, at *7.

Guidelines and, having done so, concluded that the Notice actually carried a specific defamatory meaning. Plaintiffs have no such evidence.

The only gesture Plaintiffs have made in this direction came in an interrogatory response where they asserted that unnamed performers and engineers affiliated with the LuvYa video were "concerned about the impact of the [Notice]." Pls.' Interrog. Response No. 10. Plaintiffs also contended that "over a hundred thousand" people encountered the Notice through Facebook and email distribution of the link to the LuvYa video. *Id.* None of this creates a triable issue. To begin, all of the supposed conversations described in the response are inadmissible hearsay—vague reports about what unidentified third-parties supposedly felt. It is telling that Plaintiffs produced not a single document that supports these assertions: no emails, text messages, or Facebook posts. Plaintiffs' uncorroborated, self-serving hearsay cannot save their claim. *See Walker v. Boeing Corp.*, 218 F. Supp. 2d 1177, 1191-92 & n.9 (C.D. Cal. 2002) (rejecting defamation claim premised on hearsay).

But even crediting the interrogatory response, it simply does not make the factual showing required for a defamation claim. It does not establish that any third party read YouTube's Notice in light of the Community Guidelines and believed, as a result, that YouTube was accusing Plaintiffs of doing one of things listed there that would actually be defamatory. Indeed, we know for a fact that several of those people did *not* understand the Notice that way:

- Conrad Osipowicz, a producer for the Rasta Rock Opera, thought that the Notice was a "vague message." C. Osipowicz Tr. 79:16-20. He testified that it did not make him think less of Plaintiffs. *Id.* at 79:21-80:21.

- Ben Kibour, the proprietor of an establishment where Plaintiffs claim the Rasta Rock Opera performed, testified that he was confused about the Notice, but he never believed anything was wrong with the substance of the video. Kibour Tr. 67:25-69:1.

- Derrick Sieber never read YouTube's Community Guidelines. D. Sieber Tr. 42:18-20. The most he could say was that the Notice was "vague." *Id.* at 44:4-21. He also testified that the Notice did not make him think less of any of the Plaintiffs. *Id.* at 43:9-45:3.

In short, various people being "confused" or "concerned" about a "vague" statement simply is not enough to sustain a libel *per quod* claim. *See, e.g., EPIS, Inc. v. Fid. & Guar. Life Ins. Co.*, 156 F. Supp. 2d 1116, 1130-31 (N.D. Cal. 2001) (rejecting declarations that "discuss the 'impressions' and the 'beliefs' of the agents but do not provide the specific facts or words used by [defendant] which would support a defamation claim"). There is no competent evidence that a reader ever actually

1   relied on the Guidelines to understand the Notice in a defamatory sense—as communicating "a false

2   statement of fact" about Plaintiffs or their video. *Gregory v. McDonnell Douglas Corp.*, 17 Cal. 3d 596,

3   600 (1976). That defeats Plaintiffs' claim. *See EPIS*, 156 F. Supp. 2d at 1128-31 (granting summary

4   judgment where plaintiff did not come forward with sufficient evidence that readers actually

5   understood ambiguous statement to convey a defamatory accusation).

6               **C.**      **No Third Parties Read the Notice As "Of And Concerning" Plaintiffs**

7           To be actionable, an allegedly defamatory statement also must be "of and concerning" the

8   plaintiff personally. *Blatty v. New York Times Co.*, 42 Cal. 3d 1033, 1042 (1986); *accord Vedovi v. Watson*

9   *& Taylor*, 104 Cal. App. 80, 83 (1930) ("Defamatory words to be actionable must refer to some

10  ascertained or ascertainable person, and that person must be plaintiff." (citation omitted)). To

11  survive summary judgment, moreover, "a defamatory statement that is ambiguous as to its target not

12  only must be capable of being understood to refer to the plaintiff, but also must be shown actually

13  to have been so understood by a third party." *SDV/ACCI, Inc. v. AT&T Corp.*, 522 F.3d 955,

14  960-61 (9th Cir. 2008) (awarding summary judgment to defendants where plaintiffs failed to show

15  that any third party actually understood ambiguous statements to refer to plaintiffs).

16          Plaintiffs cannot meet their burden of establishing this element either. Neither the Notice nor

17  the Community Guidelines refers to Plaintiffs, whether by name or otherwise, and neither did

18  anything on the page where the Notice was posted. Dippo Decl. Ex. 25; Haas Decl. ¶¶ 18-19. At the

19  pleading stage, Plaintiffs got around that by pointing to their bare allegations that because they had

20  linked to the LuvYa video from Rasta Rock's Facebook page, and sent some promotional emails with

21  the link, people clicking that link and seeing the Notice might have understood it as referring to

22  Plaintiffs. TAC ¶¶ 128, 133; Dkt. 115 at 10-12. But regardless of what Plaintiffs' *alleged*, they now

23  suffer from a fatal proof problem: Plaintiffs have produced no actual evidence—whether testimony

24  from third parties, data from Facebook, or otherwise—indicating this ever happened. There is

25  nothing in the record that would allow a jury to find that anyone actually ever, after April 18, 2014,

26  followed the link to the video from Plaintiffs' Facebook page or Plaintiffs' emails and was directed to

27

28

1   the Notice—much less that such a person then made a leap to connect the Notice to Plaintiffs.[12]

2   Empty allegations cannot carry Plaintiffs' burden at this stage of the case.

3         Beyond that, the only identifiable third parties that Plaintiffs assert actually saw the Notice

4   are people that Plaintiffs specifically directed to view it. For example, Ben Kibour, the owner of

5   JoJo's, a club where some of the Plaintiffs performed, testified that he encountered the Notice *only*

6   *when Plaintiff Joe Brotherton showed it to him*. Kibour Tr. 17:2-3, 64:14-24. But such self-publication

7   cannot be the basis for a libel action. Defamation requires publication *by the defendant*—that is,

8   "communication to some third person who understands the defamatory meaning of the statement

9   and its application to the person to whom reference is made." *Smith v. Maldonado*, 72 Cal. App. 4th

10  637, 645 (1999). "A plaintiff cannot manufacture a defamation cause of action by publishing the

11  statements to third persons; the publication must be done by the defendant." *Live Oak Publ'g Co. v.*

12  *Cohagan*, 234 Cal. App. 3d 1277, 1284 (1991); *accord Ellis*, 2015 WL 8293965, at *5 (when the

13  allegedly defamed person voluntarily repeats a defamatory communication to others, the originator

14  of the statement is not liable for any ensuing damage). Plaintiffs' own acts of publicizing the Notice

15  and identifying themselves as the subject of it run squarely into this rule. With no evidence that any

16  third party actually read YouTube's Notice as referring to any of the Plaintiffs—at least without

17  being told to do so by Plaintiffs themselves—there can be no viable claim for libel *per quod*.

18       **D.**    **Plaintiffs Have No Evidence of Special Damages Resulting From the Notice**

19        Because this Court has already (and correctly) ruled that the Notice is not libelous on its face

20  (Dkt. 53 at 16; *accord Bartholomew*, 2017 WL 4988177, at *8), Plaintiffs must prove special damages.

21  Cal. Civ. Code § 45a; *id.* § 48a(d)(2) (defining special damages). The defamatory statement must have

22  been a "substantial factor" in causing such damages (CACI 1705), which must be "proved precisely."

23  *Gomes v. Fried*, 136 Cal. App. 3d 924, 939-40 (1982); *accord Erlich v. Etner*, 224 Cal. App. 2d 69, 73-74

24  (1964) (special damages typically require plaintiff to "identify the particular purchasers who have

25

26       [12] The lack of such evidence is not surprising. Plaintiffs posted the link to the LuvYa video on

27  Facebook—and spread that link via email—in February 2014 (Dippo Decl. Exs. 31-32; RRC Tr. 56:19-22), but the Notice did not go up until April 18, 2014. This makes it highly unlikely that any

28  Facebook users or email recipients would have seen the Notice, which would have required clicking the link many months after Plaintiffs' promotional messages were sent.

1   refrained from dealing with him, and specify the transactions of which he claims to have been

2   deprived").

3        Plaintiffs cannot satisfy these requirements. The allegations of "special damages" set out in the

4   TAC simply are not supported by the evidence. That is true for each of the Plaintiffs:

5   •    Song fi and Rasta Rock alleged that they made "[a]dvanced payments … to lighting
        companies, scaffolding companies, film companies and recording companies … that was

6   [sic] lost when the … Notice caused the cancellations of revenue producing performances."
        TAC ¶ 153(a). Plaintiffs produced not a single document that references *any* supposedly

7   "revenue producing" performance that the Rasta Rock had booked, much less one cancelled
        as a result of the Notice. It seems that this allegation was meant to relate to a performance

8   that Mr. Sieber was supposedly trying to arrange for himself (not Rasta Rock) at a Nike store
        on July 4, 2014. As discussed below, however, this arrangement was a figment of Mr.

9   Sieber's imagination. *Infra* pp. 22-23. Not only was no such performance ever scheduled, it is
        beyond dispute that Nike's decision not to move forward with a July 4 performance had

10  nothing to do with YouTube's Notice. Schafer Decl. ¶ 5; Kauffman Decl. ¶ 6. Beyond that,
        even on his own account, Mr. Sieber was never going to be paid for any Nike-related

11  performance. RRC Tr. 114:11-13.

12  •    Plaintiff N.G.B. alleged that he had an "agreement with [PCS] to perform in a series
        of … commercials," which was supposedly cancelled. TAC ¶ 153(b). But not only did

13  Plaintiffs come forward with no documentary evidence of any such agreement, N.G.B.'s
        father expressly *denied* that such an agreement ever existed. Brotherton Tr. 230:17-232:8.

14  •    The allegation that Brotherton lost "earnings from performance revenues" (TAC
        ¶ 153(c)), is similarly belied by the evidence. Indeed, the performance venue that Plaintiffs

15  identified actually employed Brotherton *more frequently* (and as a featured performer) after the
        Notice was posted. Brotherton Tr. 244:4-19; Kibour Tr. 83:17-21, 88:6-13. Nor is there any

16  basis for Plaintiffs to assert that Brotherton's earnings dropped (if at all) *because of YouTube's
        Notice. Accord Erlich*, 224 Cal. App. 2d at 75 (while libel plaintiff "may *allege* causation in

17  general terms, he must still *prove* that fact by something more than his own guess as to what
        had gone on in his former customers' minds").

18  Plaintiffs' failure of proof on this element of their defamation claim provides another independent

19  basis for summary judgment. *See Gomes*, 136 Cal. App. 3d at 939-41.

20  **III.   <u>YouTube Is Entitled To Summary Judgment on Tortious Interference</u>**

21        Plaintiffs' other remaining claim—for tortious interference—is made only on behalf of Song

22  fi and Rasta Rock. Under California law, this claim requires Plaintiffs to prove: "(1) an economic

23  relationship between the plaintiff and some third party, with the probability of future economic

24  benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the

25  part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship;

26  and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *Korea Supply

27  Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003) (citation omitted). Plaintiffs must also

28  show that YouTube's conduct was "wrongful by some legal measure other than the fact of

1    interference itself." *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 392-93 (1995).[13]

2    Plaintiffs cannot come forward with evidence to satisfy any of these elements.

3         **A.**    **There Is No Evidence That YouTube Had Knowledge of Any Economic**

4              **Relationship Between Plaintiffs and a Third Party**

5         As an initial matter, there is no evidence that YouTube had knowledge of an actual economic

6    relationship between any Plaintiff and any third party. There are only two relationships on which

7    Plaintiffs purport to base their claim: (1) Mr. Sieber's supposed arrangement with Nike to perform at

8    the Nike store in Washington, D.C. on July 4, 2014; and (2) Song fi's funding arrangement with

9    Precision Contracting Solutions (PCS). TAC ¶ 160.

10         Plaintiffs do not even pretend that YouTube had knowledge of these relationships—or any

11    others—in April 2014, when the LuvYa video was relocated and the Notice was posted. Instead, they

12    try to establish knowledge by pointing to a demand letter that Song fi's former counsel, Ronald Wick,

13    sent to David Drummond, the Chief Legal Officer of Google, on May 12, 2014, nearly a month after

14    the removal. TAC ¶¶ 146, 161. Mr. Wick's letter stated:

15            please accept this letter as notice that YouTube's arbitrary removal of, and continued
        refusal to reinstate, Mr. Marco's video is interfering, without justification, with Song fi

16            and Mr. Marco's prospective economic relationships. Videos posted by Song fi receive
        views on its public channel from financial supporters, other performing artists who

17            may want to join Song fi, and customers who purchase Mr. Marco's music and other
        products on the Song fi music platform. By removing Mr. Marco's video from Song

18            fi's public channel, YouTube has prevented those business contacts from searching for
        or watching the video, damaging Song fi and Mr. Marco's relationships with these

19            individuals.

20    Dippo Decl. Ex. 27. Mr. Wick's vague assertions do not create a triable issue of fact about whether

21    YouTube had the knowledge required for a tortious interference claim.

22         *First*, the letter says nothing whatsoever about Nike or PCS, the two supposed relationships

23    on which Plaintiffs base their claims.[14] Beyond that, Mr. Wick's correspondence fails to identify *any*

---

24

25        [13] The only independently wrongful act on which Plaintiffs' claim is based is their allegation that
the Notice was defamatory. Dkt. 115 at 13-14. The failure of Plaintiffs' defamation theory means
that YouTube is also entitled to summary judgment on tortious interference as well. *See, e.g.,*

26    *Name.Space, Inc. v. Internet Corp. For Assigned Names & Nos.*, 795 F.3d 1124, 1133 (9th Cir. 2015).

27        [14] Mr. Wick's letter could not have referenced Nike, as even on Plaintiffs' account, Mr. Sieber's
idea that he perform at the Nike store did not even arise until "[e]arly June or late May" 2014. RRC

28    Tr. 115:1-13, 139:12-25; *see also* Schafer Decl. ¶ 2; Kauffman Decl. ¶ 2. That was weeks after Mr.
Wick's letter and months after YouTube relocated the LuvYa video.

1  actual third party with whom Plaintiffs purportedly had a contract or other business relationship. It

2  instead refers vaguely to broad categories of entities—"financial supporters," "performing artists,"

3  and "customers." But California law is clear that the relationships interfered with (and of which the

4  defendant must have knowledge) "must be either in the form of a contract or an existing

5  relationship with an *identifiable* third party." *Dooley v. Crab Boat Owners Ass'n*, 271 F. Supp. 2d 1207,

6  1216-17 (N.D. Cal. 2003) (emphasis added); *accord Damabeh v. 7-Eleven, Inc.*, No. 5:12-CV-1739-LHK,

7  2013 WL 1915867, at *10 (N.D. Cal. May 8, 2013) ("it is essential that the Plaintiff allege facts

8  showing that Defendant interfered with Plaintiff's relationship with a *particular* individual" (emphasis

9  added)). Courts have not hesitated to reject tortious interference claims where this requirement is

10  not met. *See, e.g.*, *Trindade v. Reach Media Grp., LLC*, No. 12-CV-4759-PSG, 2013 WL 3977034, at

11  *16-17 (N.D. Cal. July 31, 2013) (plaintiff "fails to allege that [defendant] had knowledge of any

12  specific relationships, rather than just a generalized knowledge that [plaintiff] was in the business of

13  contracting with other publishers"); *R Power Biofuels, LLC v. Chemex LLC*, No. 16-CV-00716-LHK,

14  2016 WL 6663002, at *17 (N.D. Cal. Nov. 11, 2016) ("[M]ultiple district courts have set aside

15  tortious interference with contract claims where no specific parties to the contracts were alleged.").

16      That is the situation here. Based on Mr. Wick's letter, YouTube would not have known the

17  identity—whether by name or otherwise—of anyone that Plaintiffs were supposedly in business

18  with. The letter thus cannot impute to YouTube the knowledge required by California law. *See R*

19  *Power Biofuels*, 2016 WL 6663002, at *17 (dismissing tortious interference claim based on plaintiff's

20  assertion that "it has an economic relationship with 'major consumers of biodiesel'" and explaining

21  that identification of a "class of companies" rather than "specific companies" is insufficient); *Blue*

22  *Dolphin Charters, Ltd. v. Knight & Carver Yachtcenter, Inc.*, No. 11-cv-565-L(WVG), 2011 WL 5360074,

23  at *5 (S.D. Cal. Nov. 3, 2011) ("Relationships with the 'general public' and 'tourists' do not satisfy

24  the specificity requirement."); *accord Winchester Mystery House, LLC v. Glob. Asylum, Inc.*, 210 Cal. App.

25  4th 579, 597-98 (2012) (rejecting tortious interference claims based on vague attorney demand letters,

26  which did not identify the specifics of the plaintiffs' third-party relationships and thus could not

27  "establish either the knowledge or intent elements" of the plaintiffs' claims).

28

*Second*, "an essential element of the tort of intentional interference with prospective business advantage is the existence of a business relationship with which the tortfeasor interfered." *Roth v. Rhodes*, 25 Cal. App. 4th 530, 546 (1994) ("an existing relationship is required"). That too is missing here. Mr. Wick's letter did not purport to identify any actual, ongoing business relationships that Plaintiffs supposedly had. While Mr. Wick's letter nods vaguely to "financial supporters," "performing artists who *may* want to join Song fi" (emphasis added), and "customers," it does not assert—and thus could not have put YouTube on notice—that any of these entities had actually entered into economic relationship with Song fi.[15] This letter, at most, advers to Song fi's hopes for the future, but that is not enough to support a claim. *See Roy Allan Slurry Seal, Inc. v. Am. Asphalt S., Inc.*, 2 Cal. 5th 505, 515 (2017) ("[A] cause of action for tortious interference has been found lacking when either the economic relationship with a third party is too attenuated or the probability of economic benefit too speculative."); *Blue Dolphin*, 2011 WL 5360074, at *5 ("An allegation that the defendant interfered with 'speculative' future customers is insufficient."); *Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 526-27 (1996) (no claim where plaintiff had "at most a hope for an economic relationship and a desire for future benefit").[16]

## B.   There Is No Evidence That YouTube's Notice Was Intended To Disrupt Plaintiff's Business Relationships

For similar reasons, Plaintiffs cannot carry their burden of proving that there were "intentional acts on the part of the defendant designed to disrupt the relationship" between Plaintiffs and third parties. *Korea Supply*, 29 Cal. 4th at 1153. Plainly, YouTube's lack of knowledge about Plaintiffs' supposed relationships with Nike and PCS alone defeats any showing of intent. *Winchester Mystery House*, 210 Cal. App. 4th at 597. But even if YouTube had known about those

---

[15] That is not surprising: at the time of Mr. Wick's letter—and at all other times—Song fi had no actual customers, no users, and no business relationships with musicians other than Mr. Sieber himself. Song fi Tr. 41:6-45:12; Dippo Decl. ¶¶ 21-22 & Ex. 20.

[16] Judge Conti allowed Plaintiffs' claim to survive because he took as true the FAC's bare allegations that Plaintiffs "informed [YouTube] that the notice was interfering with their business relationships." Dkt. 53 at 18-19. But the actual evidence—including the text of Mr. Wick's letter, which was not before Judge Conti when he ruled on this issue—makes clear that this allegation was not true: Plaintiffs did *not* inform YouTube, in the manner required by California law, of the existence of any specific, ongoing business relationships. No jury could find otherwise.

1    relationships, the claim still would fail because Plaintiffs have no evidence that YouTube "knew that

2    the interference was certain or substantially certain to occur as a result of its action." *Id.* at 596.

3           YouTube would have had no basis for believing that the posting of a routine and generic

4    notice informing users that a video was removed because its contents violated YouTube's TOS—

5    without saying anything more about the nature of the violation, who committed it, or its severity—

6    was substantially certain to impair Plaintiffs' economic relationships with some particular third party.

7    Mr. Wick's letter certainly does not bridge that gap. As discussed, that letter is silent about Nike,

8    PCS, or any other identifiable entity. Moreover, the letter focuses not on the Notice, but instead on

9    the fact of the removal itself. Dippo Decl. Ex. 27. But in light of this Court's rulings, the removal of

10   the LuvYa video, which was expressly authorized by the Agreement, cannot be the basis for a

11   tortious interference claim. Dkt. 53 at 19. Only the Notice can (Dkt. 115 at 13-14), but nothing in

12   Mr. Wick's letter suggests that the Notice was having any effect on Plaintiffs' relationships.

13          Beyond that, the undisputed record shows that YouTube's decision to post the Notice was

14   part of its regular operations, based on its good faith belief that the view count of the LuvYa video

15   had been improperly inflated. *Supra* pp. 6-8. This Notice was there simply to inform users in a

16   general way why a viewing page no longer had a video there. It was a standard-form message that

17   had nothing to do with Plaintiffs specifically and certainly was not aimed at disrupting their business

18   relationships. Haas Decl. ¶¶ 18-19. Against this, Plaintiffs offer nothing: there is no evidence that

19   YouTube had any wrongful intent or reason to believe that the Notice would interfere with any

20   actual relationship Plaintiffs had with a third party.

21          **C.    There Is No Evidence That the Notice Harmed Plaintiffs' Relationships**

22          Finally, Plaintiffs' claim fails because they have no competent evidence that either of their

23   supposed business relationships (with Nike and PCS) were actually impaired by YouTube's Notice.

24          **Nike**: Plaintiffs alleged that YouTube's "posting" of the Notice interfered with their

25   "business relationship" with Nike because Nike supposedly "learned of [YouTube]'s takedown

26   Notice and as a result was unwilling to risk a possible image problem in associating Nike with

27   inappropriate children's content." TAC ¶¶ 160, 165-167. But discovery has made clear that Plaintiffs'

28   allegations were false. As an initial matter, there was never any real relationship between Plaintiffs and

1   Nike. The evidence—both the email correspondence that Mr. Sieber had with Nike and unrebutted

2   declarations from the relevant Nike executives—makes clear that Nike never gave even preliminary

3   approval for a July 4 performance by Mr. Sieber, much less entered into any actual contract or

4   agreement for him to do so. Dippo Decl. Ex. 33; Kauffman Decl. ¶¶ 2-3; Schafer Decl. ¶¶ 2-5.

5          Beyond that, it is indisputable that Nike's decision not to move forward with a performance

6   had nothing to do with YouTube's action in regards to the LuvYa video. Nike submitted two sworn

7   declarations from the company officials who were involved in deciding whether to approve Mr.

8   Sieber's proposed performance. Both officials swear unambiguously that they were not aware that

9   the LuvYa video had been moved and never saw the removal Notice. Schafer Decl. ¶¶ 2, 5;

10  Kaufmann Decl. ¶ 6. These declarations are corroborated by the written correspondence: not a

11  single email or letter between Nike and Mr. Sieber references the LuvYa video or YouTube's actions

12  in any way. Instead, the correspondence shows Mr. Sieber for what he is: a serial litigant with an

13  abusive temper and a disregard for the truth. Dippo Decl. Ex. 33. Plaintiffs' false assertions about

14  Nike do not rescue the tortious interference claim from summary judgment.[17]

15         **PCS**: The only other business relationship that Plaintiffs claim was disrupted was a funding

16  arrangement that they had with PCS, a contracting company owned and operated **by Mr. Sieber's**

17  **own son**. D. Sieber Tr. 25:2-4; RRC Tr. 24:22-25:3, 247:24-248:3, 254:8-255:13. The TAC alleges that

18  "on May 10, 2014, PCS notified Song fi and Rasta Rock [Corp.] that PCS was suspending all further

19  funding until a satisfactory retraction of [YouTube's] Notice could be realized, thus shutting down

20  the business operations of Song fi and Rasta Rock [Corp.] indefinitely." TAC ¶ 171; *accord* Dkt. 115

21  at 13-14. Here too, however, discovery has shown that Plaintiffs' allegations were simply untrue.

22         Mr. Sieber admitted that the PCS did not cut off funding in May 2014. RRC Tr. 54:10-12;

23  Song fi Tr. 208:23-210:13. He was forced to make that admission because the checks that Plaintiffs

24  produced in discovery showed clearly that PCS continued to fund Song fi and Rasta Rock's activities

25  well after that date. Dippo Decl. Ex. 34; Song fi Tr. 185:7-186:12, 194:8-195:3. Mr. Sieber tried to

26

27         [17] Mr. Sieber testified that a Nike store manager—who was not the relevant decision maker at
    Nike in any event (*see* Schafer Decl. ¶ 2 )—told him that (unnamed) Nike employees had seen the
28  Notice. RRC Tr. 137:6-21. Beyond being contradicted by Nike executive's sworn declarations, this
    implausible and self-serving testimony consists of two layers of inadmissible hearsay.

1  play this off, claiming in his testimony that the "May 10, 2014" date alleged in the TAC (and in prior

2  complaints) was a "misprint," and that the date of the termination was supposed to be *October* 2014.

3  Song fi Tr. 208:23-210:13. Mr. Sieber's dissembling cannot save Plaintiffs' claim. Not only is this new

4  date for the supposed termination two months after Plaintiffs' filed this case—and asserted a tortious

5  interference claim by (falsely) alleging YouTube's actions had cut off Song fi's funding from its

6  "principal funder" (FAC ¶ 50)—the evidence clearly shows that *PCS was still funding Plaintiffs operations*

7  *even after October 2014. See, e.g.*, Dippo Decl. Ex. 35. In short, it is undisputed that PCS's funding

8  continued for at least *seven months* after the Notice was first posted and did not stop (if at all) until

9  long after YouTube had already changed that Notice to a new message that Plaintiffs have conceded

10  is unobjectionable. RRC Tr. 90:11-92:5. No reasonable jury could conclude that YouTube's Notice

11  was responsible for whatever rupture occurred between Plaintiffs and PCS.[18]

12  **IV.   Plaintiffs' Motion for Partial Summary Judgment Should Be Denied**

13         Plaintiffs' motion for partial summary judgment—their second such motion in this case (*see*

14  Dkts. 32-34)—requires only a brief response. Plaintiffs do not seek summary judgment on either of

15  their remaining causes of action. Instead, they focus on YouTube's affirmative defenses. PPMSJ at

16  10-21. But Plaintiffs' inability to make out a prima facie case in support of their allegations of

17  defamation or tortious interference moots any issues concerning YouTube's defenses. In any event,

18  Plaintiffs are not entitled to summary judgment on those defenses.

19         The flaws in Plaintiffs' arguments about several of YouTube's defenses are addressed above.

20  For example, a reasonable jury could find, based on numerous facts in the record, that Plaintiffs have

21  unclean hands. *Supra* n.10; *see also supra* n.7 (law of the case), n.9 (contract). As for the others:

22  •   YouTube's First Amendment and good faith defenses substantially overlap with the
       issues that Plaintiffs must prove to establish their claims. Those defenses are based on the
23     fact that YouTube had a legitimate (indeed, a correct) belief that the view count for the
       LuvYa video had been manipulated in violation of YouTube's TOS. For the same reasons
24     that YouTube is entitled to summary judgment on those issues (*supra* pp. 12-14), Plaintiffs'
       request to have the defenses dismissed should be denied.

25

26    ───────────────

         [18] Given that PCS was owned by Mr. Sieber's son, who also owned stakes in Song fi and Rasta
27  Rock Corp. (Dippo Decl. Ex. 36; D. Sieber Tr. 32:22-33:4), it defies belief that PCS stopped funding
    Mr. Sieber's quixotic enterprise because of the supposed aspersions cast by the Notice. Indeed,
28  Derrick Sieber testified that he knew the LuvYa video did not include inappropriate material.
    D. Sieber Tr. 43:5-45:2, 66:20-67:10.

- A jury could reasonably find for YouTube on its failure to mitigate damages defense in light of Plaintiffs' admission that they did nothing to promote the LuvYa video after it was relocated, and did not even change the link to the Notice from webpages that were under their control. Sieber Decl. ¶ 38; RRC Tr. 76:5-79:13. Plaintiffs offer nothing but misplaced rhetoric on this point (PPMSJ at 21), which does not overcome the evidence (and implications) of their inaction.

Finally, in a one-page argument at the end of their motion, Plaintiffs seek summary judgment on a "fact" that they describe as an "aspect of their claim for exemplary damages": that YouTube supposedly harmed others—*including Joyce Bartholomen*—by posting the same allegedly "false and defamatory" Notice used here. PPMSJ at 22. Even if this unusual request were proper under Rule 56, it should be rejected. *First*, Plaintiffs put the cart before the horse. They offer nothing to establish that YouTube's Notice was unlawful even as to themselves, to say nothing of third parties. Since Plaintiffs are not even seeking summary judgment on liability or compensatory damages (and could not do so), they have no basis for asking the Court to address their claim for exemplary damages, which would require not just a finding of liability, but "clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294(a). There is nothing like that here.

*Second*, Plaintiffs are wrong in suggesting that YouTube's use of the same notice in other cases supports exemplary damages here. Indeed, the premise of Plaintiffs' argument—that Joyce Bartholomew (and others) were harmed by YouTube's supposedly "false and defamatory" notice (PPMSJ at 22)—is directly contrary by the Court of Appeal's ruling in Ms. Bartholomew's own case, which held, as a matter of law, that the Notice is *not* defamatory. Plaintiffs cannot base a claim for exemplary damages on a legal theory definitively rejected by the state courts. Beyond that, the fact that YouTube used the same notice for other videos only confirms its good faith. The use of such a generic notice underscores that YouTube was not making any statement about the nature of Plaintiffs' video, the specific reasons it was removed, or Plaintiffs' individual conduct—much less seeking to harm Plaintiffs personally or disrupt their business relationships. *Supra* pp. 21-22. In short, the "fact" that Plaintiffs would have the Court consider works only to undermine their claims on the merits; it does nothing to advance their bid for exemplary damages.

## **CONCLUSION**

For these reasons, summary judgment should be granted in favor of YouTube and Plaintiffs' motion for partial summary judgment should be denied.

1

2   DATED: November 21, 2017

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI

Professional Corporation

By:  /s/ Brian M. Willen
          Brian M. Willen

Attorneys for Defendants
GOOGLE INC. AND YOUTUBE, LLC