IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| SONG FI, INC., et al.,<br><br>  Plaintiffs,<br><br>  v.<br><br>GOOGLE INC., et al.,<br><br>  Defendants. | No. 14-cv-05080-CW<br><br>ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br>(Dkt Nos. 211, 212, 221, 226) |

Before the Court are the parties' cross motions for summary judgment. Plaintiffs Song Fi, Inc., Rasta Rock, Inc., Joseph N. Brotherton, and N.G.B. move for summary judgment on Defendants Google Inc. and Youtube, LLC's first, second, third, fifth, sixth, seventh, and ninth affirmative defenses, as well as summary adjudication of the fact that Defendants have harmed others by using the same take-down notice, which is relevant to their claims for exemplary damages. Docket No. 221. Defendants move for summary judgment on both of Plaintiffs' affirmative claims, libel and tortious interference. Docket No. 212. On December 19, 2017, the parties appeared for a hearing on both motions. Having considered the papers and the arguments of counsel, the Court DENIES Plaintiffs' motion and GRANTS Defendants' motion.

BACKGROUND

Rasta Rock produced "Luv ya," a music video featuring a five year-old boy (N.G.B.) and five-year girl who dress up and go to a restaurant for lunch on Valentine's Day. See Declaration of

Joseph Brotherton (Brotherton Decl.), Ex. 3. Rasta Rock Opera, a music group which includes Joseph Brotherton, performs a song in the background. See id. Song Fi has an ownership interest in Rasta Rock and publishes and distributes Rasta Rock Opera's music. Declaration of Samuel Dippo (Dippo Decl.), Ex. 2 (Song Fi Depo. Trans.) at 48, 89. Song Fi also aims to create a revolutionary music platform for the distribution of other artists' music, but has never launched its product. Id. at 43. On February 14, 2014, Song fi uploaded the "Luv ya" music video to YouTube, a service that allows users to upload videos that can be viewed by people around the world. Id. at 88-89; Declaration of Katie Hushion Haas (Haas Decl.) ¶¶ 2, 4. In doing so, Song Fi agreed to the then-effective YouTube Terms of Service (TOS). Haas Decl. ¶ 2-3.

YouTube displays a view count for each video uploaded to the service, which indicates the number of times that YouTube believes people have requested to view the video. Haas Decl. ¶ 5. In the two months that followed, "Luv ya" accumulated approximately 23,000 views. Brotherton Decl. ¶ 2; Haas Decl. ¶ 23.

On April 18, 2014, YouTube removed "Luv ya," replacing the music video with a statement that read, "This video has been removed because its content violated YouTube's Terms of Service . . . Sorry about that." Docket No. 121 (Answer) ¶ 135; Declaration of Stephen Sieber, Ex. 2 (Notice). YouTube reposted the video at a new URL, resetting the view count. Haas Decl. ¶ 16. At this time, the video could no longer be seen at its original URL, and the page no longer referred to either Rasta

2

1  Rock or Song Fi.  Id. ¶ 18; see also Notice.  The Notice also
2  linked to YouTube's Community Guidelines, which provides
3  information on the type of conduct that violates YouTube's rules,
4  including spam.  Dippo Decl., Ex. 25; Haas Decl. ¶ 18.  The
5  Notice and the Community Guidelines are generic documents and
6  were not specifically drafted to be used for the "Luv ya" video.
7  Haas Decl. ¶ 19.  YouTube has posted the same Notice in thousands
8  of other instances in 2014 where it removed videos for view count
9  fraud and other violations.  Id.
10     YouTube's algorithms had detected over 188,000 fraudulent
11 viewing requests for the "Luv ya" video, which were automatically
12 marked as spam and blocked from the view count.  Declaration of
13 Mohith Rao Kotagiri (Kotagiri Decl.) ¶ 11.  This triggered
14 YouTube's suspicions and prompted it to audit the "Luv ya"
15 video's view count.  Id. ¶¶ 14-15, 18; see also Sieber Decl., Ex.
16 33 (Defendants' Answer to Plaintiffs' Interrogatory No. 4).  The
17 audit revealed that the pattern of traffic was "highly
18 anomalous," with sharp spikes of views on some days and almost no
19 views on others, as well as a large percentage of views coming
20 from the same types of devices and running on an outdated version
21 of the operating system.  Haas Decl. ¶ 22; Kotagiri Decl. ¶¶ 15-
22 18; Defendants' Answer to Plaintiffs' Interrogatory No. 4; Dippo
23 Decl., Ex. 4 (YouTube Depo. Trans.) 33-34, 79-80.
24     Shortly thereafter, on April 22, 2014, Rasta Rock Opera
25 founder Stephen Sieber (also known as Stevie Marco) contacted
26 YouTube to attempt to reinstate the video's view count through
27 YouTube's appeal process.  Haas Decl. ¶ 21; Dippo Decl., Ex. 26.
28 That same day, YouTube responded that the removal of "Luv ya" was

3

justified due to a violation of Section 4H.  Id.  YouTube advised that it had reinstated the video on a new URL, without previous views, likes, and comments.  Id.  It further advised that Section 4H prohibits use of any automated system such as "robots," "spiders," or "offline readers" that access the service "in a manner that sends more request messages to the YouTube servers in a given period of time than a human can reasonably produce in the same period by using a conventional on-line web browser."  Id.  Moreover, Section 4H also prohibits gaining views through other automated or deceptive means.  Id.

On May 12, 2014, counsel for Plaintiffs wrote a letter to David Drummond, a member of Google's Board of Directors and Chief Legal Officer.  Dippo Decl., Ex. 27.  This letter stated that it constituted "notice that YouTube's arbitrary removal of, and continued refusal to reinstate, Mr. Marco's video is interfering, without justification, with Song Fi and Mr. Marco's prospective economic relationships."  Id.  The letter requested that the video be reinstated or that YouTube provide firm evidence of a violation of YouTube's TOS.  Id.  On July 22, 2014, counsel for Plaintiffs sent a letter to YouTube's CEO Susan Wojcicki attaching a copy of the May 12, 2014 letter as well as a draft version of the complaint in this case.  Dippo Decl., Exs. 28-29.

Three days later, on July 25, 2014, Song fi filed this lawsuit in the United States District Court for the District of Columbia.  Docket No. 1.  The court denied Song fi's motion for a TRO and preliminary injunction and transferred the case to this district.  Docket Nos. 12, 19-21.  On a series of motions to dismiss, this Court dismissed Plaintiffs' claims for breach of

4

1  contract, libel per se, violation of the Consumer Legal Remedies
2  Act and the Cartwright Act, and fraud.  Docket Nos. 53, 97, 115.
3  Only Plaintiffs' claims for libel per quod and tortious
4  interference remain.

## LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute.  Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289.  The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case.  The substantive law will identify which facts are material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of

5

production by either of two methods:

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d 1099, 1106 (9th Cir. 2000).

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim. Id.; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990); Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991). If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." Bhan, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation. Nissan, 210 F.3d at 1105. If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists. Id.

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition.

Id.  This is true even though the non-moving party bears the ultimate burden of persuasion at trial.  Id. at 1107.

DISCUSSION

I.  Defendants' Motion for Summary Judgment on Plaintiffs' Affirmative Claims

    A.  Libel Per Quod

"Libel is a false and unprivileged publication by writing . . . or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation."  Cal. Civ. Code § 45.  California recognizes two types of libel: libel per se, which is defamatory on its face, and libel per quod, which a reasonable reader would be able to recognize "only by virtue of his or her knowledge of specific facts and circumstances, extrinsic to the publication, which are not matters of common knowledge rationally attributable to all reasonable persons."  Bartholomew v. YouTube, LLC., 17 Cal. App. 5th 1217, 1226-27 (2017) (quoting Barnes-Hind, Inc. v. Superior Court, 181 Cal. App. 3d, 377, 386-87 (1986)).  Libel per quod requires the plaintiff to prove that he or she has suffered special damages as a proximate result of the published statement.  Id. at 1227.

Defendants argue that Bartholomew v. YouTube is controlling.  The California Court of Appeal considered issues and facts that are very similar to the ones in this case.  Bartholomew, a Christian musician, posted a music video on YouTube, which YouTube removed because of the use of automated systems to generate views.  17 Cal. App. 5th at 1221-22.  YouTube posted the

7

1  same Notice as that here, along with a link to what appears to be
2  the same Community Guidelines.  Id. at 1222.  The Community
3  Guidelines listed a number of potential violations, including
4  "Sex and Nudity," "Hate Speech," "Shocking and Disgusting,"
5  "Children," "Copyright," "Privacy," and "Harassment."  Id.  On
6  demurrer, the court held that the Notice was not defamatory.  The
7  court first noted that the law dictated that "[i]f no reasonable
8  reader would perceive in a false and unprivileged publication a
9  meaning which tended to injure the subject's reputation in any of
10 the enumerated respects, then there is no libel at all."  Id. at
11 1226.  It then held that "an Internet user with a reasonable
12 working knowledge of the [sic] how internet hyperlinks work would
13 have understood that the list on the Community Guideline Tips
14 page is in fact general—that no one particular offense could be
15 reasonably read to apply to Bartholomew's video and that the
16 categories applied to the many thousands of videos that YouTube
17 might have had to remove for any number of reasons."  Id. at
18 1229.  The court further held: "Given the sheer breadth of the
19 items covered in YouTube's terms of service, and even taking into
20 consideration Bartholomew's profession, we do not think that the
21 removal statement can be deemed to subject her to 'hatred,
22 contempt, ridicule, or obloquy, or [cause her] to be shunned or
23 avoided' or tend to 'injure [her] in [her] occupation.'"  Id. at
24 1233.  Thus, the Notice could not be read to be making a
25 defamatory statement of and concerning Bartholomew.  Id.
26     On matters of California law, this Court is "bound to follow
27 the decisions of the California Court of Appeal unless there is
28 convincing evidence that the California Supreme Court would hold

8

otherwise." Carvalho v. Equifax Info. Servs., LLC, 629 F.3d 876, 889 (9th Cir. 2010). Bartholomew involves essentially the same material facts as this case, including the same Notice and Community Guidelines posted by YouTube. Moreover, the Bartholomew court's reasoning is persuasive. YouTube's Notice is generic and does not identify any particular type of offense. It refers to the Community Guidelines, which list a multitude of possible offenses that could have resulted in the removal of the video. Accordingly, it is unlikely that any reasonable reader would interpret the Notice and Community Guidelines in such a way as to expose Plaintiffs to "to hatred, contempt, ridicule, or obloquy," or cause them to be "shunned or avoided," or to be injured in their occupation. Cal. Civ. Code § 45.

Plaintiffs attempt to distinguish Bartholomew by arguing that their video was about children, making it more likely that viewers would conclude that the "Children" section prohibiting "inappropriate children's content" of the Community Guidelines applied and that Plaintiffs had engaged in "some serious wrongdoing involving children." Pl. Opp. at 7. But the uncontroverted evidence shows that YouTube removed the video and any reference to Plaintiffs from the original URL and posted the Notice in its place. See Original Notice; Haas Decl. ¶ 18. Thus, visitors to the original URL would not see that the video was about children, and would be unlikely to conclude that the section about "Children" applied. Without more, a reasonable reader would not jump to the conclusion that the video involved inappropriate children's content. Moreover, the Bartholomew court rejected a similar argument. Bartholomew, a Christian

9

musician, alleged that the Notice and Community Guidelines as a whole "imputed to her a want of character." Bartholomew, 17 Cal. App. 5th at 1222-24. The court rejected this argument, stating that, "even taking into consideration Bartholomew's profession," the "sheer breadth of topics covered by the [Community Guidelines] simply cannot be reasonably read to apply to Bartholomew." Id. at 1232-33. The same reasoning applies here.[1]

Defendants separately argue that Plaintiffs cannot prove several of the required elements of their libel claim. Several of these arguments provide alternative grounds for granting summary judgment on Plaintiffs' libel claim.

Defendants challenge that Plaintiffs have provided no evidence that any third party actually understood the statement as defamatory and about Plaintiffs. See Palm Springs Tennis Club v. Rangel, 73 Cal. App. 4th 1, 5-7 (1999); Hecimovich v. Encinal Sch. Parent Teacher Org., 203 Cal. App. 4th 450 (2012). Plaintiffs point to the declarations of six individuals, provided for the first time with their opposition brief: Alexandre Abdoulaev, Jared Selikson, Yillah Natalie Rosenfeld, Derrick Sieber, Hieu Le, and Joseph Yu. Defendants argue that the six declarants were not disclosed pursuant to Rule 26(a) and thus

---

[1] Plaintiffs make much of the fact that the Bartholomew court distinguished an earlier decision in this case by noting that "the plaintiff was able to allege that it was associated with a specific wrongdoing, 'inappropriate children's content.'" Id. at 1232 n.9 (citing Song Fi, Inc. v. Google, Inc. 2016 WL 1298999, *2-3 (N.D. Cal. Apr. 4, 2016)). But the Bartholomew court noted in the same footnote that it disagreed with this Court's decision. See id. ("To the extent that the two federal cases upon which Bartholomew relies come to a different conclusion, we respectfully disagree.").

10

1   their declarations must be excluded pursuant to Federal Rule of
2   Civil Procedure 37.  "A party that does not timely identify a
3   witness under Rule 26 may not use that witness to supply evidence
4   at a trial 'unless the failure was substantially justified or is
5   harmless.'"  Ollier v. Sweetwater Union High Sch. Dist., 768 F.3d
6   843, 861 (9th Cir. 2014) (quoting Fed. R. Civ. P. 37(c)).  A
7   district court has "wide latitude" to exclude witnesses pursuant
8   to Rule 37.  Yeti by Molly, Ltd. v. Deckers Outdoor Corp., 259
9   F.3d 1101, 1106 (9th Cir. 2001).  Plaintiffs apparently did not
10  include these witnesses in their disclosures.  Nor did they
11  produce any evidence from them during discovery, which closed in
12  February 2017.  As a result, Defendants did not have an adequate
13  opportunity to depose or seek discovery from these witnesses.
14  Because Plaintiffs failed to disclose the six declarants, and
15  their nondisclosure was not substantially justified or harmless,
16  these declarants will be excluded from consideration.
17  Accordingly, Plaintiffs have not provided any evidence
18  demonstrating that a third party actually understood the
19  statement as defamatory and about them.
20       Defendants further contend that Plaintiffs have no evidence
21  of special damages.  Plaintiffs respond with the declarations of
22  Joseph Brotherton, Derrick Sieber, and Stephen Sieber, which each
23  state conclusorily that they lost financial opportunities because
24  of YouTube's removal of the video.  See, e.g., Brotherton Decl.
25  ¶ 4 ("I had been promised $2,000 by Stephen Sieber AKA 'Stevie
26  Marco' in early April 2014 for participating in upcoming Rasta
27  Rock Opera (RRO) local performances.  They never occurred due to
28  YouTube's removal of the 'LuvYa' video from its website and

11

1  replacement of the video with a false Notice claiming that the
2  content of the video video [sic] violated YouTube's Terms of
3  Service.")  But these declarations fail to provide facts to
4  establish that any loss was proximately caused by defamation by
5  YouTube.  The declarations do not claim that investors were
6  deceived by YouTube's false statement, believed Plaintiffs' video
7  showed inappropriate content, and as a result refused to fund
8  Plaintiffs.  Accordingly, Plaintiffs have not established special
9  damages with the requisite level of particularity.  Gomes v.
10 Fried, 136 Cal. App. 3d 924, 939-40 (1982).

    B.   Tortious Interference

12      To establish tortious interference with prospective economic
13 relationships, Plaintiffs must prove: "(1) an economic
14 relationship between the plaintiff and some third party, with the
15 probability of future economic benefit to the plaintiff; (2) the
16 defendant's knowledge of the relationship; (3) intentional acts
17 on the part of the defendant designed to disrupt the
18 relationship; (4) actual disruption of the relationship; and (5)
19 economic harm to the plaintiff proximately caused by the acts of
20 the defendant."  Korea Supply Co. v. Lockheed Martin Corp., 29
21 Cal. 4th 1134, 1153 (2003).  Plaintiffs must also show that
22 Defendants' "conduct was wrongful by some measure other than an
23 interference with the plaintiff's interest itself."  Della Penna
24 v. Toyota Motor Sales, U.S.A., Inc., 11 Cal. 4th 376, 379 (1995).
25      Plaintiffs rely on their defamation claim to establish that
26 Defendants' actions were otherwise legally wrongful.  Docket No.
27 115 (Order on MTD) at 13-14.  Because Plaintiffs' defamation
28 claim fails, their tortious interference claim must also fail.

In addition, Plaintiffs cannot prove that Defendants knew of Plaintiffs' alleged relationships and acted intentionally to harm those relationships. Plaintiffs allege that Defendants disrupted two potential economic relationships, with Nike and Precision Contracting Solutions (PCS). With respect to Nike, Plaintiffs allege that their counsel's July 22, 2014 letter attaching a draft complaint which mentioned Nike gave Defendants notice of Plaintiffs' relationship with Nike. But Plaintiffs allege that Nike was to hire Plaintiffs for a July 4, 2014 performance, which had long passed by the time Defendants received the letter and learned of Plaintiffs' alleged relationship with Nike. Defendants therefore could not have known of Plaintiffs' alleged relationship and acted intentionally to harm that relationship. The July 22, 2014 letter did not specifically identify PCS. Thus, Plaintiffs cannot establish that Defendants had knowledge of Plaintiffs' relationships and acted intentionally to harm those relationships. See, e.g., Dryden v. Tri-Valley Growers, 65 Cal. App. 3d 990, 997 (1977) (no interference claim where "disputed contracts had been abandoned and discontinued" months before defendant's alleged wrongdoing).

Additionally, Plaintiffs have not put forth any evidence that Defendants actually interfered with Plaintiffs' relationships. According to email correspondence between Plaintiffs and Nike, the Nike performance did not go forward because Nike never approved the performance in the first place and Nike and Plaintiffs had an unrelated dispute about trademark usage. Dippo Decl., Ex. 33. Nike officials submitted declarations authenticating the correspondence and corroborating

the statements made in that correspondence.  Declaration of Carol Kauffman (Kauffman Decl.) ¶¶ 2-6; Declaration of Ryan Schafer (Schafer Decl.) ¶¶ 2-5.  Nike officials have also stated that they never saw the YouTube video and that it did not factor in their decision.  Id.  As for PCS, it appears from Plaintiffs' depositions that this company was owned and operated by Sieber's son, Derrick Sieber, and that it continued to fund Plaintiffs until at least October 2014, which was long after this lawsuit was filed.  Dippo Decl., Ex. 6 (Derrick Sieber Trans.) 25:2-4; Dippo Decl., Ex. 3 (Rasta Rock Trans.) 54-55.  Plaintiffs have produced checks indicating funding through December 2014.  Dippo Decl., Ex. 34; Song fi Trans. 185-86, 194-95.  Plaintiffs themselves have submitted a declaration indicating that their relationship with PCS continued through at December 5, 2016.  See Declaration of Stephen Sieber in Support of Opposition (Sieber Opp. Decl.) ¶ 11.

For all these reasons, Plaintiffs cannot prevail on their tortious interference claim.

II. Plaintiffs' Motion for Partial Summary Judgment on Exemplary Damages Issue and Defendants' Affirmative Defenses

The Court need not reach Plaintiffs' motion for summary judgment on the exemplary damages issue and Defendants' affirmative defenses because none of Plaintiffs' affirmative claims survives.

CONCLUSION

Plaintiffs' motion for summary judgment (Docket No. 221) is DENIED and Defendants' motion for summary judgment (Docket No. 212) is GRANTED.  The Clerk shall enter judgment in favor of

14

1  Defendants.  Defendants shall recover their costs from
2  Plaintiffs.
3       IT IS SO ORDERED.
4  Dated: May 15, 2018



   CLAUDIA WILKEN
   United States District Judge